UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
-------------------------------------------------------------x

BYD COMPANY LTD.,

                Plaintiff,

       v.

VICE MEDIA LLC,

           Defendant.

-------------------------------------------------------------x

Case No. 1:20-cv-03281

Hon. Alison J. Nathan

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS THE COMPLAINT

Rachel F. Strom
Amanda B. Levine
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Tel: (212) 489-8230
Fax: (212) 489-8340
rachelstrom@dwt.com
amandalevine@dwt.com

*Attorneys for Defendant VICE Media LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

I.       THE PARTIES..........................................................................................................3

II.      THE NDAA BANS USING U.S. FUNDS TO PURCHASE BYD ELECTRIC
         BUSES .................................................................................................................3

III.     ASPI'S REPORT LINKS BYD TO FORCED LABOR ....................................................5

IV.      VICE COVERS THE ASPI REPORT..........................................................................7

V.       BYD FILES A COMPLAINT AGAINST VICE ............................................................9

ARGUMENT ...................................................................................................................9

I.       THE ARTICLE'S HEADLINE IS NON-ACTIONABLE AND TRUE...........................10

         A.      The Headline Is a Fair Index of the Article's Truthful Contents ...........................10

         B.      The Headline Is a Privileged Fair Report of Governmental Proceedings.............14

II.      VICE'S REPORTING ON THE ASPI REPORT IS NON-ACTIONABLE....................15

         A.      VICE's Reliance on the ASPI Report Precludes a Finding of Actual Malice ......16

         B.      Alternatively, The Neutral Reportage Privilege Protects VICE's Statement .......23

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Belizaire v. Rav Investigative & Sec. Servs. Ltd.*,
    61 F. Supp. 3d 336 (S.D.N.Y. 2014)........................................................................5

*Biro v. Condé Nast*,
    807 F.3d 541, *aff'd* 622 F. App'x 67 (2d Cir. 2015)..................................16, 17, 19

*Biro v. Condé Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012).....................................................................13

*Biro v. Condé Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013)...............................................................16, 18

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984)................................................................................................16

*Cabello-Rondón v. Dow Jones & Co.*,
    2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017)..................................................11, 22

*Cabello-Rondon v. Dow Jones & Co.*,
    720 F. Appx. 87 (2d Cir. 2018)...............................................................................17

*Celle v. Filipino Reporter Enters., Inc.*,
    209 F.3d 163 (2d Cir. 2000)....................................................................................18

*Chaiken v. VV Pub. Corp.*,
    119 F.3d 1018 (2d Cir. 1997)..................................................................................25

*Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*,
    364 F. Supp. 3d 253 (S.D.N.Y. 2019)......................................................................4

*Church of Scientology Intn'l. v. Behar*,
    238 F.3d 168 (2d Cir. 2001)....................................................................................10

*Coliniatis v. Dimas*,
    965 F. Supp. 511 (S.D.N.Y. 1997) .........................................................................24

*Curtis Publ'g Co. v. Butts*,
    388 U.S. 130 (1967)................................................................................................16

*Edwards v. National Audubon Society, Inc.*,
    556 F.2d 113 (2d Cir. 1977)........................................................................23, 24, 25

*Fodor v. Berglas*,
    1995 WL 505522 (S.D.N.Y. Aug. 24, 1995) ........................................................................21

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ........................................................................................16, 17, 19

*Greene v. Paramount Pictures Corp.*,
    340 F.Supp.3d 161 (E.D.N.Y. 2018) ...................................................................................17

*Holland v. JPMorgan Chase Bank*,
    2020 WL 4054834 (S.D.N.Y. Aug. 28, 2019) .........................................................................5

*Idema v. Wagner*,
    120 F. Supp. 2d 361 (S.D.N.Y. 2000) ................................................................................14

*Johnson & Johnson v. Am. Nat'l Red Cross*,
    528 F. Supp. 2d 462 (S.D.N.Y. 2008) ..................................................................................4

*Kerik v. Tacopina*,
    64 F. Supp. 3d 542 (S.D.N.Y. 2014) .................................................................................17

*Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System, Inc.*,
    844 F.2d 955 (2d Cir. 1988) ..........................................................................................23

*Levin v. McPhee*,
    917 F. Supp. 230 (S.D.N.Y. 1996) ...............................................................................24, 25

*Loeb v. New Times Commc'ns Corp.*,
    497 F. Supp. 85 (S.D.N.Y. 1980) .....................................................................................22

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ...................................................................................................11

*Med-Sales Assocs., Inc. v. Lebhar-Friedman, Inc.*,
    663 F. Supp. 908 (S.D.N.Y. 1987) ....................................................................................22

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt LP*,
    2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ...................................................................17, 18

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................................................16

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019) .......................................................................................19, 20

*Ramsaran v. Abraham*,
    2017 WL 1194482 (S.D.N.Y. Mar. 30, 2017) .........................................................................10

*Reliance Ins. Co. v. Barron's*,
  442 F. Supp. 1341 (S.D.N.Y. 1977) ..............................................................18

*Scalabrini v. PMAB, LLC*,
  2020 WL 1049167 (S.D.N.Y. Mar. 3, 2020) ....................................................5

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ...............................................................................16, 19

*Tannerite Sports LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017) ......................................................................11

*Test Masters Educ. Servs. v. NYP Holdings, Inc.*,
  603 F. Supp. 2d 584 (S.D.N.Y. 2009) ..............................................10, 11, 15

*Volpe v. Am. Language Commc'n Ctr., Inc.*,
  200 F. Supp. 3d 428 (S.D.N.Y. 2016) .............................................................5

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015) .............................................................5

*Wheeler v. Twenty-First Century Fox*,
  322 F. Supp. 3d 445 (S.D.N.Y. 2018) ...........................................................17

**State Cases**

*Adelson v. Harris*,
  402 P.3d 665 (Nev. 2017) ..............................................................................5

*Aronson v. Wiersma*,
  65 N.Y.2d 592 (1985) ..................................................................................13

*Cholowsky v. Civiletti*,
  887 N.Y.S.2d 592 (2d Dep't 2009) ...............................................................14

*Cohn v. Nat'l Broad. Co.*,
  50 N.Y.2d 885 (1980) ..................................................................................13

*Goldblatt v. Seaman*,
  225 A.D.2d 585 (2d Dep't 1996) ..................................................................19

*Gross v. New York Times Co.*,
  281 A.D.2d 299 (1st Dep't 2001) .................................................................23

*Gunduz v. New York Post Co.*,
  188 A.D.2d 294 (1st Dep't 1992) .................................................................11

*Hayt v Newsday, LLC*,
  176 A.D.3d 787 (2d Dep't 2019) ..................................................................14

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*,
   49 N.Y.2d 63 (1979) ................................................................................14, 15, 20

*Huggins v. Moore*,
   94 N.Y.2d 296 (1999) ...............................................................................................25

*Immuno A.G. v. Moor-Jankowski*,
   145 A.D.2d 114 (1st Dep't 1989) ...............................................................................1

*Khan v. N.Y. Times Co.*,
   269 A.D.2d 74 (1st Dep't 2000) ...............................................................................21

