# EXHIBIT C



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

September 4, 2019

The Honorable James M. Inhofe
Chairman
Committee on Armed Services
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

As you negotiate the National Defense Authorization Act (NDAA) for Fiscal Year 2020, I would like to convey the Administration's great appreciation for the continued work of the Armed Services Committees on behalf of our national defense and its views on the Senate-passed bill. The NDAA is an essential step in securing our national security interests and the Administration supports passage of an NDAA for the 58th consecutive year.

The Administration applauds the Congress' continued bipartisan support for the men and women of the Armed Forces and their families. The Administration also applauds the Senate's authorization for full funding of the President's Budget request for the Department of Defense and support of related programs within the Department of Energy. In particular, the Administration thanks the Senate for supporting the Nation's nuclear deterrent enterprise, a key Administration priority.

The Administration also appreciates the work of the Intelligence Committees to ensure the Intelligence Community (IC) has the necessary tools to provide distinctive, timely insights that advance our national security, economic strength, and technological superiority. Among other positive aspects, the Intelligence Authorization Act would strengthen protections and expand opportunities for IC personnel and extend authorities that secure the IC's supply chain and facilities. In particular, the Administration strongly supports the extension of the Intelligence Identities Protection Act of 1982 to protect the identities of intelligence officers without regard to the geographic location of their assignments.

The Administration looks forward to working with the Congress to address the Administration's concerns outlined in the enclosed paper. The Administration also looks forward to reviewing the classified annex and working with Congress to address any concerns regarding classified programs.

Sincerely,

Russell T. Vought
Acting Director

Enclosure

Identical Letter Sent to:

The Honorable James M. Inhofe
The Honorable Jack Reed
The Honorable Adam Smith
The Honorable William M. Thornberry

**Space Force (Sections 1601, 1602, 1603, 1604, and 1608).** Elevating the space domain to be on par with the air, land, and sea domains is critical to advancing the role of space power in our national defense. The Nation must transform our approach to space from a support function to a domain of competition—and potential conflict—in which our space forces are prepared to deter aggression and, if necessary, to fight and win. While the bill provides some elements to elevating the space domain, it does not provide the necessary legislative authority to establish the United States Space Force as the sixth branch of the Armed Forces. The Administration strongly urges the Congress to explicitly designate the Space Force as a separate sixth branch of the Armed Forces and include all related technical and conforming amendments. Further, quickly developing a strong, multifaceted culture is critical, and the Administration urges the Congress to provide authority to transfer personnel from all branches of the Armed Forces into the Space Force.

**Oversight of Department of Defense Execute Orders (Section 1033).** The Administration strongly objects to the requirement to provide copies of execute orders (EXORDs) upon request of the Chairman or Ranking Member of a congressional defense committee. This requirement would contravene the President's authority as Commander in Chief to direct military operations and maintain the confidentiality of national security information. The Secretary of Defense recently committed to review the process for such requests, to ensure that requests for access to EXORDs are considered by senior leadership of the Department of Defense (DOD) and answered appropriately.

**Prohibition on Use of Funds for Transfer of Individuals at United States Naval Station, Guantanamo Bay (GTMO), Cuba (Sections 1021 and 1023).** Sections 1021 and 1023 would continue the purported restrictions from last year's NDAA on transfers of detainees held at GTMO. The Administration fully intends to keep open the detention facility at GTMO and to use it for detention operations but strongly objects to any restriction on the transfer of Law of War detainees. In certain circumstances, restrictions on the President's authority to transfer detainees would violate constitutional separation of powers principles, including the President's authority as Commander in Chief.

**Detention Facilities at Naval Station Guantanamo Bay (Section 4602).** Although the Administration appreciates the inclusion of the authorization for military construction of the Communications Facility and the Detention Legal Office and Communications Center at Naval Station Guantanamo Bay, it strongly objects to the lack of authorization for the High-Value Detention Facility. The President has ordered detention operations to continue at Naval Station Guantanamo Bay. The current facility for high-value detainees is experiencing structural and foundational challenges that, if unaddressed, could pose life and safety risks to guard forces and detainees.

