# EXHIBIT F

# H.R.6210 - Uyghur Forced Labor Prevention Act

116th Congress (2019-2020) | Get alerts

**Sponsor:** Rep. McGovern, James P. [D-MA-2] (Introduced 03/11/2020)
**Committees:** House - Foreign Affairs; Ways and Means; Judiciary; Financial Services
**Latest Action:** House - 03/11/2020 Referred to the Committee on Foreign Affairs, and in addition to the Committees on Ways and Means, the Judiciary, and Financial Services, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned. (All Actions)
**Tracker:** **Introduced**   Passed House   Passed Senate   To President   Became Law

Summary(1)   **Text(1)**   Actions(5)   Titles(2)   Amendments(0)   Cosponsors(37)   Committees(4)   Related Bills(1)

There is one version of the bill.

**Text available as:** XML/HTML | XML/HTML (new window) | TXT | PDF (PDF provides a complete and accurate display of this text.) ?

**Shown Here:**
**Introduced in House (03/11/2020)**

116TH CONGRESS
2D SESSION

# H. R. 6210

Ensuring that goods made with forced labor in the Xinjiang Uyghur Autonomous Region of the People's Republic of China do not enter the United States market, and for other purposes.

## IN THE HOUSE OF REPRESENTATIVES

MARCH 11, 2020

Mr. MCGOVERN (for himself, Mr. SMITH of New Jersey, Mr. SUOZZI, Mr. MALINOWSKI, Mrs. HARTZLER, Mr. WILSON of South Carolina, Mr. MEADOWS, Mr. YOHO, Mr. GALLAGHER, Mr. RASKIN, Ms. TLAIB, and Ms. WEXTON) introduced the following bill; which was referred to the Committee on Foreign Affairs, and in addition to the Committees on Ways and Means, the Judiciary, and Financial Services, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

# A BILL

Ensuring that goods made with forced labor in the Xinjiang Uyghur Autonomous Region of the People's Republic of China do not enter the United States market, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Uyghur Forced Labor Prevention Act".

**SEC. 2. FINDINGS.**

Congress finds the following:

(1) In the Xinjiang Uyghur Autonomous Region, the Government of the People's Republic of China has established a system of extrajudicial mass internment camps arbitrarily detaining as many as 1.8 million Uyghurs, Kazakhs, Kyrgyz, and members of other Muslim minority groups who have been subjected to forced labor, torture, political indoctrination, and severe human rights abuses.

(2) Forced labor exists within the Xinjiang Uyghur Autonomous Region's system of mass internment camps, and throughout the region, and is confirmed by the testimony of former camp detainees, satellite imagery, and official leaked documents from the government of the People's Republic of China as part of a targeted campaign of repression of Muslim ethnic minorities.

(3) There is a very high risk that many factories and other suppliers in the Xinjiang Uyghur Autonomous Region are exploiting forced labor according to reports from researchers, media, and civil society groups. Audits to vet products and supply chains in the Xinjiang Uyghur Autonomous Region are not possible due to the extent forced labor has contaminated the regional economy, the mixing of involuntary labor with voluntary labor, the inability of witnesses to speak freely about working conditions given heavy government surveillance and coercion, and the strong incentive of government officials to conceal government-sponsored forced labor.

(4) In its June 2019 Trafficking in Persons Report, the Department of State found that "Authorities offer subsidies incentivizing Chinese companies to open factories in close proximity to the internment camps, and local governments receive additional funds for each inmate forced to work in these sites at a fraction of minimum wage or without any compensation.".

(5) In September 2019, U.S. Customs and Border Protection issued a "Withhold Release Order" on garments produced by Hetian Taida Apparel Co., Ltd. due to "suspected prison or forced labor" from its factories in the Xinjiang Uyghur Autonomous Region.

(6) In its 2019 Annual Report, the Congressional-Executive Commission on China (CECC) found that products reportedly produced with forced labor by current and former mass internment camp detainees included textiles, electronics, food products, shoes, tea, and handicrafts.

