# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BYD COMPANY LTD.,<br><br>                Plaintiff,<br><br>      v.<br><br>VICE MEDIA LLC,<br><br>                Defendant. | Case No. 1:20-cv-03281-AJN |

**OPPOSITION TO DEFENDANT VICE MEDIA LLC'S MOTION TO DISMISS**

HARDER LLP
Charles J. Harder
100 Park Avenue, Sixteenth Floor
New York, New York 10017
Tel. (212) 799-1400

*Counsel for Plaintiff*
*BYD Company, Ltd.*

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................... 1

II.     ALLEGATIONS IN COMPLAINT..................................................................... 2

III.    STANDARD OF REVIEW .............................................................................. 5

IV.     VICE'S STATEMENTS REGARDING THE ASPI REPORT ARE
        ACTIONABLE ............................................................................................ 5

        A.  BYD Sufficiently Pleads Actual Malice........................................................ 5

        B.  The Neutral Reportage Doctrine, If It Even Exists Anymore, Does Not
            Apply Here ....................................................................................... 14

V.      VICE'S STATEMENTS REGARDING THE "BLACKLIST" ARE
        ACTIONABLE .......................................................................................... 16

VI.     CONCLUSION.......................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 5

*Barry v. Time, Inc.*,
   584 F. Supp. 1110 (N.D. Cal. 1984) ...................................................... 15

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 5

*Cabello-Rondón v. Dow Jones & Co.*,
   2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017), *aff'd* 720 Fed. Appx. 87
   (2d Cir. 2018) ......................................................................................... 21

*Cianci v. New Times Publishing Co.*,
   639 F. 2d 54 (2d Cir. 1980) ............................................................. 14, 15

*Coliniatis v. Dimas*,
   965 F. Supp. 511 (S.D.N.Y. 1997) .................................................. 15, 16

*Dickey v. CBS Inc.*,
   583 F. 2d 1221 (3d Cir. 1978) ............................................................... 15

*Edwards v. National Audubon Society*,
   556 F. 2d 113 (2d Cir. 1977) ....................................................... 14, 15, 16

*Gunduz v. New York Post Co.*,
   188 A.D.2d 294 (1st Dep't 1992) .......................................................... 20

*Kaelin v. Globe Communications Corp.*,
   162 F. 3d 1036 (9th Cir. 1998) .............................................................. 18

*Khan v. New York Times Co.*,
   269 A.D.2d 74, 710 N.Y.S.2d 41 (1st Dep't 2000) ............................... 12

*LaFaro v. New York Cardiothoracic Group*,
   570 F. 3d 471 (2d Cir. 2009) ................................................................... 5

*Levin v. McPhee*,
   917 F. Supp. 230 (S.D.N.Y. 1996) ........................................................ 16

*Liberty Mutual Insurance Co. v. Rotches Pork Packers, Inc.*,
    969 F. 2d 1384 (2d Cir. 1992) ................................................................................. 13

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ................................................................................. 9, 10

*Palin v. New York Times Co.*,
    940 F. 3d 804 (2d Cir. 2019) ................................................................................. *passim*

*Schermerhorn v. Rosenberg*,
    73 A.D.2d 276, 426 N.Y.S.2d 274 (2d Dep't 1980) ............................................. 19, 20

*St. Louis v. NYP Holdings, Inc.*,
    2017 WL 887255 (N.Y. Cty. Supr. Ct. Feb. 6, 2017) ................................................. 21

*State v. Dabney*,
    141 P. 2d 303 (Okla. Crim. App. 1943) ................................................................... 17

*Test Masters Educational Services v. NYP Holdings, Inc.*,
    603 F. Supp. 2d 584 (S.D.N.Y. 2009) .................................................................. 18, 20

*Von Gerichten v. Long Island Advance*,
    202 A.D.2d 495, 609 N.Y.S.2d 246 (2d Dep't 1994) ................................................ 20

*White v Berkshire-Hathaway*,
    10 Misc. 3d 254, 802 N.Y.S.2d 910 (Supr. Ct. Erie Cty. 2005) ................................. 20

**Other Authorities**

*Merriam-Webster's Online Dictionary* (at https://www.merriam-
    webster.com/dictionary/blacklist) .......................................................................... 17

## I.      INTRODUCTION

A non-governmental organization (the Australian Strategic Policy Institute, "ASPI"), whose accuracy and reliability have been publicly questioned, issued a report about the use of Uyghur forced labor in Chinese supply chains.  The ASPI report did not say that Plaintiff BYD Company Ltd. ("BYD") used Uyghur forced labor in its supply chain.  The report said only that BYD had done business with a company which owned a subsidiary that allegedly used forced labor in manufacturing other companies' products— not BYD's products.