*Komarov v. Advance Mag. Publishers, Inc.*,
   691 N.Y.S2d 298, 300 (Sup. Ct. N.Y. Cty. 1999) ...................................................15

*Muscarella v. Berkshire Hathaway*,
   278 A.D.2d 854 (4th Dep't 2000) .............................................................................15

*Ortiz v. Valdescastilla*,
   102 A.D.2d 513 (1st Dep't 1984) .............................................................................21

*Pelayo v. Celle*,
   270 A.D.2d 469 (2d Dep't 2000) ..............................................................................14

*Rakofsky v. Wash. Post*,
   2013 WL 1975654 (Sup. Ct. N.Y. Cnty. Apr. 29, 2013).........................................21

*Sandals Resorts Int'l. Ltd. v Google, Inc.*
   86 A.D.3d 32 (1st Dep't 2011) ...................................................................................5

*St. Louis v NYP Holdings, Inc.*,
   2017 WL 887255 (Sup Ct. N.Y. Cty. Fen. 6, 2017) ..........................................11, 15

*Sweeney v. Prisoners' Legal Services of New York, Inc.*,
   84 N.Y.3d 786 (N.Y. 1995) ......................................................................................22

*Von Gerichten v. Long Island Advance*,
   202 A.D.2d 495 (2d Dep't 1994) ..............................................................................10

*White v Berkshire-Hathaway*,
   802 N.Y.2 (Sup Ct. Erie Cty. 2005)..........................................................................11

**Federal Statutes**

National Defense Authorization Act of 2020, Pub. Law No. 116-92, 133 Stat. 1198....................3

Defendant VICE Media LLC ("VICE") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

In this defamation action, BYD Company Ltd. ("BYD"), a Chinese-based company that is "one of the world's largest manufacturers and suppliers of electric vehicles" asks this Court to chastise VICE for accurately reporting a newsworthy story based on reliable sourcing merely because BYD does not like the way the article portrays it. This case, a classic example of an "instrument[] of harassment and coercion inimical to the exercise of First Amendment rights," *Immuno A.G. v. Moor-Jankowski*, 145 A.D.2d 114, 128 (1st Dep't 1989), *aff'd*, 74 N.Y.2d 548 (1989), *vacated*, 497 U.S. 1021 (1990), *aff'd*, 77 N.Y.2d 235 (1991), calls out for immediate and early dismissal. This Court should not "unnecessarily delay the disposition of [this] libel action," *id.*, where it meritless on its face.

After BYD made headlines for entering into a $1 billion contract with the state of California for the production of personal protective equipment, VICE took a broader look into the company. VICE reported on legislation that prohibited BYD from supplying its vehicles to federally funded projects in the United States—something BYD does not and cannot deny. It also reported on BYD's "possible links to forced labor," by citing to a study from the Australian Strategic Policy Institute ("ASPI"), which reported that BYD and 82 other international companies, such as Apple and Nike, benefitted from Uyghur forced labor in their supply chains.

Instead of taking VICE up on its numerous attempts to get a comment or feedback from BYD before the article was published, BYD, acting as an archetypal "Monday morning quarterback," now brings this defamation suit by cherry-picking two out-of-context sentences

from the article and arguing that they are false and defamatory. But this tactic has no merit.

**First**, BYD takes issue with the article's headline that President Trump "blacklisted" BYD despite itself claiming that it was "targeted" by the legislation that Trump signed that banned it from supplying its electric vehicles to certain projects in the United States. But because there was no literal list "maintained by Trump," BYD argues that term "blacklist" is false and defamatory. This argument is easily dismissed. The article's headline is unquestionably a "fair index" of the article's accurate reporting on the legislation signed by Trump. In any event, the description of BYD as "blacklisted" by the President is a non-actionable fair and true report of governmental action and, therefore, privileged under New York Civil Rights Law § 74.

**Second**, BYD argues that the article's statement that "BYD was one of 83 companies identified in the report as using Uighur forced labor in its supply chain" is false and defamatory. But this statement is an accurate characterization of the ASPI study, which is unquestionably a reliable source. Indeed, by the time that VICE published its article, numerous members of the U.S. government had already relied on the accuracy of the ASPI report and introduced legislation based on it. In the face of this, BYD, a public figure, has not and cannot sufficiently allege that VICE published the statement with actual malice. Even more, the Second Circuit has recognized a privilege that protects reporting in this exact situation—an article neutrally reporting on a reliable study. Under either theory, there can be no liability for relying on a report that numerous legislators themselves already relied on. This lawsuit is a clear attempt to deflect blame onto VICE for reporting on the serious allegations that have been leveled against BYD. But BYD should not be able to draft VICE into costly and lengthy discovery when this lawsuit is meritless. This Court should dismiss BYD's Complaint.

<u>**STATEMENT OF FACTS**</u>

**I.     THE PARTIES**

Plaintiff BYD (an acronym for "Build Your Dreams") is a publicly traded corporation headquartered in China that describes itself as "one of the world's largest manufacturers and suppliers of electric vehicles, including electric cars, trucks, buses, and forklifts" as well as a manufacturer of solar panels and lithium batteries. *See* Compl. ¶¶ 2, 18 [Dkt No. 1]. In January 2020—despite apparently having no experience developing personal protective equipment—BYD opened "the world's largest PPE face-mask plant" in China, and, in April 2020, it signed a $1 billion contract with California to ship hundreds of millions of masks to the state. *Id.*

VICE is a digital media and broadcasting company that operates numerous news platforms and services, including the website www.vice.com.

**II.    THE NDAA BANS USING U.S. FUNDS TO PURCHASE BYD ELECTRIC BUSES**

Over the last few years, BYD has sold electric vehicles and other electric products to municipalities and state governments—a process that has led to both judicial and legislative scrutiny. Most notably, in December 2019, Congress passed and the President signed into law the National Defense Authorization Act (the "NDAA"). Among other things, the NDAA prohibited the use of federal funds for the purchase of rail cars and buses from companies owned or subsidized by the Chinese government. *See* National Defense Authorization Act of 2020, Pub. Law No. 116-92, 133 Stat. 1198. In practice, however, the bill affected only two electric vehicle manufacturers—one of which was BYD. Strom Decl. Ex. B. at 2.