**Authority to Transfer Individuals Detained at United States Naval Station, Guantanamo Bay, Cuba, to the United States Temporarily for Emergency or Critical Medical Treatment (Section 1025).** Although the Administration generally opposes restrictions on the transfer of detainees and this provision purports to lift such restrictions by expressly authorizing transfer to the United States in a specific, limited circumstance, the Administration objects to the inclusion of this express congressional authorization because it is unnecessary and potentially counterproductive. This provision is unnecessary because United States forces have consistently

3

which has included quickly deploying specialized personnel and equipment to respond to emergent healthcare issues. The provision is potentially counterproductive because it could undermine government efforts to defend against legal challenges to the adequacy of healthcare provided at GTMO and could ultimately result in judicial orders compelling the government to transfer detainees to the United States for treatment.

**Repeal of Codified Specification of Authorized Strengths of Certain Commissioned Officers on Active Duty (Section 501).** The Administration strongly objects to section 501, which would repeal the authorized officer strength tables and replace them with an annual congressional authorization by grades of major, lieutenant colonel, and colonel in the Army, Air Force, and Marine Corps or lieutenant commander, commander, and captain in the Navy. Authorizing officer grade strength annually would significantly impact officer personnel management planning, including accessions, promotions, retention planning, which is performed well in advance of the year of execution, and would add significant volatility to an already complex planning process for both personnel management and budgeting.

**Matters Relating to Military Operations in the Information Environment (Section 1681).** The Administration strongly objects to section 1681(a), which would affirm the authority of the Secretary of Defense to conduct military operations in the information environment as traditional military activities, because it is unnecessary. Most military operations in the information environment are not conducted clandestinely. DOD also has a long established historical practice of conducting clandestine military activities, including information operations. An affirmation specific to these types of operations is not necessary at this time. As drafted, section 1681(a) risks creating confusion as to congressional intent concerning traditional military activities that could undermine the significant progress made to clarify DOD's authority to conduct clandestine cyber operations.

**Acceleration of the Deployment of Persistent Space-Based Sensor Architecture (Section 1673).** The Administration strongly objects to section 1673, which would limit DOD's ability to establish the most cost-effective missile defense architecture for the Nation. While the Administration pursues a new space sensor architecture to support a variety of critical defense missions, this provision would restrict DOD's ability to design the most cost-effective solution. DOD has multiple efforts underway to inform the future space architecture design, including an ongoing Missile Defense Agency analysis of alternatives and prototyping efforts led by the Space Development Agency. These efforts should inform the path forward before the Department designates a lead agency and establishes design priorities.

**Contributions to Department of Defense Military Retirement Fund Based on Pay Costs per Armed Force Rather than on Armed Forces-wide Basis (Section 631).** The Administration strongly objects to section 631, which would amend 10 U.S.C. § 1465(c), changing the Military Retirement Fund (MRF) contributions rate from a single level percentage, full-time and part-time rate, to a Service-specific retirement contribution rate beginning in Fiscal Year 2021. Although the Administration supports efforts to increase budgetary transparency, this provision would increase the cost and complexity of determining and tracking contributions and enhance the likelihood for erroneous contributions and possible auditability issues without changing the aggregate amount contributed to the MRF or improving the actuarial solvency.

**Integrated Personnel and Pay System-Army (IPPS-A) (Section 4201).** The Administration strongly objects to the proposed $143 million reduction in research and development funding from the FY 2020 Budget request in section 4201 for the IPPS-A. The reduction would effectively eliminate IPPS-A for approximately 680,000 Soldiers serving in the Regular Army and Reserves and would put the Army's number one personnel modernization effort, which is currently being released to the Army National Guard, with approximately another 335,000 service members, at significant risk. IPPS-A integrates human resource capabilities across all components for the first time, and is the vehicle for the Army's Talent Management efforts. The legislation would drastically impair the Army's ability to field IPPS-A to the Army Reserve and Active Duty, significantly undermining the Army's efforts to transform its force, and places efforts to achieve auditability at risk.