(7) According to public reports, the following companies are or have been suspected of directly employing forced labor or sourcing from suppliers that are suspected of using forced labor: Adidas, Badger Sportswear, Calvin Klein, Campbell Soup Company, Coca-Cola Company, COFCO Tunhe Company, Costco, Esquel Group, Esprit, H&M, Hetian Taida, Huafu Fashion Company, Kraft Heinz Company, Litai Textiles, Nike, Inc., Patagonia, Inc., Tommy Hilfiger, Urumqi Shengshi Huaer Culture Technology Company, Yili Zhuo Wan Garment Manufacturing Company, and Zhihui Haipai Internet of Things Technology Company.

(8) Section 307 of the Tariff Act of 1930 (19 U.S.C. 1307) states that it is illegal to import into the United States "goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part" by forced labor. Such merchandise is subject to exclusion or seizure and may lead to criminal investigation of the importer.

(9) The policies of the Government of the People's Republic of China are in contravention of international human rights standards, including—

(A) the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, which China has signed but not yet ratified;

(B) the International Covenant on Economic, Social, and Cultural Rights, ratified by the People's Republic of China in 2001; and

(C) the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children (Palermo Protocol), to which China is a state party.

**SEC. 3. STATEMENT OF POLICY.**

It is the policy of the United States—

(1) to prohibit the import of all goods, wares, articles, or merchandise mined, produced, or manufactured, wholly or in part, by forced labor from the People's Republic of China and particularly any such goods, wares, article, or merchandise produced in the Xinjiang Uyghur Autonomous Region;

(2) to encourage the international community to reduce the import of any goods made with forced labor from China, particularly those goods mined, manufactured, or produced in the Xinjiang Uyghur Autonomous Region;

(3) to actively work to prevent, publicly denounce, and end human trafficking as a horrific assault on human dignity and to restore the lives of those affected by human trafficking, a modern form of slavery;

(4) to regard the prevention of atrocities as in its national interest, including efforts to prevent torture, enforced disappearances, severe deprivation of liberty, including mass internment, arbitrary detention, and widespread and systematic use of forced labor, and persecution targeting any identifiable ethnic or religious group; and

(5) to address gross violations of human rights in Xinjiang Uyghur Autonomous Region through bilateral diplomatic channels and multilateral institutions where both the United States and China are members and with all the authorities available to the United States Government, including visa and financial sanctions, export restrictions, and import controls.

**SEC. 4. PROHIBITION ON IMPORTATION OF GOODS MADE IN THE XINJIANG UYGHUR AUTONOMOUS REGION.**

(a) IN GENERAL.—Except as provided in subsection (b), all goods, wares, articles, and merchandise mined, produced, or manufactured wholly or in part in the Xinjiang Uyghur Autonomous Region of China, or by persons working with the Xinjiang Uyghur Autonomous Region government for purposes of the "poverty alleviation" program or the "pairing-assistance" program which subsidizes the establishment of manufacturing facilities in the Xinjiang Uyghur Autonomous Region, shall be deemed to be goods, wares, articles, and

merchandise described in section 307 of the Tariff Act of 1930 ([19 U.S.C. 1307](#)) and shall not be entitled to entry at any of the ports of the United States.

(b) EXCEPTION.—The prohibition described in subsection (a) shall not apply if the Commissioner of U.S. Customs and Border Protection—

(1) determines, by clear and convincing evidence, that any specific goods, wares, articles, or merchandise described in subsection (a) were not produced wholly or in part by convict labor, forced labor, or indentured labor under penal sanctions; and

(2) submits to the appropriate congressional committees and makes available to the public a report that contains such determination.

(c) EFFECTIVE DATE.—This section shall take effect on the date that is 120 days after the date of the enactment of this Act.

## SEC. 5. DETERMINATION RELATING TO ATROCITIES IN THE XINJIANG UYGHUR AUTONOMOUS REGION.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of State shall—

(1) determine if forced labor being carried out against Uyghurs, Kazakhs, Kyrgyz, and members of other Muslim minority groups in the Xinjiang Uyghur Autonomous Region of China is systematic and widespread and therefore constitutes atrocities; and

(2) submit to the appropriate congressional committees and make available to the public a report that contains such determination.

(b) FORM.—The report required by subsection (a)—

(1) shall be submitted in unclassified form but may include a classified annex, if necessary; and

(2) may be included in the report required by section 6.