However, Defendant VICE Media LLC ("VICE") decided to attempt to capitalize on anti-China hysteria, along with public outrage over the People's Republic of China's treatment of the Uyghurs, by defaming BYD.  VICE published an article falsely stating that the ASPI report found that BYD had used Uyghur forced labor in its supply chain, when it had not.  In doing so, VICE defamed BYD, and did so with actual malice.

The Complaint easily states a meritorious claim for defamation under New York law: VICE published a false statement, which has injured BYD in its trade and profession, and caused damage to BYD.

BYD has more than sufficiently pleaded actual malice:  the VICE article purported to summarize the ASPI report, but did not, and VICE knew this.  The ASPI report does not state that BYD used Uyghur forced labor in its supply chain, but VICE claims it did in its article.  VICE got the contents of the report (which it presumably knew) wrong and thus at least recklessly disregarded the truth of what was contained in the ASPI report.

BYD has a second valid claim for defamation:  the VICE story falsely claimed that

President Trump "blacklisted" BYD from selling electric buses in the United States. Again, the truth was fully available to VICE.  President Trump never did so.  Rather, the U.S. Congress passed a statute that barred the purchase of transit vehicles from *any* Chinese company.  VICE argues that this is effectively the same thing, and thus its story was a fair report of the legislation, but it plainly is not.  The Congressional statute is broad and applies to any and all Chinese companies.  There is no "list" of companies.  The notion of a "blacklist" connotes that there is a list of particular companies who were singled out and barred from making sales because they engaged in some sort of wrongdoing, and BYD is on that list.  But that is not the case at all.

VICE defamed BYD with this second allegation as well.  VICE made a false statement of fact about BYD, which has caused BYD harm.  Actual malice is adequately pled because VICE knew that President Trump had not blacklisted BYD, and thus acted with reckless disregard for the truth.

VICE sought to earn revenue by capitalizing on anti-China sentiment and generating clicks to its article with sinister, and knowingly false, allegations about a Chinese company, BYD.  This is exactly what defamation law seeks to remedy:  false, injurious statements that harm the plaintiff's reputation.

The motion to dismiss should be denied.

## II.    ALLEGATIONS IN COMPLAINT

BYD (an acronym for "Build Your Dreams"), is a publicly-traded corporation based in China.  *Complaint* ¶ 2.  BYD is one of the world's largest producers and suppliers of electric vehicles, including electric cars, buses, trucks and forklifts, as well as

solar panels, lithium batteries, and protective masks and equipment, among many other innovative, important and useful products.  *Id.*

Warren Buffet's company, Berkshire Hathaway, is a major investor in BYD.  *Id.*

BYD recently won a contract to supply the State of California with $1 billion worth of masks to protect its nurses, doctors, caregivers, first responders and other frontline personnel during and after the COVID-19 global pandemic.  *Id.*

Before the events that gave rise to this litigation, BYD enjoyed a very good reputation as a reliable supplier of quality products in the global marketplace.  *Complaint* ¶ 3.

On or about April 11, 2020, VICE published an article on its website (the "Article") falsely claiming that BYD was implicated in one of the most publicized and brutal human rights violations of modern times, the Chinese government's treatment of the Uyghur minority in Eastern China.  *Complaint* ¶ 4.  VICE falsely claimed that BYD was "using forced Uighur labor in its supply chain."  *Id.*

VICE's claim was based on a single named source: a report by an obscure Australian non-governmental organization, ASPI, which has been repeatedly criticized publicly for making false statements of fact, with an anti-Chinese bias.  *Complaint* ¶ 5.

In the Article, VICE also falsely described the contents of the ASPI report. *Complaint* ¶ 6.  The ASPI report does *not* state that BYD "us[ed] forced Uyghur labor in its supply chain", as the Article claims.  *Id.*  Rather, the ASPI report merely says that BYD did business with a company which owned a subsidiary that allegedly had used Uyghur forced labor.  *Id.*  The ASPI report does *not* say that the subsidiary of the third party

company ever produced any products or raw materials for BYD, or that the subsidiary was part of BYD's supply chain in any way.  *Id.*

VICE published the false statements about BYD knowing that they were not supported by the ASPI report, nor any other reliable source.  *Complaint* ¶ 7.  VICE made these statements for the purpose of causing tremendous reputational and economic harm to BYD, and to financially enrich VICE by driving traffic to its website through its reporting of an alleged scandal.  *Id.*