As BYD alleges, it was not always the target of this legislation. Compl ¶ 10. As initially written in the House of Representatives, the NDAA would have only applied to the procurement of passenger rail cars and, therefore, would not have affected BYD (as a manufacturer of buses). *See* Strom Decl. Ex. C. The Senate version of the legislation, sponsored by Senators John

Cornyn and Tami Baldwin, was more restrictive and also applied to buses. *Id.* Prior to the passage of the NDAA, Senator Cornyn expressed special concern with BYD, tweeting[1]:



He echoed these concerns during testimony given to the Committee on Banking, Housing, and Urban Affairs following the NDAA's enactment, stating, "I was concerned when I found out certain Chinese state-controlled companies like . . . Build Your Dreams (BYD) were submitting unrealistically low bids for transit projects in major U.S. cities in an attempt to put competition out of business." Strom Decl. Ex. D. He noted, however, "Congress has taken critical action to address the problem" in passing the NDAA. *Id.*[2]

Notably, the Trump Administration specifically endorsed the Senate version of the legislation, which broadened the ban to BYD. In doing so, the Acting Director of the Executive Office of Management and Budget explained that the House version "would only apply to passenger railcars," but "[i]t is critical that such prohibitions cover procurement of all rolling stock transit vehicles to ensure the Nation's economic and national security and to prevent the

---

[1] Courts take judicial notice of statements posted on public officials' social media accounts because the fact that the officials made the statements "can be accurately and readily determined from a source whose accuracy cannot reasonably be questioned." *Christa McAuliffe Intermediate School PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019) (taking judicial notice of statements made by Mayor Bill de Blasio on his Twitter account) (internal quotations omitted).

[2] Courts in this district have found that Congressional testimony constitutes a public record subject to judicial notice. *See Johnson & Johnson v. Am. Nat'l Red Cross*, 528 F. Supp. 2d 462, 464 n.1 (S.D.N.Y. 2008).

use of Federal dollars to support foreign state-controlled enterprises." *See* Strom Decl. Ex. C.[3]

After Trump signed the legislation, BYD issued a statement—to which VICE specifically hyperlinked in the article—excoriating the expanded language, claiming that it was "crafted by special interests and competitors to shrink the U.S. electric bus market by targeting BYD, one of only three major manufacturers of electric buses in the United States." Strom Decl. Ex. E.[4]

## III. ASPI'S REPORT LINKS BYD TO FORCED LABOR

BYD's troubles in the United States—and across the globe—did not end with the passage of the NDAA. On March 1, 2020, the Australian Strategic Policy Institute, an independent think tank, issued a report titled "Uyghurs for Sale: Re-education, forced labour and surveillance beyond Xinjiang" (the "Report"). *See* Pl. Ex. A. The Report claimed:

> The Chinese government has facilitated the mass transfer of Uyghur and other ethnic minority citizens from the far west region of Xinjiang to factories across the country. Under conditions that strongly suggest forced labour, Uyghurs are working in factories that are in the supply chain of at least 83 well-known global brands in the technology, clothing and automotive sectors.

*Id.* at 3. Specifically, the Report identified twenty-seven factories across China that used Uyghur labor. *Id.* at 4. Based on publisher supplier lists, media reports, the factories' own claimed suppliers, and conversations with numerous suppliers, ASPI identified the brands that "directly

---

[3] Courts in this district also take judicial notice of documents retrieved from official government websites. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,* 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (holding that "courts routinely take judicial notice" of documents retrieved from official government websites) (collecting cases); *Scalabrini v. PMAB, LLC,* 2020 WL 1049167 at *4 (S.D.N.Y. Mar. 3, 2020) (taking judicial notice of information retrieved from the Florida Department of State's website).

[4] Courts routinely take judicial notice of information on a party's public website. *See, e.g. Holland v. JPMorgan Chase Bank,* 2020 WL 4054834, at *3 (S.D.N.Y. Aug. 28, 2019); *Belizaire v. Rav Investigative & Sec. Servs. Ltd.,* 61 F. Supp. 3d 336, 352 (S.D.N.Y. 2014) ("As noted above, this Court may take judicial notice of the information that Defendant holds out as true on its publicly available website."); *Volpe v. Am. Language Commc'n Ctr., Inc.,* 200 F. Supp. 3d 428, 431 (S.D.N.Y. 2016) ("This Court also takes judicial notice of the contents of ALCC's website."), *aff'd* 692 F. App'x 51 (2d Cir. 2017). In addition, this statement was incorporated by reference through a hyperlink in the Article. In reviewing the article as a whole, courts will consider the material that is hyperlinked to in the article. *See, e.g., Adelson v. Harris,* 402 P.3d 665, 666 (Nev. 2017) (hyperlink to Associated Press story established privilege because "a hyperlink to source material about a judicial proceeding may suffice as a report within the common law fair report privilege"); *Sandals Resorts Int'l. Ltd. v Google, Inc.* 86 A.D.3d 32, 43 (1st Dep't 2011) (statement alleged to be defamatory was non-actionable opinion based on information contained in hyperlink).

or indirectly benefit[ed] from the use of Uyghur workers . . . through potentially abusive labour transfer programs." *Id.* at 5. BYD was listed as one such brand. *Id.* As support, the Report explained that on May 17, 2018, 105 Uyghur workers were transferred from Xinjiang to Hubei Precision Manufacturing Co. Ltd. ("Hubei"). *Id.* at 34. This factory was a subsidiary of Dongguan Yidong Electronic Co. Ltd ("Dongguan"), which produced parts for electronics. *Id.* Dongguan, in turn, stated on its website that it supplied parts "directly to BYD". Despite the Report stating it reached out to all companies named, BYD did not provide ASPI with comment. *Id.* at 5, 32. ASPI then illustrated this relationship, which actually showed that Hubei—the factory that used 105 Uyghur workers—*directly* sold products to BYD. *Id.* at 24.



Following the Report's publication, the U.S. government took quick action to condemn the use of forced Uyghur labor and to urge the companies named in the Report to reexamine their supply chains. On March 12, 2020, for example, Representative Jennifer Wexton introduced a bill in the House of Representatives titled "Uyghur Forced Labor Disclosure Act of 2020." The "Findings" section of the bill noted that "[i]n a March 2020 report, the Australian Strategic Policy Institute identified 27 factories in nine Chinese provinces that are using Uyghur labor transferred from Xinjiang. These factories indirectly supply global brands, including many American multinational companies." H.R. 6270 §2(7), 116th Cong. (2020); *see* Strom Decl. Ex. G. The bill proposed that companies must include in their annual reports information about whether they imported goods from China's Xinjiang Uyghur Autonomous Region and whether such goods originated in forced labor camps. *Id.* at § 3.[5] Thereafter, on April 3, Representative Ilhan Omar led five other members of Congress in writing a series of letters to CEOs of American companies, citing to the Report, and stating that "American companies using forced Uyghur labor, intentionally or unintentionally is profoundly disturbing" and that "[i]mporting goods made in whole or in part by forced labor is a violation of American law, and numerous international human rights and labor rights standards." Strom Decl. Ex. H at 1. The letters specifically called out American companies, like Apple, that sourced products through Dongguan, whose subsidiary, Hubei, used 105 Uyghur workers. *See* Report at 34.

## IV. VICE COVERS THE ASPI REPORT

On April 11, 2020, VICE published an article on its website, www.vice.com, titled "Trump Blacklisted This Chinese Company. Now Its Making Coronavirus Masks for U.S.

---

[5] Senators Marco Rubio and Representative Jim McGovern similarly introduced a bill that would require corporations importing goods from Xinjiang to prove that no forced labor was used in their supply chains. *See* Strom Decl. Ex. F.