**Replacement of Fluorinated Aqueous Film-forming Foam with Fluorine-free Fire-fighting Agent (Section 316).** The Administration strongly objects to this provision, which would prohibit DOD from using fluorinated fire-fighting foam before a viable equivalent replacement has been identified. DOD continues to pursue aggressively a fluorine-free foam, which must meet fire-fighting performance and workforce safety specifications.

**Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA) Used on Military Installations (Sections 1071-1075).** The Administration strongly objects to subtitle G of Title X, which would provide authority to DOD to treat water sources or provide replacement water for agricultural purposes where the water source is "contaminated" with PFOA and PFOS from military activities. Using the EPA drinking water health advisory (HA) to identify areas subject to this section of the bill would be inconsistent with the scientific basis of the HA, which was not constructed to determine unacceptable levels of PFOA/PFOS in water used for agricultural purposes. The Administration is conducting scientific research to better understand and properly address potential impacts to human health and the environment, including to agricultural production and consumption of commodities. Additionally, at potentially great cost to and significant impact on DOD's mission, the legislation singles out DOD, only one contributor to this national issue.

**Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) Release Disclosure, Detection, and Safe Drinking Water Assistance (Title LXVII).** The Administration strongly objects to a number of provisions in Title LXVII. Many of these provisions are neither grounded in science nor consistent with statutory requirements that provide for the important consideration of scientific and technical information. As such, they create significant litigation risk, set problematic rulemaking timelines and precedents, and impose substantial costs to federal agencies and the regulated community. The EPA continues to follow the regulatory processes laid out in statutes to determine the appropriate courses of action related to PFAS.

**Chief Medical Officer at United States Naval Station, Guantanamo Bay, Cuba (Section 1026).** The Administration strongly objects to the requirement of designating a Chief Medical Officer, outside the chain of command, at the United States Naval Station, Guantanamo Bay, Cuba.

**Limitation on Use of Funds to House Children Separated from Parents (Section 1044).** The Administration objects to section 1044 as it may limit DOD's ability to support the Department of Health and Human Services' efforts to house unaccompanied alien children during times of influx.

**Transmittal to Congress of Requests for Assistance (Section 1058).** The Administration objects to section 1058. It is unnecessary as the Departments of Defense, Health and Human Services, and Homeland Security already provide copies of requests for assistance and the responses to such requests, when requested by Congress. In addition, requests for assistance are documents under the control of each Federal department, and should be released to Congress by the relevant Federal department, consistent with current Federal practice.

**Comprehensive Department of Defense Policy on Collective Self-Defense (Section 1032).** The Administration believes this provision is unnecessary and objects to its inclusion in the bill. The Chairman of the Joint Chiefs of Staff Instruction on Standing Rules of Engagement (SROE) for the use of Force for United States Armed Forces currently provide policy and procedures for requesting, approving, promulgating, and executing collective self-defense rules of engagement. The SROE provides a procedures to tailor rules of engagement for specific operations.

**Unmanned Surface Vessels (Section 4201).** While the Administration applauds the Senate's recognition that large unmanned surface vessels will provide a more distributed, lethal, and survivable Navy, the bill would only authorize $134.5 million for these systems, $372.5 million below the FY 2020 Budget request. These are critical experimentation vessels with modular payloads to reduce risk, conduct integration and testing of payloads, and develop Navy tactics and concepts of operations. The Administration urges the Congress to fully support this critical capability at the levels in the FY 2020 Budget request.