## SEC. 6. STRATEGY TO ADDRESS FORCED LABOR IN THE XINJIANG UYGHUR AUTONOMOUS REGION.

(a) IN GENERAL.—Not later than 90 days after the date of the enactment of this Act, the Secretary of State, in coordination with the heads of other appropriate Federal departments and agencies, shall submit to the appropriate congressional committees a report that contains a United States strategy to promote initiatives to enhance international awareness of and to address the forced labor in the Xinjiang Uyghur Autonomous Region of China.

(b) MATTERS TO BE INCLUDED.—The strategy required by subsection (a) shall include—

(1) a plan to enhance bilateral and multilateral outreach, including sustained engagement with the governments of United States partners and allies, to end the forced labor of Uyghurs, Kazakhs, Kyrgyz, and members of other Muslim minority groups in the Xinjiang Uyghur Autonomous Region;

(2) public affairs and public diplomacy campaigns, including options to work with news organizations and media outlets to publish opinion pieces and secure public speaking opportunities for United States Government officials on issues related to the

human rights situation, including forced labor in the Xinjiang Uyghur Autonomous Region; and

(3) opportunities to coordinate and collaborate with appropriate nongovernmental organizations and private sector entities to raise awareness about forced labor made products from the Xinjiang Uyghur Autonomous Region and to provide assistance to Uyghurs, Kazakhs, Kyrgyz, and members of other Muslim minority groups, including those formerly detained in mass internment camps in the region.

(c) ADDITIONAL MATTERS TO BE INCLUDED.—The report required by subsection (a) shall also include—

(1) a list of—

(A) Chinese entities or affiliates of entities that directly or indirectly use forced or involuntary labor in the Xinjiang Uyghur Autonomous Region; and

(B) Chinese persons that acted as agents of the entities or affiliates of entities described in subparagraph (A) to import goods into the United States;

(2) a list of products made wholly or in part by forced or involuntary labor in the Xinjiang Uyghur Autonomous Region;

(3) a list of businesses that sold products in the United States made wholly or in part by forced or involuntary labor in the Xinjiang Uyghur Autonomous Region; and

(4) a description of actions taken by the United States Government to address forced labor in the Xinjiang Uyghur Autonomous Region under existing authorities, including—

(A) the Trafficking Victims Protection Act of 2000 (Public Law 106–386; 22 U.S.C. 7101 et seq.);

(B) section 307 of the Tariff Act of 1930 (19 U.S.C. 1307);

(C) the Ellie Wiesel Genocide and Atrocities Prevention Act of 2018 (Public Law 115–441; 22 U.S.C. 2656 note); and

(D) the Global Magnitsky Human Rights Accountability Act (22 U.S.C. 2656 note).

(d) FORM.—The report required by subsection (a) shall be submitted in unclassified form, but may include a classified annex, if necessary.

(e) UPDATES.—The Secretary of State shall—

(1) provide briefings to the appropriate congressional committees on a quarterly basis, as applicable, on any updates to the strategy required by subsection (a) or any additional actions taken to address forced labor in Xinjiang Uyghur Autonomous Region, including actions described in this Act; and

(2) include any updates to the strategy required by subsection (a) in the annual Trafficking in Persons report required by section 110(b) of the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7107(b)).

(f) SUNSET.—This section shall cease to have effect on the date on which the President submits to the appropriate congressional committees a determination that the Government of the People's Republic of China has ended mass internment, forced labor, and any other gross

violations of human rights experienced by Uyghurs, Kazakhs, Kyrgyz, and members of other Muslim minority groups in the Xinjiang Uyghur Autonomous Region.

### SEC. 7. IMPOSITION OF SANCTIONS RELATING TO FORCED LABOR IN THE XINJIANG UYGHUR AUTONOMOUS REGION.

(a) REPORT REQUIRED.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, and not less frequently than annually thereafter, the President shall submit to the appropriate congressional committees a report that identifies each foreign person, including any official of the Government of the People's Republic of China, that the President determines—

(A) knowingly engages in, is responsible for, or facilitates the forced labor of Uyghurs, Kazakhs, Kyrgyz, and members of other Muslim minority groups in the Xinjiang Uyghur Autonomous Region of China; and

(B) knowingly engages in, contributes to, assists, or provides financial, material or technological support for efforts to contravene United States law regarding the importation of forced labor goods from the Xinjiang Uyghur Autonomous Region.

(2) FORM.—The report required under paragraph (1) shall be submitted in unclassified form, but may contain a classified annex.