The VICE Article also contains a second blatantly defamatory statement: that President Trump "blacklisted" BYD from selling its electric buses in the United States. *Complaint* ¶ 8.  The headline of the Article at issue reads: "Trump blacklisted this Chinese company."  *Id.*

In fact, there was and is no such "blacklist"—and VICE was fully aware of this fact at the time it published the Article.  *Complaint* ¶ 10.  What actually occurred is that members of the United States Congress (not President Trump) determined that an entirely separate Chinese company: China Railway Rolling Stock Corporation, a state-owned entity, was using its public subsidies to undercut other producers of transit vehicles and unfairly compete in the market.  Accordingly, both houses of the U.S. Congress passed, and President Trump signed, language in an omnibus defense authorization bill that prohibited future federal funds from being used to purchase transit vehicles from any Chinese company.  *Id.*  This ban was not connected to any allegation of wrongdoing on the part of BYD, did not create any sort of blacklist, and was the product of Congressional legislation, not an action by President Trump to single out bad actors.  *Id.*

## III.    STANDARD OF REVIEW

"The pleading standards articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) are well-known: in order to satisfy Federal Rule of Civil Procedure 8, a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'   A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'   A well-pleaded complaint will include facts that 'raise a right to relief above the speculative level.'   'The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Palin v. New York Times Co.*, 940 F. 3d 804, 810 (2d Cir. 2019) (footnotes omitted).

"On a motion to dismiss . . . we must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group*, 570 F. 3d 471, 475 (2d Cir. 2009).

## IV.    VICE'S   STATEMENTS   REGARDING   THE   ASPI   REPORT   ARE ACTIONABLE.

VICE makes two arguments in support of its motion to dismiss on the ASPI report and false allegation that BYD used Uyghur forced labor.   Neither of them have any merit whatsoever.

### A. BYD Sufficiently Pleads Actual Malice.

First, VICE argues that there can be no actual malice because it relied on the ASPI

report.[1]  However, this argument fails for a very simple reason:  **the ASPI report does not say what VICE claims it says.**

Here is what VICE says in the Article:  "BYD was one of 83 companies identified in the report as using forced Uighur labor in its supply chain."  *Complaint* ¶ 4.

The ASPI report does not say this at all.  BYD attached the ASPI report to its Complaint as Exhibit A precisely so the Court can see what the ASPI report actually says. It contains the following references to BYD:

1.      "ASPI's research has identified 83 foreign and Chinese companies directly or indirectly benefiting from the use of Uyghur workers outside Xinjiang through potentially abusive labour transfer programs as recently as 2019: [long list of companies including BYD]."  [Dkt. 1 at 16; statement repeated at Dkt. 1 at 38].

2.      "On 17 May 2018, 105 Uyghur workers were transferred from Keriya county, Xinjiang, to Hubei Yihong Precision Manufacturing Co. Ltd in Xianning, Hubei province.  Hubei Yihong Precision Manufacturing Co. Ltd . . . is a subsidiary of Dongguan Yidong Electronic Co. Ltd  .  .  .  and produces precision parts for electronics such as backlights and battery covers.  According to their website, Dongguan Yidong Electronic Co. Ltd supply directly to BYD [and other companies]."  [Dkt. 1 at 45[2]].

---

[1] BYD assumes *arguendo* that its public role in the distribution of needed supplies in the COVID-19 crisis makes it at least a limited purpose public figure.

[2] The report includes a chart that is cited by VICE in its Motion at p. 6 for the allegation that Hubei supposedly directly sold products to BYD, but the report and the chart do not say this at all.  Rather, the chart expressly states: "Source: ASPIICPC. See appendix for supply chain source information."  [Dkt. 1 at 35].  That appendix contains these same statements: "On 17 May 2018, 105 Uyghur workers were transferred from Keriya county,

Those are the **only** references to BYD in a 56-page report.

To summarize, the report contains a general reference to BYD, along with numerous other companies, "directly or indirectly benefitting" from Uyghur labor, which language remains undefined by ASPI, and a claim that BYD is supplied by a company, which in turn owns a subsidiary that used Uyghur labor to produce electronic parts that are not indicated as having anything to do with BYD. That is all the ASPI report says.