Hospitals" (the "Article").  *See* Strom Decl. Ex. A.[6]  The Article begins by explaining that BYD was the first company approved by the United States Food and Drug Administration to provide respirator masks during the coronavirus outbreak.  *Id.* at 1.  It quickly notes, however, that BYD has had a turbulent past including being "prohibited by law from bidding for some federal contracts in the United States," a "history of supplying allegedly faulty products to the U.S.," and, finally, "possible links to forced labor."  *Id.*  The Article explains each issue in turn.

*First*, the Article states that late last year, Congress drafted legislation that "bans federal funds from being used to buy BYD electric buses effective immediately in Washington, D.C., and starting in 2022 for the rest of the country."  *Id.* at 2.  It notes, "President Donald Trump signed the ban into law in December as part of a defense authorization bill."  *Id.*  The Article includes BYD's response to the legislation and hyperlinks to BYD's press release, where BYD claimed that BYD was specifically targeted by this legislation.  *Id.*  *Second*, the Article explains that "BYD has previously been accused of delivering shoddy products to American taxpayers," recounting an investigation by the Los Angeles Times, which found that BYD's buses stalled on hills and were plagued by mechanical problems.  *Id.* at 3.  *Third*, the Article explains BYD's "possible links to forced labor," in a section titled "human-rights red flags."  *Id.* at 1, 4–5.  The Article notes that "BYD's international business has thrived despite troubling allegations of connections to Uighur forced labor in Xinjian province."  *Id.* at 4.  It then cites to the Report and notes that "BYD was one of 83 companies identified in the report as using Uighur labor in its supply chain, alongside major international brands such as Apple, Nike, and General Motors."  *Id.* at 5.  The Article also includes BYD's previous statements on the subject, noting that BYD

_____

[6] BYD attaches a version of this article to the Complaint as Exhibit B.  This version, however, is pulled from Outline.com, a site that removes "clutter" in articles.  A full version of the relevant article appears online at https://www.vice.com/en_us/article/qjdqnb/trump-blacklisted-this-chinese-company-now-its-making-coronavirus-masks-for-us-hospitals and is attached as Exhibit A to the Strom Declaration.

has "denied allegations of labor abuses" and that "the company has been called a 'model employer' by labor advocates." *Id.*

Despite VICE contacting "two U.S.-based BYD spokespeople," a "U.S.-based lawyer who represents BYD Precision Manufacture," a "Hong Kong-based PR firm," and "a company representative in Europe," BYD never provided comment on the Article. *Id.* at 4.

## V. BYD FILES A COMPLAINT AGAINST VICE

BYD now brings this Complaint against VICE asserting a single claim of defamation based on two statements from the Article. ***First***, BYD claims that a portion of the Article's title—"Trump Blacklisted this Chinese Company"—is defamatory. *See* Compl. ¶¶ 8–9. While BYD recognizes that "Congress passed, and President Trump signed, language in an omnibus defense authorization bill that prohibited future federal funds from being used to purchase transit vehicles from Chinese companies," and while BYD does not deny that it was one of only two companies affected by the legislation, BYD claims it was not literally included in "some sort of list maintained by President Trump." *Id.* ¶ 10. ***Second***, without ever denying that it sources products from Dongguan, whose subsidiary factory had 105 Uyghur laborers transferred there, BYD alleges that it was defamatory for the Article to state, "BYD was one of the companies identified in the report as using forced Uighur labor in its supply chain," *id.* ¶ 4, both because BYD says it does not use forced Uyghur labor in it supply chain and because the Report only states that "BYD did business with a company which owned a subsidiary that (allegedly) had used Uyghur forced labor," *id.* ¶¶ 6, 30.

## ARGUMENT

In order to prevail on a defamation claim, a public figure, like BYD, must plead and prove that the statements at issue are "(1) of and concerning [it], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either

knowledge of falsity or reckless disregard of the truth." *Church of Scientology Intn'l. v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001). "A defamatory statement is actionable only if it is made without authorization or privilege (a requirement that is sometimes listed as part of the elements of a defamation action)." *Ramsaran v. Abraham*, 2017 WL 1194482, at *3 (S.D.N.Y. Mar. 30, 2017) (internal quotes omitted). Here, BYD does not—and cannot—meet this burden on either of the allegedly defamatory statements at issue. Indeed, both statements are privileged as a matter of law. Additionally, the headline here is a fair index of the concededly true statements in the Article and BYD has not and cannot come close to sufficiently pleading that VICE acted with actual malice. This case should be dismissed.

## I.   THE ARTICLE'S HEADLINE IS NON-ACTIONABLE AND TRUE

BYD's claim based on the Article's headline is baseless for two independent reasons. ***First***, the headline is a fair index of the contents of the Article and, therefore, non-actionable. ***Second***, the headline is privileged as a fair and true report of legislative and official proceedings under New York Civil Rights Law § 74 ("Section 74").

### A.   The Headline Is a Fair Index of the Article's Truthful Contents

As is clear by now, BYD admits that it was subject to a legislative "ban," signed by President Trump, that prohibited U.S. projects using federal dollars to purchase BYD vehicles. BYD itself complained that it was the "target" of this bill. *See* Compl. ¶ 10; Strom Decl. Ex. E. Yet, remarkably, BYD still brings this defamation action claiming that the title "Trump Blacklisted This Chinese Company," is false and defamatory. But the law is clear that a headline is not actionable so long as it is a "fair index of the substantially accurate material included in the article." *Test Masters Educ. Servs. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009) (internal quotations omitted); *see also Von Gerichten v. Long Island Advance*, 202 A.D.2d 495, 496 (2d Dep't 1994) (holding that "headline of the article . . . must be read and evaluated in

conjunction with the text it precedes").[7]  "This threshold question is one of law for the court, not a question of fact for a jury.  If the headline is indeed a 'fair index' of the related news article, it is not actionable as a matter of law."  *White v Berkshire-Hathaway*, 802 N.Y.2,2d 910, 912 (Sup Ct. Erie Cty. 2005) (internal citations omitted).

Under this standard, "[a] newspaper need not choose the most delicate words available in constructing its headline."  *Test Masters*, 603 F. Supp. 2d at 589.  Rather, "it is permitted some drama in grabbing its reader's attention."  *Id.* (using "Scam" in headline to refer to company was fair index of article that explained the Consumer Protection Bureau had investigated the company and demanded that it provide refunds); *see also Gunduz v. New York Post Co.*, 188 A.D.2d 294, 294 (1st Dep't 1992) (headline, "Public Enemy No. 1" was non-actionable fair index of article even though plaintiff, a taxi cab driver, had not committed a crime).  That is, even if a headline is "unfortunate, sensationalist and drafted simply to garner attention," it is not actionable where it is a "fair index of the underlying article."  *St. Louis v. NYP Holdings, Inc.*, 2017 WL 887255, at *2 (Sup Ct. N.Y. Cty. Fen. 6, 2017).  This determination is often made on a motion to dismiss.  *Id.; see, e.g.*, *Cabello-Rondón v. Dow Jones & Co.*, 2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017), *aff'd* 720 F. App'x 87 (2d Cir. 2018).  For example, in *St. Louis,* the headline "Drunk driving-pothead thinks he's fit to be a corrections officer," was held to be non-actionable on a motion to dismiss even though marijuana charges against the plaintiff were dropped because the article itself made that clear.  2017 WL 887255, at *1.