**Safe to Report Policy (Section 527).** The Administration objects to expanding this policy and making it applicable across the Armed Forces. While the Department supports programs that minimize barriers to reporting, this provision may have an adverse impact by perpetuating misconceptions of false reporting. Additionally, the provision may expose victims to unnecessary lines of questioning during cross-examination during the military justice process and could adversely impact the prosecution of sexual assault offenses.

**Reprioritization of Military Construction Funding to Unrequested Projects (Section 4601).** The Administration objects to the bill's realignment of military construction funding from priority projects to other projects not included the FY 2020 Budget request. Contrary to the Administration's fiscally responsible policy to fully fund projects, the bill proposes to incrementally fund 18 military construction projects, effectively creating an unfunded obligation of $1.7 billion needed to fully fund these projects over time. In addition, the bill diverts or rescinds $1.5 billion from the FY 2020 Budget request and prior year appropriations that are required to fully fund priority projects in order to fund other unrequested projects.

**Reports on Contributions to the North Atlantic Treaty Organization (Section 1240).** The Administration objects to the reporting requirements in section 1240, which would impede the executive branch in multilateral negotiations and national decision-making. The provision would limit the Administration's flexibility during negotiations with Allied nations on issues related to the subject of the reports.

**Military Privatized Housing Reform (Sections 3001-3056).** The Administration strongly objects to the bill's significant changes to the Military Housing Privatization Initiative. The proposed language includes provisions that would be legally and practically impossible to implement; create unfunded requirements; and, to the extent they could be implemented, would be overly prescriptive or burdensome. The provisions erroneously assume that privatized housing project entities operate as DOD contractors and that legislation can alter the terms and conditions of previously executed legal agreements. The Department is actively working to improve its oversight and accountability of its privatized housing to provide safe, healthy homes for our military families living in privatized housing. The Administration recognizes the importance of proper congressional oversight and appreciates the Senate's interest in and support for these efforts. The Administration looks forward to working with the Congress on these issues.

**Modification of Authority to Provide Assistance to Vetted Syrian Groups (Section 1221 and 1224).** The Administration greatly appreciates the authority in section 1221 to waive the repair and renovation caps for foreign contributions to the Counter-ISIS Train and Equip Fund (CTEF) and the ability to support stabilization activities. However, as currently written, a corresponding modification to the CTEF appropriation language is required to make the provision effective. The Administration is concerned that limiting repair and renovation in Syria to $4 million per project and $12 million in the aggregate severely limits the Administration's ability to assist the Syrian Democratic Forces in the repair and renovation of detention facilities for thousands of ISIS fighters, including foreign terrorist fighters. Other provisions, such as section 1224, would undermine existing State lead responsibilities within the Executive branch related to ISIS detainees.

**North Korea Sections (6901-6966).** The Administration appreciates support for the President's maximum pressure campaign on North Korea as reflected in the new title reinforcing North Korea trade sanctions. However, of primary concern are provisions that would impose new mandatory North Korea related sanctions (e.g., banking) that need revisions to provide more flexible, calibrated implementation. These revisions include improving or adding waiver authorities, and others to prevent precluding federal preemption actions where needed in order to stop state or local government measures from interfering with United States foreign policy priorities.

**Fentanyl Sanctions (Sections 6801-6837).** The Administration shares the sentiments reflected in the Fentanyl Sanctions Act and strongly supports efforts to target synthetic opioid traffickers and sources. However, the bill's provisions fail to acknowledge the actions already being effectively taken against this threat through discretionary sanctions (applied to the worst offenders "identified as appropriate" for sanctions by the President) under the Foreign Narcotics Kingpin Designation Act (Kingpin Act), and add new rigid mandatory sanctions.

**International Maritime Matters (Sections 8531-8534).** The Administration is concerned that the Maritime SAFE Act, among other things, would rigidly regulate international maritime matters and other related domestic matters as well as needing key revisions to ensure inclusion of foreign policy direction.