(b) IMPOSITION OF SANCTIONS.—The President shall impose the sanctions described in subsection (c) with respect to each foreign person identified in the report required under subsection (a)(1).

(c) SANCTIONS DESCRIBED.—The sanctions described in this subsection are the following:

(1) ASSET BLOCKING.—The President shall exercise all of the powers granted to the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in property and interests in property of a foreign person identified in the report required under subsection (a)(1) if such property and interests in property—

(A) are in the United States;

(B) come within the United States; or

(C) come within the possession or control of a United States person.

(2) INELIGIBILITY FOR VISAS, ADMISSION, OR PAROLE.—

(A) VISAS, ADMISSION, OR PAROLE.—An alien described in subsection (a)(1) is—

(i) inadmissible to the United States;

(ii) ineligible to receive a visa or other documentation to enter the United States; and

(iii) otherwise ineligible to be admitted or paroled into the United States or to receive any other benefit under the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

(B) CURRENT VISAS REVOKED.—

(i) IN GENERAL.—An alien described in subsection (a)(1) is subject to revocation of any visa or other entry documentation regardless of when the visa or other entry documentation is or was issued.

(ii) IMMEDIATE EFFECT.—A revocation under clause (i) shall—

(I) take effect immediately; and

(II) automatically cancel any other valid visa or entry documentation that is in the alien's possession.

(d) IMPLEMENTATION; PENALTIES.—

(1) IMPLEMENTATION.—The President may exercise all authorities provided under sections 203 and 205 of the International Emergency Economic Powers Act ([50 U.S.C. 1702](#) and 1704) to carry out this section.

(2) PENALTIES.—The penalties provided for in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act ([50 U.S.C. 1705](#)) shall apply to a foreign person that violates, attempts to violate, conspires to violate, or causes a violation of paragraph (1) to the same extent that such penalties apply to a person that commits an unlawful act described in subsection (a) of such section 206.

(e) WAIVER.—The President may waive the application of sanctions under this section with respect to a foreign person identified in the report required under subsection (a)(1) if the President determines and certifies to the appropriate congressional committees that such a waiver is in the national interest of the United States.

(f) EXCEPTIONS.—

(1) EXCEPTION FOR INTELLIGENCE ACTIVITIES.—Sanctions under this section shall not apply to any activity subject to the reporting requirements under title V of the National Security Act of 1947 ([50 U.S.C. 3091](#) et seq.) or any authorized intelligence activities of the United States.

(2) EXCEPTION TO COMPLY WITH INTERNATIONAL OBLIGATIONS AND FOR LAW ENFORCEMENT ACTIVITIES.—Sanctions under subsection (c)(2) shall not apply with respect to an alien if admitting or paroling the alien into the United States is necessary—

(A) to permit the United States to comply with the Agreement regarding the Headquarters of the United Nations, signed at Lake Success June 26, 1947, and entered into force November 21, 1947, between the United Nations and the United States, or other applicable international obligations; or

(B) to carry out or assist law enforcement activity in the United States.

(3) EXCEPTION RELATING TO IMPORTATION OF GOODS.—

(A) IN GENERAL.—The authorities and requirements to impose sanctions authorized under this section shall not include the authority or a requirement to impose sanctions on the importation of goods.

(B) GOOD DEFINED.—In this paragraph, the term "good" means any article, natural or manmade substance, material, supply, or manufactured product, including inspection and test equipment, and excluding technical data.

(g) TERMINATION OF SANCTIONS.—The President may terminate the application of sanctions under this section with respect to a foreign person if the President determines and reports to the appropriate congressional committees not less than 15 days before the termination takes effect that—

(1) information exists that the person did not engage in the activity for which sanctions were imposed;

(2) the person has been prosecuted appropriately for the activity for which sanctions were imposed;

(3) the person has credibly demonstrated a significant change in behavior, has paid an appropriate consequence for the activity for which sanctions were imposed, and has credibly committed to not engage in an activity described in subsection (a)(1) in the future; or

(4) the termination of the sanctions is in the national security interests of the United States.

(h) SUNSET.—This section, and any sanctions imposed under this section, shall terminate on the date that is 5 years after the date of the enactment of this Act.