To return to what VICE published: "BYD was one of 83 companies identified in the report as using forced Uighur labor in its supply chain." VICE clearly made a false statement of fact. The ASPI report *never* identifies BYD as using forced Uyghur labor in its supply chain, as VICE falsely states in its Article. The ASPI report contains a generic statement that BYD "directly or indirectly benefitted" from Uyghur labor and, to explain what that cryptic statement means, a further statement that BYD was supplied by a company that owned a subsidiary that used such labor, *without any connection* drawn between that subsidiary and BYD. The report does not state that the subsidiary supplied BYD.

VICE, incredibly, tries to argue that these statements—using forced labor in a supply chain, and being supplied by a company that happens to own a *separate subsidiary* that used forced labor—are the same thing. They are not—not by a long shot. In simple

---

Xinjiang, to Hubei Yihong Precision Manufacturing Co. Ltd in Xianning, Hubei province. Hubei Yihong Precision Manufacturing Co. Ltd . . . is a subsidiary of Dongguan Yidong Electronic Co. Ltd . . . and produces precision parts for electronics such as backlights and battery covers. According to their website, Dongguan Yidong Electronic Co. Ltd supply directly to BYD [and other companies]." [Dkt. 1 at 45].

terms, consider the following two statements:

1.     "A's component parts were made in factories using forced labor."

2.     "A's component parts were not made using forced labor, but it did buy component parts from X.  X owns a subsidiary, Y, which does not supply any parts to A. But Y used forced labor in supplying other companies."

These are obviously not the same statement.  If statement #2 is true, and statement #1 is false, then publishing a story asserting statement #1 does great harm to A's reputation, because it says A is using forced labor to produce its products when it is not.

VICE's arguments to the contrary are without merit.  First, VICE cites several inapposite cases that discuss complaints which generally plead actual malice without pleading any factual theory as to reckless disregard for the truth.  *See Memorandum of Law In Support of Defendant's Motion to Dismiss* at p. 17 (condemning pleading of "actual malice buzz-words").

BYD did not plead "buzz-words."  It articulated its theory of actual malice clearly and based on the facts:  "[VICE] knew that the contents of the ASPI Report did not support its claim regarding BYD's alleged use of forced labor in its supply chain. VICE…did not rely on any other source to support its claim regarding forced labor, and recklessly disregarded the fact that ASPI was an unreliable source for any such claim, especially when used as the sole source for such an explosive allegation which foreseeably would cause tremendous reputational and economic harm to BYD."  *Complaint* ¶ 31.  No "buzzwords" are alleged anywhere.

BYD in fact alleges the most obvious form of actual malice that one could imagine:

VICE read the ASPI report, and then *knowingly misstated* its contents.   VICE cannot seriously contend that a journalistic entity that knowingly misstates the contents of a document is not at least recklessly disregarding the truth.

This was the same theory of actual malice endorsed by the U.S. Supreme Court in the famous case of *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991).   In *Masson*, the author Janet Malcom of *The New Yorker* knew exactly what the plaintiff had said in her interviews of him—she had tape-recorded the interviews.   She nonetheless quoted him as saying things he did not say, and defended his defamation suit by arguing that a writer should have latitude to modify quotations.   The Supreme Court held that actual malice turned on whether "the meaning a statement convey[ed] to a reasonable reader" was different in the actual statement from what was quoted in the article.   *Id.* at 515.   In other words, actual malice is present if there is a "material change in the meaning conveyed by the statement" between the actual statement and the defendant's publication. *Id.* at 517.

Applying the *Masson* standard here, if the meaning conveyed by the ASPI report to a reasonable reader is different than the meaning of what VICE published, BYD has properly alleged actual malice.   As shown above, what VICE wrote is very different from what the ASPI report said.   A company "using forced labor in its supply chain" is very different from a company being alleged to have "directly or indirectly benefitted" from forced labor.   Many persons and companies may have "indirectly benefitted" in some way from forced labor without having employed it to make their products.   But for a company to "use forced labor in its supply chain" is an entirely different statement, and one far

more serious.  BYD satisfies the *Masson* standard.

The Second Circuit's recent decision in *Palin v. New York Times Co.* also provides useful guideposts for the pleading of actual malice.  In *Palin*, the issue was whether former vice presidential nominee Sarah Palin could state a cause of action against the *New York Times* ("the *Times*") with respect to a story the *Times* published that claimed there was a link between a map prepared by Palin's political action committee, which showed a crosshairs over certain Democratic Party congressional districts, and the actual shooting of a Democratic congresswoman. 940 F. 3d at 808.  The *Times* then ran a correction, admitting it was an error to claim a link.  *Id.* at 808-809.   Palin sued for defamation.