---

[7] A defamation claim must also be dismissed at the outset if the plaintiff has not adequately pled that the statement at issue is materially false.  *See Tannerite Sports LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) ("[F]alsity is an element of a defamation claim under contemporary New York law.").  So long as "the substance, the gist, the sting, of the libelous charge [is] justified," a statement is not actionable.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal quotes omitted).  When assessing falsity, "[t]he entire publication, as well as the circumstances of its issuance, must be considered."  *Tannerite Sports*, 864 F.3d at 243 (quoting *Silsdorf v. Levine*, 59 N.Y.2d 8, 13 (1983)).  As explained above, the headline is based on a substantially accurate account of the NDAA's passage, which BYD does not allege is in any way false.

Here, the headline "Trump Blacklisted This Chinese Company" is a "fair index" of the facts presented in the Article—none of which BYD disputes and all of which are "substantially accurate." The second paragraph of the Article explains that BYD was "prohibited by law from bidding for some federal contracts in the United States." Strom Decl. Ex A at 1. Indeed, as the Article recounts, this legislation "bans federal funds from being used to buy BYD electric buses . . . [and] President Donald Trump signed the ban into law in December." *Id* at 2. BYD itself concedes all of this in its Complaint—even calling the NDAA a "ban." Compl. ¶ 10. Whether you call it a "ban" or a "blacklist," the headline clearly refers to the passage of the NDAA, and is therefore a fair index of the Article. The headline is not actionable.

BYD makes a number of strained and ultimately meritless arguments to try to save this claim. First, BYD alleges that it was not "blacklisted" by President Trump because the Act was "an action by Congress, not President Trump, and it was not a 'blacklist'" (i.e. a physical list maintained by President Trump). *Id.* ¶¶ 9, 29. These objections border on absurd. Preliminarily, it is hard to understand how it is any more defamatory to state that the BYD was banned by Trump rather than by Congress. But, in fact, the executive branch specifically endorsed the version of the NDAA that affected BYD through a letter from the Office of Management and Budget, *see* Strom Decl. Ex. C, and the President signed the bill into law. Accordingly, BYD's claim that this was merely Congressional action is incorrect. And after reviewing the Article, no reasonable reader could believe that by "blacklist," the headline means that President Trump was maintaining a literal list of companies to ban.

BYD next argues that the headline is false because the NDAA was not directed specifically at BYD. *See* Compl. ¶ 10. BYD conveniently ignores that its own press release— which is hyperlinked to in the Article—unequivocally stated that the NDAA was "targeting"

BYD.  *See* Strom Decl. Ex. E.  And BYD's press release is correct.  As the Wall Street Journal article hyperlinked in the Article states, BYD was one of only two manufacturers affected by the NDAA, *see id.* Ex. B, and the version of the NDAA that was adopted and signed by the President was specifically drafted to cover BYD, *see id.* Ex. C.

Finally, BYD argues that the word "blacklist" implies that BYD engaged in "wrongful activity."  Compl. ¶ 29.[8]  In making this argument, BYD is straining the plain meaning of the Article in a way that the law will not allow.  *See Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985) ("A statement "cannot be made [to have a defamatory meaning] by a strained or artificial construction."); *Cohn v. Nat'l Broad. Co.*, 50 N.Y.2d 885, 887 (1980) ("[C]ourts will not strain to find [defamation] where none exists.").  No reasonable reader would make BYD's leap when the Article itself makes clear that "the ban on using federal dollars on BYD vehicles stems from fears the company can outbid American rivals and that China uses corporate partners to spy on Americans."  Article at 8.  The Article even notes that:

> BYD has in the past responded to these allegations by arguing that it is not state-owned, that it is publicly traded, and part-owned by Buffett.
>
> 'No one has pointed to any evidence of any wrongdoing by BYD,' a company representative told Marketplace last year.  'Obviously there's bigger issues going on between China and the U.S., but BYD has come to this country and followed all the rules of the road.'

*Id.*  Thus, the Article is clear that BYD was "banned" because of its connection to China and over fears that BYD could make it harder for U.S. businesses to thrive—and nothing else.[9]

---

[8] To the extent BYD attempts to assert a defamation-by-implication claim, its pleading falls far short of meeting that standard.  In order to sustain a defamation-by-implication claim in New York, a plaintiff must plead that an otherwise truthful statement can be "reasonably read to impart [a] false innuendo" and that "the author intends or endorses the inference."  *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012).  But BYD does not allege that the headline is "otherwise truthful" and it does not plead that VICE intended or endorsed the defamatory implication that BYD was covered by the NDAA because of any particular wrongdoing on BYD's part.

[9] In this way too, the Article is unquestionably accurate—Senator Cornyn, who sponsored the version of the NDAA that was adopted, made clear that his version of the bill was aimed to address his concerns that "certain Chinese state-controlled companies like . . . Build Your Dreams (BYD) were submitting unrealistically low bids for transit

Because the Article clearly sets out how BYD was "blacklisted" by the NDAA's passage, the headline is a "fair index" of the Article, and BYD's claim based on it must be dismissed.

### B.     The Headline Is a Privileged Fair Report of Governmental Proceedings

Alternatively, BYD's claim based on the Article's headline is barred by New York Civil Rights Law Section 74, which provides, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." The New York legislature enacted this statute in order to avoid stifling "an active, thriving and untrammeled press" and to ensure that the press receive "broad protection." *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd* 29 F. App'x 676 (2d Cir. 2002) (internal quotes omitted). The privilege created by Section 74 is "absolute," *see Pelayo v. Celle*, 270 A.D.2d 469, 469 (2d Dep't 2000), and its applicability is a question of law for the court, *see, e.g.*, *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 66–68 (1979). As a result, courts regularly dismiss defamation suits based on this privilege before discovery. *Idema*, 120 F. Supp. 2d at 365–66; *Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 595–96 (2d Dep't 2009); *Hayt v Newsday, LLC*, 176 A.D.3d 787, 788 (2d Dep't 2019).

The privilege does not require exacting precision in reporting on official proceedings and instead only requires that the "substance of the article be *substantially* accurate." *Holy Spirit Ass'n*, 49 N.Y.2d at 67 (emphasis added). The New York Court of Appeals has explained:

> [Media] accounts of legislative or other official proceedings must be accorded some degree of liberality. When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision. . . . Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a

---

projects in major U.S. cities in an attempt to put competition out of business."  Strom Decl. Ex. D at 1.  He publicly cited BYD as an example of how "China is increasingly at threat to US economy and security."  *See supra* p. 4.

publication deadline, be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used.

*Id.* at 68. Importantly, where a headline is based on an article reporting on an official proceeding, it must be viewed with the "requisite degree of liberality" required by Section 74. *St. Louis*, 2017 WL 887255 at *2 (headline referring to plaintiff as a "pothead" not actionable where marijuana charges against plaintiff were dropped and the article itself made that clear).