**Organizational Issues (Sections 903 and 237).** The Administration has concerns about a number of provisions that would direct organizational changes and realignment of DOD organizations. For example, section 903 would realign the responsibilities of the Defense Business Systems Chief Information Officer (DBS CIO) and Chief Data Officer to the CIO of DOD from the Chief Management Officer. Section 237 would transfer the Combating Terrorism Technical Support Office from the Assistant Secretary of Defense for Special Operations/Low-Intensity Conflict to the Under Secretary of Defense for Research and Engineering. The Administration welcomes the opportunity to continue working with the Congress on such provisions.

**Sexual Assault Prevention and Response (Sections 531-544).** The Administration applauds the Congress's continuing commitment to addressing sexual assault prevention and response. We look forward to continuing ongoing discussions and dialogue on these important issues and welcome the opportunity to share views on technical adjustments required to fully implement such provisions.

**Legal Assistance by Special Victims' Counsel for Victims of Alleged Domestic Violence Offenses (Section 541).** DOD remains committed to eliminating domestic violence offenses. This provision, however, would decrease access for sexual assault victims to Special Victims' Counsel (SVCs)/Victims' Legal Counsel (VLCs), exacerbate already high caseloads for SVC/VLCs, and impose an unfunded mandate.

**Defense Nuclear Nonproliferation Research and Development (Section 4701).** The Administration objects to the bill's proposed reduction of $20 million from the National Nuclear Security Administration's (NNSA) Proliferation Detection program. Such a reduction would prevent NNSA from addressing an immediate need that the interagency identified and vetted as a high-priority concern. It would impede the NNSA's ability to provide the best technical advice and capabilities to national leadership to detect and monitor foreign weapon development programs of concern.

**Federal Oversight of Nuclear Modernization (Section 3113).** The Administration appreciates the bill's lifting of limits on excepted service positions, but increasing hiring authority for those positions would have no effect if the limit on overall authorized personnel levels for NNSA remains. NNSA needs additional staff above that limit to provide necessary program and project guidance and oversight to execute nuclear security programs.

**Membership of Defense Nuclear Facilities Safety Board (Section 8202).** The Administration objects to the bill's prohibition on reappointment of any Board Member whose first term was three or more years and reappointment of any Board Member to a third term. If enacted, these changes would hamper the ability of the Board to provide independent technical safety oversight by arbitrarily limiting an already narrow pool of qualified individuals and increasing the likelihood of the Board's falling below quorum. As a result, the Board's ability to perform effective nuclear safety oversight may be diminished or suspended for an indeterminate period of time, thereby

destabilizing the agency and jeopardizing public health and safety. Elimination of the term limits would appropriately allow the President, with Senate confirmation, the flexibility to appoint the most qualified candidates without regard to their previous service, in line with the statutes of other boards and commissions.

**USE IT (Section 6001).** The Administration has concerns the provision creates inefficiencies and overlapping authorities for agencies to the extent it would have the Environmental Protection Agency (EPA) duplicate already existing direct air capture and carbon utilization efforts led by the Department of Energy (DOE). DOE is responsible for Federal research, development and demonstration efforts on carbon capture utilization and sequestration (CCUS) technologies, and over the past decade has gained significant CCUS related experience and expertise, including with respect to siting, permitting, financing, and regulatory frameworks for CCUS projects. Given DOE's expertise and resources, we recommend DOE lead these efforts jointly or in consultation with the EPA Administrator, and further recommend that DOE establish the geographically diverse task forces instead of the Council on Environmental Quality. We look forward to continuing to work with the Congress to address these concerns.

**Transfer of THAAD Procurement and O&M Funding from MDA to the U.S. Army (Sections 4101 and 4301).** The Administration is concerned with the combined $525.7 million funding transfer from the Missile Defense Agency's (MDA) Ballistic Missile Defense Terminal Defense Segment (THAAD) to the United States Army. DOD, MDA, and the Army are currently assessing THAAD transfer options and are trying to better understand the ramifications of the these options prior to submission of DOD's plans to transition missile defense programs that have reached Milestone C or equivalent approval from MDA to the Military Departments, as required by section 1676(b)(3) of the National Defense Authorization Act for Fiscal Year 2018.