(i) DEFINITIONS.—In this section:

(1) ADMISSION; ADMITTED; ALIEN.—The terms "admission", "admitted", and "alien" have the meanings given those terms in section 101 of the Immigration and Nationality Act ([8 U.S.C. 1101](#)).

(2) FOREIGN PERSON.—The term "foreign person" means a person that is not a United States person.

(3) UNITED STATES PERSON.—The term "United States person" means—

(A) a United States citizen or an alien lawfully admitted for permanent residence to the United States; or

(B) an entity organized under the laws of the United States or any jurisdiction within the United States, including a foreign branch of such an entity.

## SEC. 8. REPORT ON "WITHHOLD RELEASE ORDERS" PURSUANT TO SECTION 307 OF THE TARIFF ACT OF 1930.

(a) IN GENERAL.—Not later than 60 days after the date of the enactment of this Act, the President shall submit to the appropriate congressional committees a report including a determination as to whether reasonable grounds exist, and an explanation of the reasons for any conclusion that such grounds do not exist, to issue a "Withhold Release Order" pursuant to section 307 of the Tariff Act of 1930 ([19 U.S.C. 1307](#)) with respect to products of each of the following:

(1) Yili Zhou Wan Garment Manufacturing Company.

(2) Zhihui Haipai Internet of Things Technology Company.

(3) Urumqi Shengshi Hua'er Culture Technology Limited Company.

(4) Litai Textiles, Huafu Fashion Company.

(5) Esquel Group headquartered in Hong Kong.

(6) Cofco Tunhe Company.

(b) FORM.—The report required by paragraph (1) shall be submitted in unclassified form but may contain a classified annex.

## SEC. 9. DISCLOSURES TO THE SECURITIES AND EXCHANGE COMMISSION OF CERTAIN ACTIVITIES RELATED TO THE XINJIANG UYGHUR AUTONOMOUS REGION.

(a) POLICY STATEMENT.—It is the policy of the United States to protect American investors, though stronger disclosure requirements, alerting them to the presence of Chinese and other companies complicit in gross violations of human rights in United States capital markets, including American and foreign companies listed on United States exchanges that enable the mass internment and population surveillance of Uyghurs, Kazakhs, Kyrgyz, and other Muslim minorities and source products made with forced labor in the Xinjiang Uyghur Autonomous Region in China. Such involvements represent clear, material risks to the share values and corporate reputations of certain of these companies and hence to prospective American investors, particularly given that the United States Government has employed sanctions and export restrictions to target individuals and entities contributing to human rights abuses in China.

(b) DISCLOSURE OF CERTAIN ACTIVITIES RELATING TO THE XINJIANG UYGHUR AUTONOMOUS REGION.—

(1) IN GENERAL.—Section 13 of the Securities Exchange Act of 1934 ([15 U.S.C. 78m](15 U.S.C. 78m)) is amended by adding at the end the following new subsection:

"(s) DISCLOSURE OF CERTAIN ACTIVITIES RELATING TO THE XINJIANG UYGHUR AUTONOMOUS REGION.—

"(1) IN GENERAL.—Each issuer required to file an annual or quarterly report under subsection (a) shall disclose in that report the information required by paragraph (2) if, during the period covered by the report, the issuer or any affiliate of the issuer—

"(A) knowingly engaged in an activity with an entity or the affiliate of an entity engaged in creating or providing technology or other assistance to create mass population surveillance systems in the Xinjiang Uyghur Autonomous Region of China, including any entity included on the Department of Commerce's 'Entity List' in the Xinjiang Uyghur Autonomous Region;

"(B) knowingly engaged in an activity with an entity or an affiliate of an entity building and running detention facilities for Uyghurs, Kazakhs, Kyrgyz, and other members of Muslim minority groups in the Xinjiang Uyghur Autonomous Region;

"(C) knowingly, directly or indirectly, purchased or otherwise acquired significant types or amounts of textiles made from material produced or manufactured in the Xinjiang Uyghur Autonomous Region;

"(D) knowingly engaged in an activity with an entity or an affiliate of an entity described in section 6(c)(1) of the Uyghur Forced Labor Prevention Act, including—

"(i) any entity engaged in the 'pairing-assistance' program which subsidizes the establishment of manufacturing facilities in the Xinjiang Uyghur Autonomous Region; or