Similar to BYD in this case, Palin pleaded a factual theory of actual malice.  Palin's theory contained three parts:  "(1) [the *Times*' editor James] Bennet's background as an editor and political advocate provided sufficient evidence to permit a jury to find that he published the editorial with deliberate or reckless disregard for its truth, (2) the drafting and editorial process also permitted an inference of deliberate or reckless falsification, and (3) the *Times*' subsequent correction to the editorial did not undermine the plausibility of that inference."  *Id.* at 814.

The Second Circuit reversed the District Court's dismissal, and held that the complaint sufficiently pled actual malice.  Importantly, the Second Circuit held that because the *Times*' editor, Mr. Bennet, had access to articles published in *The Atlantic* **six years earlier** was indicative of his reckless disregard of the truth.  *Id.* at 814.  If access to articles in another publication from six years earlier is enough to justify a finding of reckless disregard of the truth, surely misstating the content of a report that is the very

subject of the Article itself is more than sufficient.

*Palin* also contains a very important instruction regarding the pleading of actual malice:  "[t]he test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation." *Id.* at 815.  The District Court was not entitled, on a motion to dismiss, to credit the *Times*' explanation of how it came to publish the article. The only issue is whether the theory pleaded in the Complaint is plausible.

Here, BYD's theory is plausible:  the ASPI report never said that BYD used forced labor in its supply chain, but merely insinuated that BYD indirectly benefitted because a company in its supply chain had invested in an unrelated subsidiary which had apparently supplied other companies, *not BYD*, with components that were produced with forced labor.  VICE decided that the truth was not interesting enough for its readers, and *deliberately misstated* the ASPI report in order to create a more sensationalistic story.  In the process, its readers were misled, and BYD was defamed.

VICE's arguments ask this Court to do exactly what the Second Circuit prohibited in *Palin*: adopt an alternative explanation, in a Rule 12(b)(6) proceeding, for VICE's conduct even though the Complaint's allegations are plausible.

VICE attempts to distinguish *Palin* (the controlling, 13-month old Second Circuit case) in a footnote, contending that it was only because of all of the elements (the previous articles debunking Palin's responsibility for the shooting, the editor's bias against Palin and personal bias in the gun rights debate, and the *Times*' correction), that the actual malice theory was sufficiently pleaded.  This is ridiculous—nowhere does the Second Circuit say that *Palin* is a limited holding applicable only to its specific facts.  For

instance, VICE cannot seriously contend that, had the *Times* not corrected its false report about Palin, it would have prevailed in her appeal.   VICE also ignores the express language of the *Palin* opinion, which discusses extensively how the role of a U.S. District Court in the context of a motion to dismiss is extremely limited.  *E.g., Palin*, 940 F. 3d at 812 ("[D]istrict courts are not free to bypass rules of procedure that are carefully calibrated to ensure fair process to both sides.").

VICE attempts to rely on *Khan v. New York Times Co.*, 269 A.D.2d 74, 710 N.Y.S.2d 41 (1st Dep't 2000), to argue that an allegation that a publication lied about the contents of a written report does not sufficiently allege actual malice.   *Khan*, which involved a motion for summary judgment, not a motion to dismiss, says nothing about the standard for pleading actual malice, which is what is at issue in the instant motion to dismiss.  *Khan* also involves a unique fact pattern.  The *Times* reporter in *Khan* fell on her sword and testified that she misread and failed to comprehend two news articles that she read, in reporting that the plaintiff had been sued by the SEC and fired from a job for stock fraud.   Even if the New York state court's decision in *Khan* is taken as rightly decided, the rule in that case would apply only on a summary judgment motion, and only if VICE admitted under oath that it misread the ASPI report.  VICE, of course, is doing nothing of the kind here, contending forcefully (and falsely) that it read the ASPI report correctly.

VICE next argues that it was entitled to rely on a single source, and that ASPI is supposedly more reliable than BYD pleads it to be.  This argument misses the point.  BYD is not contending that journalists can never report news from a single source.  So long as

the journalist is not consciously disregarding the truth or knowingly publishing falsehood, they can.  However, as shown above, VICE's Article misrepresented the contents of the ASPI report.  For this reason, VICE's reliance on a single, biased source is relevant; VICE admits it has no other information to support its false statement in the Article that BYD uses forced labor in its supply chain.