Here, the Article indisputably reports on both a "legislative proceeding"—Congress passing the NDAA—and an "official proceeding"—the President signing the NDAA into law. "New York courts have broadly construed the meaning of an official proceeding as used in Section 74." *Test Masters*, 603 F. Supp 2d at 588. "The test is whether the report concerns actions taken by a person officially empowered to do so." *Id.* (internal quotes omitted). Actions by the executive and legislative branches indisputably fall within this definition. *See, e.g.*, *Muscarella v. Berkshire Hathaway*, 278 A.D.2d 854, 855 (4th Dep't 2000) (reporting on findings from Department of Housing and Urban Development deemed privileged under Section 74); *Komarov v. Advance Mag. Publishers, Inc.*, 691 N.Y.S2d 298, 300 (Sup. Ct. N.Y. Cty. 1999) (reporting on internal FBI affidavit deemed privileged under Section 74).

In addition, the headline, when considered with the Article, provides a "substantially accurate" report of these proceedings. As discussed above, the Article makes clear that BYD was "blacklisted"—or as BYD would have it "targeted" and "banned"—under the NDAA, which prohibited it from selling buses to projects in the United States that relied on federal funds.

In short, VICE was both "fair" and "substantially accurate" in reporting on the NDAA. As such, the headline here is absolutely privileged under Section 74 and should be dismissed.

## II. VICE'S REPORTING ON THE ASPI REPORT IS NON-ACTIONABLE

While never once denying that it sources products from a company whose subsidiary

apparently uses forced labor, BYD still claims that it was false and defamatory to report that ASPI implicated BYD and its supply chain in its Report on the use of forced labor. VICE cannot be held liable for ASPI's conclusions for two reasons. First, BYD has not and cannot come close to establishing that VICE acted with actual malice by relying on a Report *after* it had been relied upon by numerous members of Congress. And, more than that, under Second Circuit precedent, VICE's neutral reporting of the ASPI Report is privileged.

### A.    VICE's Reliance on the ASPI Report Precludes a Finding of Actual Malice

For more than fifty years, the First Amendment has prohibited a public official from recovering damages for a defamatory falsehood unless "*he proves* that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (emphasis added). The Supreme Court later expanded this rule to include public figures, in addition to public officials, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 153 (1967); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 333–34 (1974), and the law is now clear that a public figure libel plaintiff bears the burden of proof on actual malice, a burden he must carry by "demonstrat[ing] with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubts as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984); *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."); *Biro v. Condé Nast*, 807 F.3d 541, 544, *aff'd* 622 F. App'x 67 (2d Cir. 2015).

"Not only is proving actual malice a heavy burden, but, in the era of *Iqbal* and *Twombly,* pleading actual malice is a more onerous task as well." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013), *aff'd* 807 F.3d 541 *aff'd* 622 F. App'x 67 (2d

Cir. 2015) (internal quotes and citations omitted).[10]  "Pleading 'actual malice buzz-words' is simply not enough to nudge a case into discovery." *Id.* at 279–80 (citation omitted); *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 456 n.9 (S.D.N.Y. 2018) (holding that "conclusory statements" of actual malice will not suffice) (citation omitted).  And, for this reason, courts routinely dismiss defamation claims prior to discovery based on the failure to adequately plead actual malice.  *See Cabello-Rondon v. Dow Jones & Co.*, 720 F. Appx. 87, 88 (2d Cir. 2018); *Biro*, 807 F.3d at 542; *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at *9–11 (S.D.N.Y. Sept. 29, 2018); *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 573 (S.D.N.Y. 2014).   This Court should do the same here and dismiss this meritless suit.

**<u>BYD Is A Public Figure</u>:**  BYD is at least a limited purpose public figure in the realm of manufacturing.  Indeed, it appears that BYD concedes as much alleging only that VICE acted with "actual malice" and not mentioning the standard of gross irresponsibility or negligence applicable for private figure plaintiffs.  Compl. ¶¶ 12, 31, 35; *see also Greene v. Paramount Pictures Corp.,* 340 F.Supp.3d 161, 169 (E.D.N.Y. 2018) ("Plaintiff elected not to pursue a private-figure defamation claim, leaving only his public-figure claim based on actual malice."), *aff'd* 2020 WL 3095915 (2d Cir. June 11, 2020).

In any event, BYD is a public figure as a matter of law.  Courts have delineated two kinds of "public figure" defamation plaintiffs.  A "general purpose public figure" is someone who has "assumed [a] role[] of especial prominence in the affairs of society."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).  A "limited purpose public figure," by contrast, is someone who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  *Id.* at 351–52.  "Where the question whether a

---

[10] Except for the conclusory statement that "VICE Media knew that there was no 'blacklist,'" *see* Compl. ¶ 31, BYD provides no factual support to establish that VICE acted with actual malice in publishing the Article's headline. Thus BYD's claim stemming from the headline should also be dismissed for failure to plead actual malice.

plaintiff is a public figure can be determined upon the pleadings alone, the Court may deem a plaintiff a public figure at the motion to dismiss stage." *Biro*, 963 F. Supp. 2d at 270.

A plaintiff's "candid admissions" about its own status are "telling" in determining whether it is a public figure, *id.*, and courts routinely rely on nothing more than admissions in a complaint to establish public figure status, *see Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) ("Given plaintiff['s] own characterization of himself as a 'well known radio commentator' within the Metropolitan Filipino-American community, the district court correctly held that he is a public figure."); *Biro*, 963 F. Supp. 2d at 274 (finding plaintiff to be a public figure based only on complaint's allegations). In its Complaint, BYD refers to itself as "one of the world's largest producers and suppliers of electric vehicles, as well as solar panels, lithium batteries, and protective masks and equipment, among many other innovative, important and useful products." Compl. ¶ 2. In addition, it notes that billionaire Warren Buffett's company became a "major investor" in BYD, *id.*, and explains that BYD has a reputation "as a reliable supplier of quality products in the global marketplace," *id.* ¶ 3. These admissions confirm that BYD is, at least, a limited purpose public figure in its industry.[11]

**<u>BYD Has Not Plausibly Alleged Actual Malice</u>:** As BYD is at least a limited purpose public figure within the manufacturing sphere, it can only recover for defamation upon "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or

---

[11] Similarly, BYD's website notes that BYD has "established over 30 industrial parks worldwide," "has played a significant role in industries relating to electronics, automobiles, new energy, and rail transit," and has "revenue and market capitalization each exceeding RMB 100 billion." https://www.byd.com/en/CompanyIntro.html. The website also has an entire section devoted to the awards BYD has won, including being listed as one of Bloomberg's 50 Most Innovative Companies. https://www.byd.com/en/CompanyHonor.html?scroll=true. The fact that BYD is a financially well-endowed publicly-traded corporation, *see* Compl. ¶ 2, only further supports the finding that it is a public figure. *See MiMedx Grp.*, 2018 WL 4735717, at *8 n.5 (publicly traded corporation that processes, markets, and distributes medical products deemed public figure on motion to dismiss); *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977) (corporation with more than a billion dollars in assets was a public figure). Any other conclusion would lead to the illogical result that BYD could flaunt its industry dominance while simultaneously being protected from criticism about this status.

with reckless disregard for the truth." *Gertz*, 418 U.S. at 342. This standard, referred to as "actual malice," is measured by "what the defendant actually believed and not by 'what a reasonably prudent man would have published or would have investigated before publishing.'" *Goldblatt v. Seaman*, 225 A.D.2d 585, 586 (2d Dep't 1996) (quoting *St. Amant*, 390 U.S. at 731). On a motion to dismiss, "a public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro*, 807 F.3d at 546 (citation omitted).