**Afghan Special Immigrant Visas (SIV) (Section 1216).** The Administration appreciates the Congress's support of the Afghan SIV program. However, the Administration urges the conferees to consider including its full request for 4,000 Afghan SIVs to ensure continued support of the Afghans who have worked alongside our troops and diplomats.

**Trauma Experts in Review by Boards for Correction of Military Records (Section 550).** The Administration supports the current law mandate that requires the opinion of a clinical psychologist or psychiatrist if the request for correction of records concerned relates to a mental health disorder, but strongly objects to the redundant mandate in section 550(a) requiring advice from two separate, specially-trained mental health specialists when reviewing the claims of members or former members who were diagnosed with a mental health condition while in the service.

**Limitation on Certain Rolling Stock Procurements (Section 6015).** The Administration supports section 6015, which would prevent financial assistance, specifically Federal transit dollars, from being used to award a contract or subcontract for the procurement of any rolling stock transit vehicles to priority enterprises owned, controlled, or subsidized by certain foreign states. Section 896 of the House NDAA includes similar language, but would only apply to passenger railcars. It is critical that such prohibitions cover procurement of all rolling stock transit vehicles to ensure the Nation's economic and national security and to prevent the use of Federal dollars to support foreign state-controlled enterprises.

**Calculation of the Means Test by Military Veterans and their Survivors in Bankruptcy (Section 6004).** The Administration supports the modifications in section 6004. This provision would exclude from the means test calculation performed by consumer debtors in bankruptcy certain benefits received by military veterans and their survivors. But the immediate effective date imposed by the current legislative text does pose practical concerns. Federal Rule of Bankruptcy Procedure 9009 requires debtors to use official forms prescribed by the Judicial Conference to perform the means test calculations. Passage of the legislation will necessitate changes to these forms, which the Judicial Conference may not have had sufficient time to make with an immediate effective date. Separately, unless the provision is clarified further, the Administration is concerned that litigation may arise concerning whether section 6004 applies to cases already pending on the date of enactment.

**DOD Integrated Spectrum Automation Enterprise Strategy (Section 214(c)).** While the Administration supports the goals of the electromagnetic spectrum sharing research and development program in section 214 to facilitate innovative fifth-generation wireless networking technologies, the Administration objects to the unrelated and unfunded mandate in subsection (c) that would require DOD and the Commerce Department's National Telecommunications and Information Administration (NTIA) to jointly develop an integrated spectrum automation enterprise strategy for DOD. Any DOD-focused automation strategy must be harmonized with the Administration's broader set of initiatives and proposals in the FY 2020 Budget request to reengineer government-wide spectrum management business practices and to modernize NTIA's full suite of automated technical tools.

### Intelligence Authorization Act (IAA) for FY18-FY20 (Divisions F & G)

**Exclusivity, Consistency, and Transparency in Security Clearance Procedures and Limitations on Determinations Regarding Certain Security Classifications (Sections 9311 and 10310).** The Administration strongly objects to section 9311, which purports to regulate determinations regarding eligibility for access to classified information, and section 10310, which purports to preclude IC officers nominated for a position requiring Senate confirmation from making certain classification decisions. These provisions would unconstitutionally infringe on the President's control over national security information.

**IC Information Technology Environment (Sections 10312).** The Administration objects to section 10312, which conflates the IC Information Environment with the IC Information Technology Enterprise (IC ITE), interferes with the intended purpose of the IC ITE, and risks reversing the gains achieved in establishing common platforms. The provision treats the IC ITE construct itself as a major system deliverable with overly prescriptive testing and developmental requirements, and it would inflexibly require IC elements to use IC ITE, regardless of whether doing so in a given situation is either necessary or appropriate. Further, the required business plan incorrectly assumes that all legacy applications are compatible with IC ITE.