"(ii) any entity for which the Department of Homeland Security has issued a 'Withhold Release Order' under section 307 of the Tariff Act of 1930 ([19 U.S.C. 1307](#)); or

"(E) knowingly conducted any transaction or had dealings with—

"(i) any person the property and interests in property of which were sanctioned by the Secretary of State for the detention or abuse of Uyghurs, Kazakhs, Kyrgyz, or other members of Muslim minority groups in the Xinjiang Uyghur Autonomous Region;

"(ii) any person the property and interests in property of which are sanctioned pursuant to the Global Magnitsky Human Rights Accountability Act ([22 U.S.C. 2656](#) note); or

"(iii) any person or entity responsible for, or complicit in, committing atrocities in the Xinjiang Uyghur Autonomous Region.

"(2) INFORMATION REQUIRED.—If an issuer described under paragraph (1) or an affiliate of the issuer has engaged in any activity described in paragraph (1), the issuer required under this paragraph is a detailed description of each such activity, including—

"(A) the nature and extent of the activity;

"(B) the gross revenues and net profits, if any, attributable to the activity; and

"(C) whether the issuer or the affiliate of the issuer (as the case may be) intends to continue the activity.

"(3) NOTICE OF DISCLOSURES.—If an issuer reports under paragraph (1) that the issuer or an affiliate of the issuer has knowingly engaged in any activity described in that paragraph, the issuer shall separately file with the Commission, concurrently with the annual or quarterly report under subsection (a), a notice that the disclosure of that activity has been included in that annual or quarterly report that identifies the issuer and contains the information required by paragraph (2).

"(4) PUBLIC DISCLOSURE OF INFORMATION.—Upon receiving a notice under paragraph (3) that an annual or quarterly report includes a disclosure of an activity described in paragraph (1), the Commission shall promptly—

"(A) transmit the report to—

"(i) the President;

"(ii) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives; and

"(iii) the Committee on Foreign Relations and the Committee on Banking, Housing, and Urban Affairs of the Senate; and

"(B) make the information provided in the disclosure and the notice available to the public by posting the information on the Internet website of the Commission.

"(5) INVESTIGATIONS.—Upon receiving a report under paragraph (4) that includes a disclosure of an activity described in paragraph (1), the President shall—

"(A) make a determination with respect to whether any investigation is needed into the possible imposition of sanctions under the Global Magnitsky Human Rights Accountability Act (22 U.S.C. 2656 note) or section 7 of the Uyghur Forced Labor Prevention Act or whether criminal investigations are warranted under statutes intended to hold accountable individuals or entities involved in the importation of goods produced by forced labor, including under section 545, 1589, or 1761 of title 18, United States Code; and

"(B) not later than 180 days after initiating any such investigation, make a determination with respect to whether a sanction should be imposed or criminal investigations initiated with respect to the issuer or the affiliate of the issuer (as the case may be).".

(c) SUNSET.—On the date that is 30 days after the date on which the President submits to the appropriate congressional committees the determination described in section 6(f), section 13(s) of the Securities Exchange Act of 1934, as added by subsection (b), is repealed.

(d) EFFECTIVE DATE.—The amendment made by subsection (b) shall take effect with respect to reports required to be filed with the Securities and Exchange Commission after the date that is 180 days after the date of the enactment of this Act.

**SEC. 10. DEFINITIONS.**

In this Act:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Foreign Affairs and the Committee on Financial Services of the House of Representatives; and

(B) the Committee on Foreign Relations and the Committee on Banking.

(2) ATROCITIES.—The term "atrocities" has the meaning given the term in section 6(2) of the Elie Wiesel Genocide and Atrocities Prevention Act of 2018 (Public Law 115–441; 22 U.S.C. 2656 note).

(3) FORCED LABOR.—The term "forced labor" has the meaning given the term in section 307 of the Tariff Act of 1930 (19 U.S.C. 1307).

(4) PERSON.—The term "person" means an individual or entity.

(5) MASS POPULATION SURVEILLANCE SYSTEM.—The term "mass population surveillance system" means installation and integration of facial recognition cameras, biometric data collection, cell phone surveillance, and artificial intelligence technology with the "Sharp Eyes" and "Integrated Joint Operations Platform" or other technologies that are used by Chinese security forces for surveillance and big-data predictive policing.