Independently, VICE's discussion of the supposed reliability of ASPI is irrelevant for another reason as well: it is all hearsay factual material that the Court cannot weigh (or even consider) on a motion to dismiss.  The allegations in the pleading that ASPI is unreliable and biased are plausible allegations—when Wikipedia says a group is biased and unreliable, it is *plausible* to allege that it is biased and unreliable.  Thus, VICE is not entitled, in this proceeding, to dispute those factual allegations.  In any event, the fact that some politicians relied on ASPI does not prove that the organization has no bias or is reliable; politicians, after all, often deploy the conclusions of biased NGO's to bolster their political arguments.[3]

---

[3] VICE contends that it sought comment from BYD and did not receive any response to its story.  This statement is completely outside the record.  It is not pleaded in the Complaint, and the Complaint obviously did not affirm the truth of any of the statements in the VICE Article (which it alleged to be false and defamatory).  Thus, VICE's statements that it contacted BYD for comment are non-judicially noticeable hearsay. *Liberty Mutual Insurance Co. v. Rotches Pork Packers, Inc.*, 969 F. 2d 1384, 1388-89 (2d Cir. 1992) (court may not judicially notice materials for truth of the matters asserted therein, only for their existence).  At any rate, there is no legal doctrine that says that a defendant may publish blatantly false and defamatory statements merely because the plaintiff was unavailable for comment.

**B. The Neutral Reportage Doctrine, If It Even Exists Anymore, Does Not Apply Here.**

VICE's last resort on its forced labor allegation is a 43-year old case that announced an orphaned doctrine, the "neutral reportage" concept. *Edwards v. National Audubon Society*, 556 F. 2d 113 (2d Cir. 1977), held that there was a narrow media privilege to report charges made by reputable institutions (in that case, the National Audubon Society) even if such charges may not be true.

The holding of *Edwards* was very limited and does not apply here. In particular, it only applied when the underlying organization is reputable, and it further only applied when the publisher does not deliberately distort the underlying statement. *Id.* at 120 ("when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges"); *id.* ("a publisher who...deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage").

Further, *Edwards* was an appeal from a judgment *after a trial*. VICE asks the Court to resolve these fact-bound issues on no record at all on a motion to dismiss, which contravenes Second Circuit law. *Cianci v. New Times Publishing Co.*, 639 F. 2d 54, 68 (2d Cir. 1980) ("[T]he privilege was limited in scope and required careful examination of the facts in each case . . ."). For instance, BYD has pleaded that ASPI is an unreliable organization, and that VICE has distorted what ASPI said. These statements must be taken as true. This Court cannot judicially notice ASPI's reputation—especially in the

face of a pleading that alleges that ASPI is biased, unreliable, and anti-China.

The Complaint alleges that ASPI is biased, and further alleges that VICE deliberately distorted the statements in the ASPI report.  That is enough to defeat a motion to dismiss on neutral reportage grounds.[4]

VICE cites *Coliniatis v. Dimas*, 965 F. Supp. 511, 520 (S.D.N.Y. 1997), in support of its neutral reportage argument, but *Coliniatis* is inapplicable.  First, *Coliniatis* was a summary judgment proceeding, where the facts regarding the reliability of the organization which made the defamatory statement could be developed.  *Colianitis* does not contain any language authorizing a court to make that determination on a motion to dismiss.  Second, *Colianitis'* neutral reportage discussion is *dicta*:  the Court held that the plaintiff failed to show actual malice.

Even if *Colianitis'* discussion of neutral reportage is given any weight, it does not apply here.  *Colianatis* stated in *dicta* that a Greek language newspaper's reportage of allegations made by a prominent law firm of a kickback scheme relating to a major Greek

---

[4] Importantly, despite *Edwards* being decided by a Circuit Court of Appeals that sees a lot of media litigation, BYD is only able to locate one published opinion in the 43 years since *Edwards* where the Second Circuit extensively discussed the doctrine.  In *Cianci*, the court held that the *New Times* could not claim the privilege when it published an allegation that a politician had been accused of rape, because it did not accurately summarize the underlying facts, citing "[t]he need for the careful limitation of a constitutional privilege for fair reportage."  639 F. 2d at 70.  While *Edwards* technically remains good law in this Circuit, it has also been emphatically rejected by other courts to consider the issue.  *E.g.*, *Dickey v. CBS Inc.*, 583 F. 2d 1221, 1225 (3d Cir. 1978); *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1124 (N.D. Cal. 1984) ("The court is well aware that, since *Edwards*, many courts have declined to adopt the privilege of neutral reportage, or have severely circumscribed its application.").  This Court should therefore exercise extreme caution in applying *Edwards* beyond its narrow context of an accurate quote from a trusted entity such as the National Audubon Society.

airline, who was a client of that law firm, could be protected as neutral reportage.  The court held that the law firm constituted a "responsible, prominent organization" comparable to the Audubon Society in *Edwards* because it had special credibility due to its former representation of the airline.  965 F. Supp. at 520 ("Given the Greek–American community's interest in Olympic, it is newsworthy that the company's own counsel made such allegations . . . The firm's status with respect to Olympic also provides a certain degree of trustworthiness.").  There is nothing comparable here.  Rather than accurately reporting the statements of an alleged wrongdoer's own lawyers, VICE inaccurately reported the contents of a biased NGO's report.  That is not neutral reportage.