In *St. Amant*, the U.S. Supreme Court provided examples of the types of facts that could establish actual malice, including where a story is fabricated by the defendant or is based wholly on "unverified" or "anonymous" sources; where the "allegations are so inherently improbable that only a reckless man would have put them in circulation;" and "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732. BYD alleges nothing of the sort and, as a result, falls far short of plausibly pleading actual malice. Instead, BYD makes the conclusory assertion that VICE "knew that the contents of the ASPI Report did not support its claim regarding BYD's alleged use of forced labor in its supply chain." Compl. ¶ 31. But BYD never alleges how or why VICE would know this, particularly when the Report made clear that BYD was one of "83 foreign and Chinese companies directly or indirectly benefiting from the use of Uyghur workers."[12]

_____

[12] In this way, this case differs dramatically from the Second Circuit's recent decision in *Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019), in which the court found that the plaintiff, former Vice Presidential nominee, Sarah Palin, plausibly alleged actual malice. In that case, Palin claimed that a *New York Times* editorial defamed her when it linked a crosshair map circulated by Palin's political action committee to the shooting of a Congressman. Unlike here, Palin made numerous allegations that, when considered together, could support a finding of actual malice. She alleged that the *Times'* editor knew that the allegedly defamatory statement was false because he had previously served as the editor for other publications that debunked the connection between the map and the shooting. *Id.* at 814. In addition, the editor's brother—a U.S. Senator—was previously targeted by a shooter and both the editor and his brother became active anti-gun advocates. *Id.* Palin alleged that this made the editor more likely to be hostile to her. *Id.* Palin noted that the article included a hyperlink to another article debunking the connection between the map and Palin's PAC. *Id.* Finally, the *Times* issued a correction after the article was published, which the Second

Indeed, the thrust of BYD's argument appears to be that the Article did not accurately set forth ASPI's allegations because the "Report does not even state that BYD 'us[ed] forced Uyghur labor in its supply chain.' Rather, the ASPI Report merely says that BYD did business with a company which owned a subsidiary that (allegedly) had used Uyghur forced labor." Compl. ¶ 6.[13] BYD's claim that the ASPI Report did not implicate BYD's supply chain is just wrong. ASPI makes clear in the report that "[u]nder suggestions that strongly suggest forced labour, Uyghurs are working in factories that are *in the supply chains of at least 83* well-known global brands . . . ." Report at 3 (emphasis added); *see also id.* at 5, 27 ("ASPI's research has identified 83 foreign and Chinese companies directly or indirectly benefitting from the use of Uyghur workers outside Xinjiang through potentially abusive labour transfer programs."); Compl. ¶ 26. The Report then lists these 83 companies, which include BYD. Report at 34.

The U.S. government's actions following the Report's release underscore that VICE read the Report correctly. One week before VICE published the Article, six members of Congress wrote to the CEOs of major U.S. companies listed in the Report, "calling on them to stop the use of forced labor of the Uyghur Muslim population." *See* Strom Decl. Ex. H. Apple—which was included in the same section of the report as BYD (as an end customer for Dongguan)—was one such company targeted by the letters. *Id.* Said differently, Congress read the Report for what it was—identifying 83 companies that used Uyghur forced labor in their supply chains. It was entirely accurate for VICE to state that "BYD was one of the companies identified in the report as using forced Uighur labor in its supply chain."

Even if BYD were correct, however, and VICE mis-cited the ASPI report, that still would

---

Circuit found could support the claim that the editor published the editorial knowing, or recklessly disregarding, the falsity of the claim. *Id.* BYD's allegations here entirely lack support and fall far short of the pleading in *Palin*.

[13] In fact, if BYD's only claim is that the Article is false because VICE misstated the ASPI Report, then BYD's claim here should also be dismissed because of its failure to sufficiently plead falsity. As discussed above, VICE did not mis-cite the ASPI Report. Thus, VICE's reporting on the ASPI report was substantially true.

not amount to actual malice.  *See Khan v. N.Y. Times Co.*, 269 A.D.2d 74, 79 (1st Dep't 2000) (no actual malice when defendant "obtained her information from a reputable news source" and had "no reason to question the accuracy of the [underlying] report, that she misread").

Switching tactics, BYD then tries to discredit VICE's reliance on the APSI Report, but this attempt also fails.  ***First***, BYD takes issue with the fact that the statement "BYD was one of the companies identified in the report as using forced Uighur labor in its supply chain" was entirely based on the Report and no other source.  Compl. ¶ 31.  As a practical matter, it is hard to see why an article reporting on the findings of a new study would need to corroborate those findings with other sources or even how this would be possible given the groundbreaking allegations contained within the Report.  Regardless, "reliance on a single source does not itself indicate actual malice."  *Fodor v. Berglas*, 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995). That is particularly true where, as here, the underlying source is a reputable, independent report. *Rakofsky v. Wash. Post*, 2013 WL 1975654, at *10 (Sup. Ct. N.Y. Cty. Apr. 29, 2013) ("It is well settled that a republisher may rely on the research of the original publisher, 'absent a showing that the republisher had, or should have had, substantial reasons to question the accuracy of the articles or the *bona fides* of [the] reporter.'") (citation omitted);  *Ortiz v. Valdescastilla*, 102 A.D.2d 513, 519 (1st Dep't 1984) (defendant was privileged to publish information received from a dependable news source unless there were "substantial reasons to question the accuracy of the information or the bona fides of his source").  ASPI is a well-known think-tank and this very Report was cited and relied upon by U.S. governmental officials *before* VICE ever relied on it.  As Congresswoman Omar noted, the Report "painstakingly tracked" its findings, Strom Decl. Ex. H at 1, and the Report itself notes that the authors contacted each of the brands named in the Report to confirm their relevant supplier details—although BYD chose not to respond, *see*

Report at 5.  And even though BYD did not respond to the Report's authors, VICE attempted to contact BYD for comment before publishing the Article, reaching out to two U.S.-based BYD spokespeople, a U.S-based lawyer for BYD, BYD's Hong Kong-based PR firm, and a European company representative.  Article at 4.  BYD again did not respond.  Still, VICE included previous statements that BYD made about alleged labor issues in its U.S. factories and noted that BYD was deemed a "model employer" by labor advocates.  *See id.* at 5.  These many attempts to include BYD's perspective undercut any allegation of actual malice.  *See Cabello-Rondón*, 2017 WL 3531551, at *10 (finding no actual malice when "the article makes clear that the authors sought comment from [plaintiff]'s representatives . . .  before publication . . . and the article included, in several places, earlier statements by [plaintiff] . . . disputing any allegations of wrongdoing).