**Office of the Director of National Intelligence (ODNI) Reporting Structure (Sections 10404 - 10405).** The Administration objects to sections 10404 and 10405, which would unnecessarily require two positions within ODNI, the IC Chief Financial Officer and IC Chief Information Officer, to report directly to the DNI. These two positions already serve statutory roles as the DNI's principal advisors within their areas of expertise. As such, they already have and will continue to have direct access to the DNI and Principal Deputy DNI to execute their responsibilities.

**Reporting Requirements (Sections 10719, 10721, et al.).** The Administration objects to certain reporting requirements in the IAA. The IAA contains more than 50 new reporting and briefing requirements, including several that recur periodically, which would exceed the IC's ability to respond in a timely manner and would require the IC to shift limited resources away from executing its critical missions. Furthermore, the Administration strongly objects to section 10719 to the extent it would require reporting of information about ongoing law enforcement investigations. The Administration also objects to section 10721, which would affect the Vulnerabilities Equities Process.

**Security Clearance Reform (Title CVI and Section 9313).** The Administration appreciates support from the Congress for improving the security clearance process; the Administration is concerned, however, that the cumulative amount of burdensome reporting and short deadlines included in title CVI would slow down current reform initiatives. The number and nature of the requirements are such that they will likely distract from interagency efforts to execute the needed reforms and transfer activities that are desired. In particular, the Administration objects to section 10604's establishment of timelines for conducting security clearances, as the prescribed deadlines are not based on empirical data and do not take into account the transformation activities already underway to significantly streamline the clearance process. The Administration looks forward to continuing to work with Congress to ensure appropriate performance measures are established as the current reform initiatives are implemented. The Administration also objects to section 9313, because requiring an electronic portal for security clearance applicants is premature without first assessing its viability, and because the requirement for each agency to create an electronic portal discounts efforts currently underway to reduce duplication and move to enterprise shared services.

**Election Matters (Sections 9408, 10501-10505, 10507-10508).** The Administration has several concerns with certain aspects of the bill's election-related provisions. The Administration objects to section 9408, which would require submission of an assessment regarding foreign interference in elections concurrently to the President and the Congress. This provision is inconsistent with Executive Order 13848, which already provides for such an assessment. Further, section 10501 would require the Department of Homeland Security (DHS) to disclose sensitive information obtained through voluntary partnerships that may not have anticipated such disclosures, and section 10508 raises similar concerns. Section 10503 would require the IC to conduct assessments of security vulnerabilities of State election systems, which is outside the scope of appropriate IC activities. Section 10505 is redundant of existing requirements. And section 10507 would duplicate ongoing DHS information-sharing activities. Moreover, the posture review required by section 10502 should be updated, and the strategy required by section 10504 duplicates current strategies being developed, but, if required, should be scoped to the threat rather than to specific countries.

**Paid Parental Leave (Section 9307).** While the Administration supports paid parental leave, it has concerns with limiting such a program to a select few Federal agencies. The Administration looks forward to working with the Congress on proposals to provide parental leave to all families nationwide, including to all United States Government employees, as set forth in the President's Budget.

**Limitation on Transfer of National Intelligence University (9312).** The Administration supports transferring the National Intelligence University to ODNI and looks forward to working with the Congress on this issue.

**Notification of Travel By Accredited Diplomatic and Consular Personnel of the Russian Federation in the United States (Section 10705).** The Administration has concerns with section 10705, which would require State to provide notifications of Russian diplomatic travel in the United States. Such requirement would invite more stringent Russian limitations on United States diplomats' travel within Russia and undermine the ability of United States diplomats to operate freely in Russia to advance United States interests.

**Securing Energy Infrastructure (Section 10742).** The Administration has concerns with section 10742, which would authorize a pilot program, working group, and report concerning energy infrastructure. We look forward to working with Congress to address these concerns.