VICE also cites *Levin v. McPhee*, 917 F. Supp. 230 (S.D.N.Y. 1996), in support of its neutral reportage argument, but *Levin* supports BYD's position.  *Levin* rejects the neutral reportage privilege where the underlying sources lacked credibility and prestige comparable to the Audubon Society.  *Id.* at 239 ("[I]t is clear that Galina, Burke, Dodge, Kuzminsky and Melamid are not all 'responsible, prominent organization[s]' or otherwise comparable to the National Audubon Society . . .").

## V.   VICE'S STATEMENTS REGARDING THE "BLACKLIST" ARE ACTIONABLE.

The defamatory nature of the statement that BYD was "blacklisted" arises from the fact that a "blacklist" is qualitatively different from a statute that simply prohibits certain governmental actions.

This is intuitively obvious.  For instance, consider a noncitizen who wished to serve in the military.  If a law prohibited noncitizens from serving in the military, would

that mean the same as saying that the noncitizen was placed on a blacklist that prohibited him or her from serving?  Obviously not.  In the first instance, there is simply a generally applicable law that affects an entire group of people that the noncitizen belongs to; in the second instance, it connotes that the person was singled out, presumably because of something he or she did wrong, and specifically prohibited from serving while others similarly situated could serve.  This is consistent with the dictionary definition of a "blacklist."  *See Complaint* ¶ 9 ("A 'blacklist' is defined by the Oxford English dictionary as 'a list of people or things that are regarded as unacceptable or untrustworthy and should be excluded or avoided.'"); *accord Merriam-Webster's Online Dictionary*, "blacklist" ("1: a list of persons who are disapproved of or are to be punished or boycotted 2: a list of banned or excluded things of disreputable character") (at https://www.merriam-webster.com/dictionary/blacklist); *State v. Dabney*, 141 P. 2d 303, 307 (Okla. Crim. App. 1943) (quoting *Black's Law Dictionary*: "A list of persons marked out for special avoidance, antagonism, or enmity on the part of those who prepare the list or those among whom it is intended to circulate . . .").

Note that in all of these definitions, a "list" is required.  Here, there is no list.

VICE's headline said something very different than what actually happened.  That headline carried a highly defamatory implication.

This sort of headline can constitute actionable defamation, and it is actionable in this case.  To hold otherwise would open up the floodgates of dishonest headlines. Oftentimes, the headline is the only thing the reader sees, and is even more likely to damage a plaintiff's reputation than a claim that is included in the text of an article itself.

*Kaelin v. Globe Communications Corp.*, 162 F. 3d 1036 (9th Cir. 1998), is on point. *Kaelin* arose out of the O.J. Simpson murder case.  The plaintiff was O.J. Simpson's houseguest and a material witness in the case, in which Simpson was accused of a double murder.  The *Globe* ran a headline that said "COPS THINK KATO DID IT!".  The sub-head and the article explained that Kaelin was being investigated for perjury.  However, the obvious implication of the headline was that Kaelin was a suspect in the double murder, which would be defamatory if, in fact, he was only being investigated for perjury and was not a murder suspect.

The *Globe* made exactly the same argument that VICE makes here: that the reader can read the article and discern that the headline is misleading.  The Ninth Circuit rejected that argument, and held that it was up to a jury to decide whether it agreed with the *Globe*: "Globe argues that the entirety of the publication, including the story itself, clears up any false and defamatory meaning that could be found on the cover.  Whether it does or not is a question of fact for the jury."  *Id.* at 1041.

VICE accurately states the test for headlines under New York law:  it must be a "fair index" of what is contained in the article, and some "drama" is permitted.  *Test Masters Educational Services v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009).  However, VICE misapplies that standard here.

As stated above, saying that President Trump "blacklisted" BYD is entirely at odds with saying that Congress passed, and the President signed, a generally applicable law that prohibited the purchase of certain sorts of equipment from any and all Chinese companies. They are two completely different contexts.