In a last ditch attempt to plead actual malice, BYD claims that ASPI is "biased and discriminatory against China and Chinese businesses."  Compl. ¶ 19.  But "all publications have some sort of editorial slant, and, indeed, the variety of angles in the press is exactly what creates the spirited debate that is the aim of the First Amendment."  *See Med-Sales Assocs., Inc. v. Lebhar-Friedman, Inc.*, 663 F. Supp. 908, 914 (S.D.N.Y. 1987).  Simply having a slant is not enough to establish actual malice; BYD must show that the slant was so prevalent that it would lead VICE to subjectively doubt the veracity of the publication.  *Loeb v. New Times Commc'ns Corp.,* 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("[F]ailure to verify statements with the plaintiff and reliance upon some biased sources, in themselves, do not amount to reckless disregard of the truth");  *Sweeney v. Prisoners' Legal Services of New York, Inc.,* 84 N.Y.3d 786, 793 (N.Y. 1995) (defendant's reliance on a convicted felon who presumably lacked credibility, did not satisfy actual malice standard); *Gross v. New York Times Co.,* 281 A.D.2d 299, 299 (1st Dep't

2001) (defendant may rely on sources who "may have borne plaintiff ill-will"). BYD does not allege that ASPI's bias against China caused it to publish anything false. Indeed, BYD never once denies that it sources products from Dongguan, or that Dongguan's subsidiary factory, Hubei, has 105 Uyghur workers that were transferred there by China. Moreover, the Report is not merely about Chinese businesses. To the contrary, it alleges that major American brands, including Amazon, Apple, Gap, Google, and Nike (among others), benefit from forced labor in their supply chains. Report at 5. Given this, BYD provides no reason why VICE would believe the Report to be biased against Chinese companies.

As a result, because BYD provides no grounds whatsoever to infer that VICE subjectively doubted the statement that "BYD was one of the companies identified in the report as using forced Uighur labor in its supply chain," BYD's claim arising from this statement should be dismissed.

### B.    Alternatively, The Neutral Reportage Privilege Protects VICE's Statement

Even if this case is not dismissed on actual malice grounds (as it should be), the Second Circuit has actually carved out a special protection for the precise type of reporting that VICE conducted here. The neutral report privilege, adopted by the Second Circuit in *Edwards v. National Audubon Society, Inc.*, provides that "when a responsible, prominent organization . . . makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity." 556 F.2d 113, 120 (2d Cir. 1977).[14] The justification for this privilege is simple— "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming

---

[14] *Edwards* articulated a First Amendment privilege that applies in this Circuit regardless of the underlying New York state law. *Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System, Inc.*, 844 F.2d 955, 961 n.12 (2d Cir. 1988)

responsibility for them." *Id.*

Thus, for example, in *Edwards*, the plaintiff brought a defamation action against the *New York Times* based on an article reporting on statements made by the National Audubon Society in an annual report. The report stated that scientists who supported using the pesticide DDT were "paid to lie." *Id.* at 117. After the report was released, a reporter for the *New York Times* contacted the Audubon Society author and the scientists for comment, and then published an article reporting on the annual report and the scientists implicated. *Id.* at 117–18. Because the Second Circuit held that the *New York Times* reported on the Audubon Society's charges "fairly and accurately," the article was held to be a privileged, neutral report. *Id.* at 120.

The *Edwards* privilege is limited to those instances where the defendant publishes a defamatory statement about a public figure in the context of (1) "an accurate and disinterested report"; (2) regarding a newsworthy controversy; (3) in which the defamatory statement was made by a "responsible, prominent organization"; and (4) provided that the statement is not endorsed by the publisher." *Levin v. McPhee*, 917 F. Supp. 230, 239 (S.D.N.Y. 1996), *aff'd* 119 F.2d 189 (2d Cir. 1997) (citation omitted). If the neutral reportage privilege applies at all, it applies here, to VICE's reporting on the Report in the same manner as the U.S. government.

***First,*** as detailed above, BYD is a public figure. ***Second,*** the Article is an "accurate and disinterested report." *Id.* The Article both includes the allegations contained in the Report (making clear that they came from the Report), and, even though BYD refused to provide comment on either the Report or the Article, includes earlier public statements that BYD made about its labor practices. This balance satisfies the "accurate and disinterested" prong of *Edwards*. *See Coliniatis v. Dimas*, 965 F. Supp. 511, 520 (S.D.N.Y. 1997). ***Third,*** the controversy reported—the potential abuse of an ethnic minority in China, which BYD itself

refers to as "one of the most publicized and brutal human rights violations of modern time"—is clearly newsworthy. *See* Compl. ¶ 4.[15] **Fourth,** ASPI is a "responsible, prominent organization." *Levin*, 917 F.Supp. at 239. The U.S. government's prompt response to the Report, including sending concerned letters to various companies named in the Report and introducing legislation that specifically cited to the Report, *see* Strom Decl. Exs. F–H, more than establishes that the Report was deemed credible. **Fifth**, and finally, the allegedly defamatory statement was not endorsed by VICE. The Article *never* states as a fact that BYD uses Uyghur forced labor. Instead, the Article either directly refers to the Report or notes that BYD only has "*possible* links to forced labor" or "troubling *allegations* of connections to Uighur forced labor in Xinjiang province." *See* Article at 1, 4 (emphasis added).

VICE's reporting is precisely the type of reporting that the neutral reportage privilege was intended to protect. *Edwards* fully shields VICE from liability for the statement "BYD was one of the companies identified in the report as using forced Uighur labor in its supply chain."

## CONCLUSION

BYD seeks to punish VICE for responsibly and accurately reporting on serious allegations that have been made against the company. Despite BYD's frustration with VICE's reporting, BYD has not and cannot adequately plead a libel case. VICE, therefore, respectfully requests that this Court enter an order dismissing the Complaint against it with prejudice and for such other and further relief as the Court deems just and proper.

---

[15] "[W]hile not conclusive, a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is newsworthy, may be powerful evidence of the hold those subjects have on the public's attention." *Chaiken v. VV Pub. Corp.,* 119 F.3d 1018, 1032 (2d Cir. 1997) (internal quotes omitted); *Huggins v. Moore*, 94 N.Y.2d 296, 303 (1999) (absent clear abuse, "courts will not second guess editorial decisions as to what constitutes matters of genuine public concern").

Dated: New York, New York
        August 17, 2020

                                  Respectfully submitted,

                                  DAVIS WRIGHT TREMAINE LLP
                                  By: */s/ Rachel F. Strom*
                                      Rachel F. Strom
                                      Amanda B. Levine
                                  1251 Avenue of the Americas, 21st Floor
                                  New York, NY  10020-1104
                                  (212) 489-8230 Phone
                                  rachelstrom@dwt.com
                                  amandalevine@dwt.com

                                  *Attorneys for Defendant VICE Media LLC*