VICE argues that BYD was targeted by the legislation.  However, that misses the point.  Even if some members of Congress mentioned BYD as part of the legislative debate, and even if there were only three suppliers of Chinese buses (including BYD) who were affected by the legislation, there is still a categorical difference between passing a broad trade restriction, that applies to not just three companies now but also to any and all other Chinese companies that might seek to enter the market, and the President singling out BYD alone for wrongful conduct and placing it on a blacklist.  One is a trade sanction against China; the other is an executive action based on an allegation of specific wrongdoing against BYD alone.

This is not merely a matter of "drama" in a headline.  VICE chose a headline that did not fairly index its story, and instead told its readers that BYD alone was singled out and "blacklisted" by the President of the United States.  This was actionable defamation.

The "fair index" rule is not a license for a publisher to put defamatory statements into a headline.  In *Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 426 N.Y.S.2d 274 (2d Dep't 1980), the court held that the headline "SCHERMERHORN SAYS NDDC CAN DO WITHOUT BLACKS" was defamatory, even though the rest of the article accurately explained that what Schermerhorn, a State Senator, had actually said was that the NDDC (Newburgh Development District Corporation) Board was probably constitutionally prohibited from creating a preference for Black applicants to the NDDC.  The headline was susceptible to multiple interpretations, one of which was defamatory, and thus was not a "fair index" to the article; only a jury could determine the issue.  *Id.* at 286, 426 N.Y.S.2d at 283 ("The rule in this State is that '(d)**efamatory headlines are actionable**

though the matter following is not, unless they fairly indicate the substance of the matter

to which they refer, and * * * unless they are a fair index of the matter contained in a

truthful report.'") (emphasis added).

The cases cited by VICE are distinguishable or unpersuasive. *Test Masters*

*Educational Services*, involved a *New York Post* headline that referred to an "LSAT Cram

Scam" where the plaintiff had chosen a name confusingly similar to another test

preparation service, Testmasters (with no space); thus, the headline fairly described the

article.  603 F. Supp. 2d at 589.

*Von Gerichten v. Long Island Advance*, 202 A.D.2d 495, 496, 609 N.Y.S.2d 246,

247 (2d Dep't 1994), apparently held the headline there to be a fair index, but the opinion

did not state what the headline at issue was; thus, the case has limited value here.

*White v Berkshire-Hathaway*, 10 Misc. 3d 254, 255, 802 N.Y.S.2d 910, 912 (Supr.

Ct. Erie Cty. 2005), a trial court order, distinguished *Schermerhorn* because, in *White*, the

headline referred to an "operation" and did not even make clear it was referring to the

plaintiff.  VICE's headline ("Trump Blacklisted This Chinese Company . . .") clearly

refers to BYD.

*Gunduz v. New York Post Co.*, 188 A.D.2d 294, 294 (1st Dep't 1992), demonstrates

the sort of "drama" that is not misleading to readers—New York City revoked the license

of its worst taxi driver, who had been in multiple disputes with passengers and had been

cited for violations multiple times.  The *Post* jokingly called him "Public Enemy No. 1" in

the headline; the sub-head explained he was actually the City's worst taxi driver.  This sort

of obvious, humorous hyperbole stands in stark contrast to saying President Trump

blacklisted BYD.

The unpublished order in *St. Louis v. NYP Holdings, Inc.*, 2017 WL 887255 (N.Y. Cty. Supr. Ct. Feb. 6, 2017), involved a headline calling a rejected prison guard applicant who had prior arrests for marijuana and open container violations a "Drunk Driving Pothead." The court stated this headline was "sensationalistic" but not actionable. Again, the VICE headline contains no hyperbole; it contains a false statement of fact about a blacklist.

Finally, in *Cabello-Rondón v. Dow Jones & Co.*, 2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017), *aff'd* 720 Fed. Appx. 87 (2d Cir. 2018), there was no "fair index" issue because the headline "perfectly tracked" the article. That is not the case here.

## VI.    CONCLUSION

For the foregoing reasons, VICE's motion to dismiss should be denied in its entirety.[5]

Dated:  September 14, 2020                Respectfully submitted,


                                          By: _/s/ Charles J. Harder_
                                              Charles J. Harder
                                              HARDER LLP
                                              100 Park Avenue, Sixteenth Floor
                                              New York, New York 10017
                                              Tel. (212) 799-1400

                                              *Counsel for Plaintiff*
                                              *BYD Company, Ltd.*

---

[5] Should the Court find that any portion of VICE's motion is meritorious and that the deficiency can be cured by amendment, BYD respectfully requests this Court grant it leave to amend.