

21st Floor
1251 Avenue of the Americas
New York, NY  10020-1104

**Rachel F. Strom**
212-403-4069 tel
212-489-8340 fax

Rachelstrom@dwt.com

March 12, 2021

**BY ECF**
Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square, Room 2102
New York, New York 10007

Re:   *BYD Company Ltd. v. VICE Media LLC* (20-cv-03281)

Dear Judge Nathan:

This firm represents defendant VICE Media LLC ("VICE") in the above-captioned action and writes pursuant to Your Honor's Individual Practices in Civil Cases, Rule 3.H, which provides that counsel for a movant shall send a letter to alert the Court when a motion has been outstanding for more than 90 days.  VICE's Motion to Dismiss the Complaint (ECF No. 17) (the "Motion") was fully briefed on October 2, 2020, and has therefore been outstanding for longer than 90 days.

In addition, VICE respectfully asks this Court to take notice of new case law that is relevant to its Motion.[1]  On November 10, 2020, New York amended its anti-SLAPP statute to cover claims involving "any communication in a place open to the public or a public forum in connection with an issue of public interest."  N.Y. Civil Rights Law § 76-a(1)(a).  The law directs that the phrase "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter."  *Id.* § 76(a)(1)(d).  The law further provides that plaintiff must "establish[] by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false," *id.* § 76(a)(2), the same actual malice standard as articulated by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

In two recent decisions, courts in the Second Circuit have held that the amended anti-SLAPP statute's actual malice standard applies in federal court and applies retroactively to cases filed and briefed prior to the law's enactment.  *See Palin v. The N.Y. Times Co.*, No. 17-cv-4853, 2020 WL 353455, at *3-4 (S.D.N.Y. Dec. 29, 2020) (attached hereto as **Exhibit A**); *Coleman v.*

---

[1] While Federal Rule of Appellate Procedure 28(j) provides a process for notifying an appellate court of supplemental authorities, the Federal Rules of Civil Procedure do not contain an analogous provision.  However, "[i]t is fairly standard practice for parties to occasionally send letters or to otherwise file supplemental authority after briefing is complete."  *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427(NGG) (ST), 2016 WL 4617159, at *7 (E.D.N.Y. Sept. 2, 2016).

**DWT.COM**

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.

Hon. Alison J. Nathan
March 12, 2021
Page 2


*Grand*, No. 18-cv-5663 (ENV) (RLM), 2021 WL 768167, at *7 (E.D.N.Y. Feb. 26, 2021) (attached hereto as **Exhibit B**).

  Here, because Plaintiff admits for purposes of the Motion that it is "at least a limited purpose public figure," *see* Opposition (ECF No. 23) at 6 n.1, the heightened actual malice standard already applies to this case.  Even if Plaintiff did not make this admission, however, the requirement to plead and prove actual malice also applies because this matter involves a communication in a public forum in connection with an issue of public interest under the anti-SLAPP statute.

       Respectfully submitted,

       Davis Wright Tremaine LLP

       */s/ Rachel F. Strom*

       Rachel F. Strom


cc:  All counsel of record (via ECF)

# EXHIBIT A

2020 WL 7711593
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sarah PALIN, Plaintiff,

v.

The NEW YORK TIMES COMPANY
and James Bennet, Defendants.

17-cv-4853 (JSR)

|

Signed 12/29/2020

**Synopsis**

**Background:** Politician brought defamation action under
New York law against newspaper publisher, relating to
editorial linking the shooting of a congresswoman to the
circulation by politician's political action committee (PAC)
of a map superimposing a crosshairs target over certain
congressional districts. The United States District Court
for the Southern District of New York, Jed S. Rakoff,
Senior District Judge, 264 F.Supp.3d 527, granted publisher's
motion to dismiss for failure to state a claim, and denied
reconsideration, 2017 WL 5514371. Politician appealed. The
Court of Appeals, Walker, Senior Circuit Judge, 940 F.3d
804, vacated and remanded. On remand, following filing of
amended complaint to add editorial's author as a defendant
and granting of publisher's renewed motion for partial
judgment on the pleadings regarding claim for disgorgement
damages, 2020 WL 353455, the parties filed cross-motions
for summary judgment, which were denied, 2020 WL
5086531. Defendants then moved for order modifying
opinion to reflect fact that New York subsequently amended
its "anti-strategic litigation against public participation" (anti-
SLAPP) law to expressly require that public figures prove
actual malice by clear and convincing evidence.

**[Holding:]** The District Court, Rakoff, Senior District Judge,
held that New York's anti-SLAPP law, as amended, applied
retroactively to this action and required that plaintiff prove
actual malice by clear and convincing evidence as a matter of
New York law, separate and apart from the requirements of
the federal Constitution.

Motion granted.

West Headnotes (16)

**[1]** **Federal Civil Procedure** 🔑 Grounds and Factors

Although the Federal Rules of Civil Procedure
provide that an interlocutory order may be
revised at any time before entry of a judgment
adjudicating all the claims and all the parties'
rights and liabilities, past decisions should not
be revisited without good reason. Fed. R. Civ. P.
54(b).

**[2]** **Federal Civil Procedure** 🔑 Change in law or facts

An intervening change of controlling law
constitutes good reason for a court to revise an
interlocutory order. Fed. R. Civ. P. 54(b).

**[3]** **Pleading** 🔑 Frivolous pleading

Amendments to New York's "anti-strategic
litigation against public participation" (anti-
SLAPP) law substantially broadened the reach
of the actual malice requirement; while prior
version of law effectively limited actual malice
requirement to cases initiated by persons
or business entities that were involved in
controversies over a public application or permit,
amended law revised definition of an "action
involving public petition and participation" to
include claims based upon any communication
in a place open to the public or a public forum
in connection with an issue of public interest,
or any other lawful conduct in furtherance of
the exercise of the constitutional right of free
speech in connection with an issue of public
interest, or in furtherance of the exercise of
the constitutional right of petition, and further
directed that term "public interest" be construed
broadly to mean any subject other than a purely
private matter. N.Y. Civil Rights Law § 76-a.

1 Cases that cite this headnote

**[4]    Pleading 🔑 Frivolous pleading**

New York's "anti-strategic litigation against public participation" (anti-SLAPP) law requires public figures to prove actual malice by clear and convincing evidence. N.Y. Civil Rights Law § 76-a.

1 Cases that cite this headnote

**[5]    Federal Courts 🔑 Anti-SLAPP laws**

Federal court sitting in diversity must apply New York's "anti-strategic litigation against public participation" (anti-SLAPP) law because it is a substantive, rather than a procedural, provision. N.Y. Civil Rights Law § 76-a.

**[6]    Statutes 🔑 Amendatory statutes**

Under New York law, statutory amendments are generally presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated.

**[7]    Statutes 🔑 Remedies and Remedial Statutes**

Under New York law, "remedial legislation" should be given retroactive effect in order to effectuate its beneficial purpose.

**[8]    Statutes 🔑 Remedies and Remedial Statutes**

Under New York law, "remedial statutes" which should be given retroactive effect are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party.

**[9]    Statutes 🔑 Amendatory statutes**

Under New York law, factors considered in determining whether statutory amendments should apply retroactivity include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency, whether the statute was designed to rewrite an unintended judicial interpretation,

and whether the enactment itself reaffirms a legislative judgment about what the law in question should be.

**[10]    Pleading 🔑 Frivolous pleading**

New York's "anti-strategic litigation against public participation" (anti-SLAPP) law, as amended, would be given retroactive effect to defamation action brought by politician against newspaper publisher, which was filed before amendments took effect but had not yet gone to trial, such that she would be required, as a matter of state law, to prove actual malice by clear and convincing evidence; anti-SLAPP law was a remedial statute, the Legislature conveyed a sense of urgency by directing that amendments were to "take effect immediately," the law's legislative history demonstrated that amendments were intended to correct narrow scope of state's prior anti-SLAPP law, politician, who was never entitled to recover monetary damages absent a showing of actual malice, failed to identify any "harsh impact" of retroactively applying the law to her case, and retroactive application would protect publisher's reliance interests. U.S. Const. Amend. 1; N.Y. Civil Rights Law § 76-a.

1 Cases that cite this headnote

**[11]    Constitutional Law 🔑 Defamation**

Famously "intricate relationship" between First Amendment and state libel law is especially pronounced where a state opts to conform aspects of its state law to the First Amendment. U.S. Const. Amend. 1.

**[12]    Statutes 🔑 Language and Intent; Express Provisions**
        **Statutes 🔑 Presumptions and inferences**

Under New York law, legislation is typically presumed to apply prospectively, but that presumption may be overcome with a "clear expression" of legislative purpose.

**[13]**　**Constitutional Law** 🖝 Defamation

States are free to subject to the actual malice rule defamation plaintiffs who might otherwise fall outside the reach of the First Amendment. U.S. Const. Amend. 1.

**[14]**　**Constitutional Law** 🖝 Retrospective laws and decisions; change in law

Retroactive legislation may, in certain cases, implicate due process concerns. U.S. Const. Amends. 5, 14.

**[15]**　**Constitutional Law** 🖝 Retrospective laws and decisions; change in law

Due process requires a persuasive reason for the potentially harsh impacts of statutory retroactivity. U.S. Const. Amends. 5, 14.

**[16]**　**Courts** 🖝 Operation and effect in general

While courts might, in some contexts, credit a litigant's objectively reasonable reliance on binding appellate precedent, there is no case law or principle of constitutional adjudication that would credit a litigant's wishful reliance on the prospect that binding appellate precedent will one day be overturned.

**Attorneys and Law Firms**

Shawn Preston Ricardo, Michael McGee Munoz, Golenbock Eiseman Assor Bell & Peskoe LLP, New York, NY, Kenneth G. Turkel, Shane B. Vogt, Bajo Cuva Cohen Turkel, Tampa, FL, for Plaintiff.

David A. Schulz, Ballard Spahr LLP, Jacquelyn Nicole Schell, Thomas Byrne Sullivan, Ballard Spahr LLP, New York, NY, Jay Ward Brown, Michael D. Sullivan, Pro Hac Vice, Lee Levine, Ballard Spahr LLP, Washington, DC, David L. Axelrod, Ballard Spahr, Philadelphia, PA, Thomas S. Leatherbury, Vinson & Elkins LLP, Dallas, TX, for Defendant The New York Times Company.

Jay Ward Brown, Lee Levine, Ballard Spahr LLP, Washington, DC, David L. Axelrod, Ballard Spahr, Philadelphia, PA, Jacquelyn Nicole Schell, Thomas Byrne Sullivan, Ballard Spahr LLP, New York, NY, for Defendant James Bennet.

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

**\*1** On June 27, 2017, plaintiff Sarah Palin brought a single defamation claim against The New York Times Company ("The Times") arising from The Times' editorial of June 14, 2017 titled America's Lethal Politics regarding gun control (the "Editorial"). Dkt. No. 1. The now-operative complaint, filed on December 30, 2019, also named James Bennet, the author of the relevant segments of the Editorial. Dkt. No. 70.

Although plaintiff does not dispute that she is a "public figure," in a previously-filed motion for partial summary judgment, she argued that she is not required to prove actual malice, and prove it by clear and convincing evidence, on the ground that the federal constitutional rule imposing that burden in the case of public figures either is no longer good law or does not apply to this case. Dkt. No. 100. Defendants argued, among other things, that the federal constitutional rule governed the case and that, in any event, New York law independently imposed an actual malice requirement. Dkt. No. 104. In an Opinion and Order dated August 28, 2020 (the "Opinion"), Dkt. No. 117, the Court held that the federal Constitution, under well-settled and binding precedent, imposed the actual malice requirement, id. at 12-13 (citing New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)), and declined to reach the question whether New York law independently imposed that burden, id. at 13 n.8. The case is now set for trial, pandemic permitting, on June 21, 2021.

Now before the Court is defendants' motion, pursuant to Federal Rule of Civil Procedure 54(b), for an order modifying the Opinion to reflect the fact that on November 10, 2020, New York amended its "anti-strategic litigation against public participation" ("anti-SLAPP") law to expressly require that public figures prove actual malice by clear and convincing evidence. Dkt. No. 120. Plaintiff opposes. Dkt. No. 123. For the reasons set forth below, the motion is granted.

 **[1]**  **[2]**  Federal Rule of Civil Procedure 54(b) provides, in relevant part, that an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Of course, past decisions should not be revisited "without good reason." Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003). But "an intervening change of controlling law" is just such a reason. Id.

 **[3]**  Here, there has been just such an intervening change of law. It is true that New York's anti-SLAPP law has long had an actual malice requirement, providing that:

> [i]n an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

 **\*2**  See N.Y. Civil Rights Law § 76-a(2). The prior version of the law, however, defined "an action involving public petition and participation" narrowly to include only claims "brought by a public applicant or permittee, and [that are] materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission." See Intl. Shoppes v. At the Airport, 131 A.D.3d 926, 928, 16 N.Y.S.3d 72 (2d Dep't 2015).[1] As a result, the actual malice requirement was effectively limited to cases initiated by persons or business entities that were involved in controversies over a public application or permit. See Chandok v. Klessig, 632 F.3d 803, 819 (2d Cir. 2011) ("Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission.").

On November 10, 2020, New York amended its anti-SLAPP law. See A.B. 5991-A. Among other things, the amendments substantially broadened the reach of the actual malice rule. As amended, the law defines an "action involving public petition and participation" to include a claim based upon:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civil Rights Law § 76-a(1)(a). The law further directs that the term "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter." Id. § 76-a(1)(d). Also, although less directly relevant here, the amendments create an affirmative cause of action for certain defendants to recover attorneys' fees and other damages from plaintiffs in specified circumstances. Id. § 70-a.[2]

Defendants now ask the Court to rule that § 76-a, as amended on November 10, 2020, applies retroactively to this action and thus requires that plaintiff prove actual malice by clear and convincing evidence as a matter of New York law, separate and apart from the requirements of the federal Constitution. Def. Mem. at 4. They contend that "a ruling now on the applicability of state law will inform the drafting of jury instructions at trial, simplify future proceedings including on appeal, and give effect to constitutional avoidance ...." Id. at 5.

Plaintiff responds that defendants have not established extraordinary circumstances warranting reconsideration. Plaintiff's Response to Defendants [sic] Memorandum of Law in Support of Motion for Reconsideration ("Pl. Mem."), Dkt. No. 123, at 1. Plaintiff argues that the Court has already decided that the actual malice standard applies to this case, and that the source of the actual malice rule does not matter for the purposes of the upcoming trial. Id. at 1-2. And, plaintiff contends, if she loses at trial and renews her challenge to the federal actual malice rule on appeal, defendants will have preserved their argument that New York independently imposes the requirement. Id. at 2. Therefore, according to plaintiff, nothing will be simplified by granting reconsideration; indeed, doing so "would amount to an advisory opinion." Id. at 1-2.

 **\*3**  The Court sees no reason why it should delay resolution of this plainly relevant issue. If, as defendants contend, § 76-a applies retroactively to this action, that will undoubtedly simplify proceedings on appeal; by contrast, if, as plaintiff insists, the statute does not have retroactive effect, then we are exactly where we began and, to prevail at trial, plaintiff will still have to prove actual malice as a matter of federal constitutional law. Either way, there is nothing to be gained from delay. In light of the intervening change of law, the Court now turns to the merits of defendants' motion.

**[4]** **[5]** It is undisputed that § 76-a requires public figures, like plaintiff, to prove actual malice by clear and convincing evidence. It is also undisputed (albeit by virtue of neither party having raised the issue) that a federal court sitting in diversity must apply § 76-a because it is a substantive, rather than a procedural, provision. See Adelson v. Harris, 774 F.3d 803, 809 (2d Cir. 2014) (affirming the district court's application of certain substantive provisions of Nevada's anti-SLAPP law); see also La Liberte v. Reid, 966 F.3d 79, 86 n.3 (2d Cir. 2020) (distinguishing between the applicability in federal court of substantive and procedural elements of state anti-SLAPP laws). The only question here is whether § 76-a should be given retroactive effect to this action, which was filed before the amendments took effect but has not yet gone to trial.

**[6]** **[7]** **[8]** **[9]** Under New York law, statutory amendments are generally "presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." Matter of Gleason (Michael Vee, Ltd.), 96 N.Y.2d 117, 122, 726 N.Y.S.2d 45, 749 N.E.2d 724 (2001). So-called "remedial legislation," however, "should be given retroactive effect in order to effectuate its beneficial purpose. Id. "Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." Nelson v. HSBC Bank USA, 87 A.D.3d 995, 998, 929 N.Y.S.2d 259 (2d Dep't 2011). "Other factors in the retroactivity analysis include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." Gleason, 96 N.Y.2d at 122, 726 N.Y.S.2d 45, 749 N.E.2d 724.

**[10]** It is clear that § 76-a is a remedial statute that should be given retroactive effect. The Legislature conveyed a sense of urgency by directing that the amendment was to "take effect immediately." See A.B. 5991-A § 4; see, e.g., Gleason, 96 N.Y.2d at 122, 726 N.Y.S.2d 45, 749 N.E.2d 724. Moreover, the legislative history demonstrates that the amendments to § 76-a were intended to correct the narrow scope of New York's prior anti-SLAPP law. As State Senator Brad Hoylman, the Senate sponsor of the amendments, explained: the prior anti-SLAPP law had been "strictly limited to cases initiated by persons or business entities that are embroiled in controversies over a public application or permit, usually

in a real estate development situation." Sponsor Mem. of Sen. Hoylman (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. "By revising the definition of an 'action involving public petition and participation,' this amendment to Section 76-a will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law" -- namely, "to provide the utmost protection for the free exercise or speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern." Id. "These factors together persuade [the Court] that the remedial purpose of the amendment should be effectuated through retroactive application." Gleason, 96 N.Y.2d at 123, 726 N.Y.S.2d 45, 749 N.E.2d 724.

**\*4** **[11]** Plaintiff offers three reasons not to give § 76-a retroactive effect, but none is persuasive. First, plaintiff argues that while "the changes made to Section 70-a appear to be 'remedial' in nature, ... the changes to Section 76-a are not." Pl. Mem. at 2. For example, plaintiff points out that § 70-a states that it applies to "any person who commenced or continued such action," (emphasis added), whereas § 76-a "contains no such temporal expression." Id. at 4. That § 70-a might also be intended to have retroactive effect, however, does not undermine the clear evidence that the Legislature intended § 76-a to have retroactive effect. Nor is it any surprise that the Legislature did not expressly state that § 76-a would apply to any plaintiff who "continued" such an action; after all, any public figure would have already had to prove actual malice under the federal Constitution.[3]

**[12]** **[13]** Next, plaintiff argues that Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 N.Y.3d 332, 130 N.Y.S.3d 759, 154 N.E.3d 972 (2020), a recent New York Court of Appeals decision, creates a presumption against retroactivity, where, as here, the amendment would "impact substantive rights." Pl. Mem. at 3 (quoting Regina, 35 N.Y.3d at 370, 130 N.Y.S.3d 759, 154 N.E.3d 972). For at least two reasons, however, this argument is unpersuasive. The first is that Regina created no such rule. Instead, the Regina court simply restated well-established New York law: that legislation is typically presumed to apply prospectively but that the presumption could be overcome with "a clear expression of ... legislative purpose." 35 N.Y.3d at 369, 130 N.Y.S.3d 759, 154 N.E.3d 972 (quoting Gleason, 96 N.Y.2d at 122, 726 N.Y.S.2d 45, 749 N.E.2d 724). Nothing in Regina suggests that it is overturning the general rule that remedial legislation, like § 76-a, is presumed to have retroactive effect.[4] Second, even assuming

arguendo that Regina did articulate such a rule, § 76-a will not have any meaningful impact on plaintiff's "substantive rights." As already discussed, any public figure seeking to recover damages for defamation would already have had to prove actual malice as a matter of federal law separate and apart from the requirements of New York law.[5]

[14] [15] Finally, plaintiff, again relying on Regina, suggests that applying § 76-a retroactively would "raise a bevy of constitutional concerns," including due process concerns. Pl. Mem. at 4-5. Specifically, plaintiff contends that "the retroactive application of Section 76-a would impose a significant element of proof (actual malice by clear and convincing evidence) upon Plaintiff on a claim based on conduct occurring over three years ago." Id. at 5. Plaintiff is correct, of course, that retroactive legislation could, in certain cases, implicate due process concerns. This, however, is not such a case. As Regina itself recognizes, "due process requires a persuasive reason for the potentially harsh impacts of retroactivity." Regina, 35 N.Y.3d at 375, 130 N.Y.S.3d 759, 154 N.E.3d 972. Here, however, plaintiff fails to identify any "harsh impact" of retroactively applying § 76-a to the instant case.

*5 Regina itself helps prove the point. There, the Court of Appeals held that the retroactive application of certain provisions of the Housing Stability and Tenant Protection Act of 2019 would violate the Due Process Clause. 35 N.Y.3d at 388, 130 N.Y.S.3d 759, 154 N.E.3d 972. Relevant to the court's holding was the fact that the retroactive application of the law would effectively penalize landlords for having disposed of tenant records years earlier, even though doing so at the time was perfectly legal. Id. at 379-80, 130 N.Y.S.3d 759, 154 N.E.3d 972. By contrast, and by virtue of the First Amendment, plaintiff was never entitled to recover monetary damages absent a showing of actual malice.

[16] Put differently, here, unlike the plaintiffs in Regina, plaintiff has not demonstrated any reasonable reliance interest. To the extent plaintiff invokes such a reliance interest, her claim would seem to be that, in first bringing this lawsuit in 2017, she relied on the prospect that the Supreme Court would overturn New York Times Co. v. Sullivan and allow her to recover damages without a showing of actual malice. While courts might, in some contexts, credit the "objectively reasonable reliance on binding appellate precedent," cf. Davis v. United States, 564 U.S. 229, 231, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), there is no case law or principle of constitutional adjudication that would credit a litigant's wishful reliance on the prospect that binding appellate precedent will one day be overturned. If anything, the retroactive application of § 76-a will protect the reliance interests of defendants, who published the Editorial in a media landscape long-governed by the actual malice rule, against possible changes of constitutional law at the federal level.

For the foregoing reasons, defendants' motion is granted. The Court holds that N.Y. Civil Rights Law § 76-a, as amended on November 10, 2020, applies to this action and requires plaintiff, as a matter of state law, to prove by clear and convincing evidence what she had already been tasked with establishing under the federal Constitution: that defendants made the allegedly defamatory statements in the Editorial "with knowledge of [their] falsity or with reckless disregard of whether [they were] false" -- that is, with actual malice. See § 76-a(2).

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2020 WL 7711593

---

Footnotes

1    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

2    Defendants do not ask the Court to apply § 70-a in this action, nor do they contend that the provision would even apply in federal court. See Defendants' Memorandum of Law in Support of Motion for Reconsideration ("Def. Mem."), Dkt. No. 120, at 4 n.4.

3    As the preceding analysis makes clear, the famously "intricate relationship between First Amendment and state libel law," Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000), is especially pronounced where, as here, a state opts to conform aspects of its state law to the First Amendment.

4    Indeed, Regina itself recognized that certain portions of the Housing Stability and Tenant Protection Act of 2019 were intended by the Legislature to have retroactive effect, although, as discussed below, it ultimately refused to effectuate that legislative intent on due process grounds. See 35 N.Y.3d at 387, 130 N.Y.S.3d 759, 154 N.E.3d 972.

5    To be sure, states are free to subject to the actual malice rule plaintiffs who might otherwise fall outside the reach of the First Amendment. See, e.g., Nelson Auto Center, Inc. v. Multimedia Holdings Corporation, 951 F.3d 952, 957 (8th Cir. 2020) ("Minnesota is free to categorize corporations as public figures that must prove actual malice even if federal law does not."). Because plaintiff is clearly a public figure under well-established federal law, the Court need not and does not address whether § 76-a subjects to New York's actual malice rule a broader collection of plaintiffs than does the First Amendment.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2021 WL 768167
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Steven Douglas Coleman, Plaintiff,

v.

María Kim Grand, Defendant.

18-cv-5663 (ENV) (RLM)
|
Filed 02/26/2021

MEMORANDUM & ORDER

ERIC N. VITALIANO United States District Judge

 **\*1** On October 10, 2018, plaintiff Steven Douglas Coleman commenced this action against María Kim Grand, bringing a libel claim and requesting damages of at least $500,000 plus attorney's fees. Grand filed counterclaims alleging libel and intentional infliction of emotional distress (IIED).[1] The parties have cross-moved for summary judgment on their respective claims. For the reasons that follow, both parties' libel claims and Grand's IIED claim fail as a matter of law.

Background[2]

From 2011 to 2016, Coleman and Grand had what both parties characterize as a rocky, on-and-off sexual relationship. Coleman's libel claim arises from a November 2017 email Grand circulated to around 40 friends and industry colleagues, describing her experiences in the relationship and her feeling that Coleman had used his age and status to harass and take advantage of her. *See* Am. Compl., Dkt. 22, ¶¶ 51–59; Grand Email, Dkt. 1-3; Grand Letter, Dkt. 1-4. Grand's libel counterclaim centers on, among other communications, an email Coleman sent to around 80 people in May 2018 saying her accusations were false, presenting his side of the story and including explicit text messages between the two. *See* Ans. to Am. Compl., Dkt. 25, ¶¶ 75–92; Coleman Email, Dkt. 87-3.

Grand, an aspiring young saxophonist, met Coleman, a prominent saxophonist, when she attended a 2009 workshop he gave in New York City. Pl.'s 56.1, Dkt. 82-1, ¶ 1. At this first encounter, Coleman was 52 years old and Grand was 17.

Def.'s 56.1, Dkt. 85, ¶ 1. Grand, who was visiting the United States from her home in Switzerland, asked Coleman for a lesson and, after first saying he did not work with beginners, he agreed. Def.'s Mem., Dkt. 86, at 4–5. There is no dispute that they did not then begin a sexual relationship, though each says the other was pursuing one. *See, e.g.*, Coleman Tr., Dkt. 82-7, at 454:10–13; Grand Tr., Dkt. 82-6, at 33:22–23.

Grand moved to New York City in 2011, at which point she and Coleman did begin a sexual relationship, though they disagree about who initiated it. Grand Tr. at 34:21–35:8; Am. Compl. ¶ 12. The relationship was never exclusive—Coleman was married and saw other women, and Grand also had other relationships. Def.'s 56.1 ¶ 3. Grand would later say she felt pressured to have sex with Coleman in order for him to continue teaching and working with her, and to avoid his anger. Def.'s Mem. at 5; Grand Tr. at 109:17–110:13, 131:4–132:2. At the same time, she said she was in love with him, was "slightly manipulative" and sometimes initiated sex, which "was never physically forced." Def.'s Mem. at 5; Grand Tr. at 112:4–5. Coleman says the relationship was fully consensual, often with Grand pursuing him, and that he helped her gain valuable work experience and an O-1 visa. Am. Compl. ¶¶ 10–17.

 **\*2** They split temporarily in 2013, following an argument Grand says was occasioned by Coleman's wife asking for a divorce. Pl.'s 56.1 ¶ 3; Grand Tr. at 111:10–21. Their relationship resumed in 2014 and continued on and off for the next two years with increasing antagonism, especially when they toured together. Grand Tr. at 85:24–86:16, 134:17–135:16; Coleman Tr. at 254:2–16. They had their final sexual encounter in September 2016. Grand Tr. at 57:17–58:21; Pl.'s 56.1 ¶¶ 5–6. As with much else, they disagree on who initiated it. Grand Tr. at 57:17–58:21, 60:18–25; Pl.'s 56.1 ¶¶ 5–6. In November 2016, Grand told Coleman's manager she no longer wanted to work with Coleman. Pl.'s 56.1 ¶ 7. For the next year, they had little contact. Am. Compl. ¶ 27; Grand Tr. at 62:5–63:15.

In May and October 2017, Grand wrote in emails and texts to Coleman that she intended to speak publicly about her concerns with their relationship, centered on Coleman pursuing her despite the gap in their age and status. Pl.'s 56.1 ¶¶ 8–12. She posted on Facebook in October that, after former Hollywood producer Harvey Weinstein's arrest for sex crimes, she was glad "skeletons are coming out." Dkt. 1-2. Coleman apparently saw this post, and her other messages, as "threats." Am. Compl. ¶ 31; Pl.'s 56.1 ¶¶ 10–11. Grand,

adding fuel to the fire, flat out denies that they were. Ans. to Am. Compl. ¶ 31. Grand also wrote an email to Coleman's estranged wife in November saying she intended to speak publicly. Pl.'s 56.1 ¶ 13.

These communications led up to the November 2017 email and letter at the heart of Coleman's claim. On November 5, 2017, Grand emailed seven friends, asking for help proofreading an open letter on her relationship with Coleman before she shared it more broadly. Pl.'s 56.1 ¶ 17; Dkt. 82-13 at 50. On November 17, Grand sent the finalized seven-page letter to around 40 people, mostly industry colleagues. *See* Grand Email. It recounted her history with Coleman, but called him "X" because, she said, naming him would be "legally dangerous." *Id.* Grand said the letter described her "experience with" "sexism in the music industry," motivated by her desire to "start [ ] a larger conversation" on the subject. *Id.*

The letter Grand sent that lit the fireworks began by stating that she felt conversations on sexism were "long overdue," then detailed what she called an "abusive dynamic" and "sexual harassment" in her relationship with Coleman, focusing on the post-2013 period. Grand Letter at 2. She described various encounters she said disturbed her, such as waking up to find "X" in her hotel bed and having to convince him to leave. But, the letter also acknowledged that she had fallen in love with him and that she was grateful for their time together. *Id.* at 4, 6, 8. "Simply, the highs were very high and the lows were very low," she wrote. *Id.* at 4. Then circling back to where she had begun her letter, Grand claimed that, despite her anxiety and reluctance to "say something," she was "speaking out" to create change in the industry. *Id.* at 7–8.

Among the letter's statements Coleman challenges as defamatory are: "About 6 months after I moved to New York in 2011, he convinced me to be intimate with him"; "By that point [in 2013], though, I wasn't in love with him anymore. I didn't want to be intimate with him anymore. That period is when the sexual harassment started."; and "He would call me in the middle of the night and never take no for an answer." *Id.* at 4–5; Pl.'s Mem., Dkt. 83, at 10–14.

There appears to be no dispute that, as Coleman alleges, Grand authorized one of the email's recipients, Okkyung Lee, to share the letter with colleagues and journalists and name Coleman in doing so. Pl.'s 56.1 ¶ 19; Def.'s Reply 56.1, Dkt. 94, ¶ 19; Dkt. 82-13 at 14, 20, 24–25, 31. Nor is there a dispute that, on November 27, Grand named Coleman when

sending the letter to seven members of the We Have Voice Collective, a group she and other artists launched "to bring awareness to issues of inequity, including but not limited to sexual harassment and bullying" in the performing arts. Pl.'s 56.1 ¶ 18; Dkt. 82-13 at 2–3; Dkt. 87-16. Grand also sent the letter to Coleman's wife, which is again undisputed. Pl.'s 56.1 ¶ 15; Def.'s Reply 56.1, ¶¶ 15. His wife, Coleman says, knew it was about him. Pl.'s 56.1 ¶¶ 15, 22; Def.'s Reply 56.1, ¶¶ 15, 22.

**\*3** Coleman claims he found out about Grand's email in January 2018. Coleman Tr. at 209:18–24. He testified that he lost band members as a result of it, and experienced embarrassment and lost productivity. *Id.* at 193:21–194:9, 199:19–204:3; Pl.'s 56.1 ¶¶ 55–57. He alleges that, to cope, he began receiving massages and seeing a psychotherapist. Coleman Tr. at 180:3–181:23. He asserts that he lost work starting in October 2018. Pl.'s 56.1 ¶¶ 58–67; Dkt. 82-12 at 8–28.

Striking back, on May 5, 2018, Coleman emailed a letter of his own to around 80 people—forming the focus of Grand's counterclaims. *See* Coleman Email; Def.'s 56.1 ¶ 8; Ans. to Am. Compl. ¶¶ 75–76. He selected recipients whom he thought had received Grand's letter, though some had not. Coleman Tr. at 308:4–14, 312:5–12. He addressed the letter to the We Have Voice Collective. Coleman Email at 2. He said he was "writing this letter to categorically denounce [Grand's] accusation as false, and to appeal to you to hear both sides of the story before reflexively rushing to judgment." *Id.* He said he was doing so now because, the week before, one of the Collective's members had asked Coleman to leave a concert of Grand's, at her request. *Id.* Like Grand's letter, Coleman's gave his version of the relationship. He said it "was unusual, intense, argumentative, and passionate, but it was also completely consensual and should have been private." *Id.* He said each pursued the other, and he never threatened Grand or forced her to do anything, "which thoroughly refutes Maria's accusations of sexual harassment." *Id.* He called her sexually aggressive and manipulative. *Id.* at 2–3. He included an "addendum" with excerpts of his texts with Grand as "small examples of evidence," some explicitly sexual and others discussing their relationship or making plans. *Id.* at 4–9. Coleman also made a few statements over the following months on Facebook, in emails and to the media, defending his position and saying Grand's story was false. Ans. to Am. Compl. ¶¶ 77–84.

Coleman filed the instant case on October 10, 2018, making Grand's email and letter available on the Court's public docket. Compl., Dkt. 1. Beginning almost immediately, he lost numerous bookings and a teaching job. Pl.'s 56.1 ¶¶ 58–67; Coleman Decl., Dkt. 82-8, ¶ 48. In explaining his cancelations, however, venues cited the lawsuit, headlines about it and their institutions' related concerns. Dkt. 82-12 at 8–28. Coleman's expert estimates his losses topped $1.2 million. Pl.'s 56.1 ¶ 68; Kucsma Report, Dkt. 82-10, at 7. Similarly, Grand claims she lost work due to Coleman's statements, as well as during their relationship, when she alleges he only booked her if she slept with him. Ans. to Am. Compl. ¶¶ 93–94.

### Standard of Review

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.' " *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Courts do not try issues of fact at the summary judgment stage, but instead merely "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

**\*4** The movant carries the burden of demonstrating there is no genuine dispute as to any material fact, *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the motion court will resolve all ambiguities and draw all permissible factual inferences in the light most favorable to the party opposing the motion. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Where the nonmoving party "will bear the burden of proof at trial," it bears the initial procedural burden at summary judgment of demonstrating that undisputed facts "establish the existence of [each] element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322–23. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116

F.3d 28, 33 (2d Cir. 1997). When the parties cross-move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

### Discussion

Although Coleman and Grand disagree on most everything else, they both describe their relationship as rocky, with numerous highs and lows. Each recalls pursuing the other and being pursued, sometimes saying no and sometimes yes to a continued personal and professional relationship. Both sides agree that the encounters, retold in their briefing, were legal and consensual. Although the parties may parse the details of those encounters, all that is in issue is whether the dueling statements Grand and Coleman published about each other give rise to plausible claims of defamation and, in Grand's case, for intentional infliction of emotional harm, and whether any of them any party is entitled to summary judgment in the absence of any dispute of material issue.

### I. Coleman's Defamation Claim

Coleman's single claim is that Grand's email and letter constitute defamation as a matter of law. Libel is defamation in writing or print. *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Under New York law, which applies here, a plaintiff must establish five elements to prevail on a libel claim:

> 1) a written defamatory statement of fact of and concerning the plaintiff;

> 2) publication by defendant to a third party;

> 3) fault;

> 4) falsity of the defamatory statement; and

> 5) injury to plaintiff, either special damages or *per se* libel. *Id.*; *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). Libel actions require courts to consider both a plaintiff's interest in protecting one's reputation and society's interest in preserving free speech rights. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 146–47, 87 S. Ct. 1975, 1991, 18 L. Ed. 2d 1094 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254,

84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Therefore, even though defamation actions are created by state law, they are not solely delimited by state law. In fact, "the elements of a libel action are heavily influenced by the minimum standards required by the First Amendment" and any additional free expression protections afforded speech by the state constitution. *Celle*, 209 F.3d at 176; *Immuno AG. v Moor-Jankowski*, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991).

These variable constitutional standards affect the fault and falsity analyses. Libel defendants who write about public figures and officials, or matters of public interest, receive the protection of a heightened fault standard. Under federal constitutional law, plaintiffs who are public figures must show defendants acted with actual malice, whereas private figures need only meet a gross negligence standard. *Curtis Pub. Co.*, 388 U.S. at 155; *Sullivan*, 376 U.S. at 280; *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001). For statements on matters of public concern, New York law has long required all plaintiffs to show defendants acted with gross irresponsibility and, as discussed below, recently imposed an actual malice standard in certain cases. *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101–02 (2d Cir. 2000) (quoting *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975)); *Palin v. New York Times Co.*, No. 17-CV-4853 (JSR), 2020 WL 7711593, at *2 (S.D.N.Y. Dec. 29, 2020) (quoting N.Y. Civ. Rights. Law § 76-a). Second, only falsifiable factual statements can be actionable libel. Opinions are constitutionally protected. *Immuno AG.*, 77 N.Y.2d at 254–55. In deciding these issues, summary judgment on libel claims has "particular value" in avoiding the "chilling effect of protracted litigation." *Id.* at 256.

### A. Fault[3]

**\*5** The applicability of the actual malice fault standard depends on whether Coleman is a public figure and whether Grand spoke on a matter of public interest. These are questions of law for the Court. *See Celle*, 209 F.3d at 176; *Konikoff*, 234 F.3d at 106.

#### i. General purpose public figure

A public figure is someone with "general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Gertz*, 418 U.S. at 324. As previewed above, public figure status is a question of law for the Court that places the burden of proof on the defendant. *Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 192, 674 N.Y.S.2d 662 (1st Dep't 1998). If a

plaintiff is classified as a public figure, he must then prove by clear and convincing evidence that the defendant acted with actual malice, defined as "knowledge of its falsity or reckless disregard for the truth." *Id.* at 342.

There are two types of public figures: general and limited purpose public figures. General purpose public figures are those who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," and must therefore meet the actual malice standard for all libel claims. *Gertz*, 418 U.S. at 345. To qualify, the person's fame must be "very great; the individual must be a 'household name' on a national scale." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 n.8 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015) (quoting *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 20 n.14 (1st Cir. 2011)). It is the "rare person" who meets this test. *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 137 (2d Cir. 1984).

Grand argues Coleman has achieved sufficient fame as a musician to be considered a general purpose public figure. Def.'s Mem. at 39–40. Coleman began playing music in the 1970s, and has continued performing, touring, giving workshops and releasing albums since. Holzen Report, Dkt. 87-26, ¶ 16; Def.'s 56.1 ¶ 10; *see generally* Coleman Tr. He has received recognition for this work, including a MacArthur Fellowship, a Guggenheim Fellowship and awards from the Doris Duke Charitable Foundation. Holzen Report ¶ 17; Kucsma Report at 5; Coleman Tr. at 46:16–24. Local media coverage from 2015 and 2016 describes him as "a rising giant" in jazz and a recipient of "many awards." *See Morning Call* Article, Dkt. 96-2, at 3; *Chicago Reader* Article, Dkt. 96-3, at 3. In 2017 and 2018, publications ranked his albums as among the year's best jazz releases. Def.'s 56.1 ¶ 9. Tabloid headlines covering this litigation call Coleman a "famed" and "prominent" saxophonist. Holzen Report ¶ 25; Dkt. 87-28.

These facts show Coleman has achieved notable success and recognition within the world of jazz—one he described as "small," Coleman Tr. at 309:4–9, and "underground," Dkt. 96-23 at 3—and the broader creative community. Coleman has sought and attained public attention for his music, including by giving interviews to the media. *See James v. Gannett Co.*, 40 N.Y.2d 415, 422, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976) (considering media access central to the public figure analysis); *Morning Call* Article; *Chicago Reader* Article. To classify Coleman as a general purpose public figure, however, his celebrity must be greater than that

of a successful musician "well known in some circles." *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 249 (S.D.N.Y. 2014). The Court does "not lightly assume" that Coleman's "participation in community and professional affairs render[s] him a public figure for all purposes." *Gertz*, 418 U.S. at 352. Instead, the Court requires a "clear showing" of fame, asking whether he is a "well-known celebrity" whose name is a " 'household word.' " *Horowitz v. Mannoia*, 10 Misc. 3d 467, 469, 802 N.Y.S.2d 917, 921 (Nassau Cty. Sup. Ct. 2005) (quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980)). As Grand has not sufficiently demonstrated that Coleman has reached this high level of celebrity and name recognition, Coleman cannot be classified as a general purpose public figure.

### ii. Limited purpose public figure

 **\*6** Depending upon the circumstances established in the record, a plaintiff can be classified as a limited purpose public figure if he "ha[s] thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. When such a plaintiff challenges a defendant's statements concerning that controversy as defamatory, to succeed he must show the defendant acted with actual malice. *Id.* at 342.

For courts to categorize a plaintiff as a limited purpose public figure:

> A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Lerman*, 745 F.2d at 136–37.

Grand does not contend that Coleman meets this test, arguing instead that he is a public figure for all purposes. In any event, Grand fails at the first factor. There is no evidence that, prior to Grand's email, Coleman successfully sought public attention and influence for his views on matters arguably related to this litigation, such as his relationships, relationships generally or sexual harassment allegations. The record reflects only that Coleman sought and received attention for making music. *Cf. Lerman*, 745 F.2d at 137 (plaintiff was limited purpose public figure in case involving mislabeled nude photos because she had "voluntarily devot[ed] herself to the public's interest in sexual

mores, through extensive writing on this topic"); *Pisani v. Staten Island Univ. Hosp.*, No. 06-CV-1016 (JFB) (MLO), 2008 WL 1771922, at \*16 (E.D.N.Y. Apr. 15, 2008) (plaintiff was private figure because "[d]efendants have failed to cite any facts showing that [plaintiff's] prominence was related to the topic of the [defendant's] statement"); *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 225 (S.D.N.Y. 1993) (plaintiff who "sought out the press on matters completely unrelated" to alleged defamation was private figure).

Further, while Grand's email addressed an existing public controversy—as "part of broader discussions regarding sexual assault, sexual harassment and consent in workplaces across the country," *Elliott v. Donegan*, 469 F. Supp. 3d 40, 53 (E.D.N.Y. 2020)—Coleman did not voluntarily inject himself into and assume prominence in that controversy. Responding to Grand's email and bringing this action do not make him a public figure, nor does the fact that his attorney commented in one newspaper article. *See Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96 S. Ct. 958, 966–67, 47 L. Ed. 2d 154 (1976) (participating in litigation generally insufficient to render plaintiff public figure); *Lluberes*, 663 F.3d at 19 ("[A]n individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations."); *Lerman*, 745 F.2d at 136 (plaintiff "dragged unwillingly into the controversy" is not public figure). In this light, therefore, Coleman does not meet the test for classification as a limited purpose public figure. Consequently, because Grand has not shown Coleman to be either a general or limited public figure, for litigation purposes he must be treated as a private figure, which would require Grand to show she spoke on a matter of public interest in order to have the defamation claim lodged against her by Coleman adjudged by the more defense-friendly actual malice standard, as discussed below.

### iii. Matter of public interest

 **\*7** Not missing a beat, Grand initially argued that, even if Coleman is not a public figure, her statements addressed a matter of public concern, requiring him to show she acted with gross irresponsibility. *See* Def.'s Mem. at 40 (citing *Chapadeau*, 38 N.Y.2d at 199). Seeking now to raise the bar even higher, Grand argues in a recent submission to this Court that New York's amended anti-strategic litigation against public participation ("anti-SLAPP") statute—which applies to communications on issues of public interest—has imposed a new standard that requires Coleman to show she acted with actual malice. *See* Def.'s Notice, Dkt. 105 (citing *Palin*, 2020 WL 7711593; N.Y. Civ. Rights. Law § 76-a).

It was an important tweak to New York law. New York courts have long held that, if a defendant's allegedly defamatory statements involve a matter "arguably within the sphere of legitimate public concern," the plaintiff bears the burden of showing, by a preponderance of the evidence, that the defendant made those statements "in a grossly irresponsible manner." *Konikoff*, 234 F.3d at 101 (quoting *Chapadeau*, 38 N.Y.2d at 199). The state's protections for libel defendants speaking on public affairs increased on November 10, 2020, when amendments to New York's anti-SLAPP statute took effect. *See Palin*, 2020 WL 7711593, at \*1–2. Indeed, New York's anti-SLAPP law has always imposed an actual malice standard in any "action involving public petition and participation." *Id.*; N.Y. Civ. Rights Law § 76-a(2). The old version of the law defined such actions narrowly, however, covering only those "brought by a public applicant or permittee." *Palin*, 2020 WL 7711593, at \*2 (citing *Chandok v. Klessig*, 632 F.3d 803, 819 (2d Cir. 2011)). The amendments, among other changes, broadly expand that definition to include:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or
>
> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civ. Rights Law § 76-a(1)(a); *see also Palin*, 2020 WL 7711593, at \*2.

The only court to have addressed this amendment thus far has it applies in federal court and has retroactive effect. *See Palin*, 2020 WL 7711593, at \*3–4. This Court agrees. It is a hornbook rule that "federal courts sitting in diversity apply state substantive and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219, 135 L. Ed. 2d 659 (1996). The anti-SLAPP provision at issue here, § 76-a, applies in federal court because it is "manifestly substantive," governing the merits of libel claims and increasing defendants' speech protections. *Id.*; *cf. La Liberte v. Reid*, 966 F.3d 79, 86 n.3 (2d Cir. 2020) (finding California anti-SLAPP law's "special motion to strike" procedural); *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (finding Nevada anti-SLAPP law's provisions on immunity from civil liability and fee-shifting substantive); *Egiazaryan v. Zalmayev*, No. 11-CV-2670 (PKC), 2011 WL 6097136, at \*12 (S.D.N.Y. Dec. 7, 2011) (applying

New York's pre-amendment anti-SLAPP law in diversity jurisdiction case).

Having found § 76-a to be substantive and applicable in federal court, the question becomes whether that application can be retroactive. New York's statutory amendments "are presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." *In re Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122, 726 N.Y.S.2d 45, 749 N.E.2d 724 (2001). New York, moreover, is in harmony with the general rule that legislation considered "remedial," "should be given retroactive effect in order to effectuate its beneficial purpose." *Id.* So, too, should legislation regarding which the Legislature "conveyed a sense of urgency," or aimed "to rewrite an unintended judicial interpretation." *Id.* Overall, these legislative statements must amount to a " 'persuasive reason' for the 'potentially harsh' impacts of retroactivity." *Regina Metro. Co., LLC v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 375, 130 N.Y.S.3d 759, 154 N.E.3d 972, 995 (2020) (internal citation omitted).

**\*8** The anti-SLAPP amendments are just such remedial, retroactive legislation. The memorandum accompanying the bill's introduction states that "as drafted, and as narrowly interpreted by the courts, the application." Section 76-a has failed to accomplish [its] objective." S52A Sponsor Mem. (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52. The memorandum expresses the specific intent that the proposed amendments will "better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law": to protect the free exercise of speech, particularly in public fora on matters of public interest. *Id.* The bill became effective "immediately." *Id.* Under New York law, these clear legislative expressions of remedial purpose and urgency give the amendments retroactive effect. *See Palin*, 2020 WL 7711593, at \*5 (quoting *Gleason*, 96 N.Y.2d at 123 ("These factors together persuade [the Court] that the remedial purpose of the amendment should be effectuated through retroactive application.")). Nor, furthermore, does retroactive application offend due process where, as here, plaintiff will face no "harsh impacts" from retroactive application. *See id.* at \*5. Coleman has already hitched his wagon to the actual malice standard, which he claims to satisfy. *See* Pl.'s Mem. at 8–10.

Applying New York's amended anti-SLAPP law, the Court finds Coleman must prove Grand acted with actual malice because he brings "a claim based upon ... lawful conduct

in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a). This interpretation is guided not only by the legislative intent of the amendment, but also by its directive to construe "public interest" broadly, as encompassing all but purely private matters. S52A Sponsor Mem. The Court is guided by this legislative directive, as well as the New York courts' "extremely broad interpretation" of statements on "matters of public concern," which likewise receive heightened protections. *Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001). In that regard, New York law considers a matter of public concern as "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298, 445 N.Y.S.2d 156 (2d Dep't 1981) (quoting *Waldbaum*, 627 F.2d at 1296). This includes "a matter of political, social, or other concern to the community," even if it does not "affect the general population." *Abbott v. Harris Publications, Inc.*, No. 97-CV-7648 (JSM), 2000 WL 913953, at *7 (S.D.N.Y. July 7, 2000). That said, "publications directed only to a limited, private audience" are deemed by these same New York courts as "matters of purely private concern." *Id.* at 270 (quoting *Huggins v. Moore*, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 726 N.E.2d 456 (1999)). Following logically, statements falling "into the realm of mere gossip and prurient interest" are also deemed matters of private concern. *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 595, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989).

Here, Grand defines the issue of public interest as "sexual impropriety and pressure in the music industry." Pl.'s Mem. at 40. The Court assesses the topic at the time of her allegedly defamatory statements. Grand sent her email and letter on November 17, 2017, amid the rising tide of public concern over workplace sexual harassment known as the #MeToo movement. Following the reporting of sexual assault allegations against Harvey Weinstein, "#MeToo catapulted into the public's consciousness in October 2017." *Elliott*, 469 F. Supp. 3d at 51. People began engaging in "widespread and difficult conversations about what constitutes inappropriate behavior in professional settings and how to construe consent in sexual relationships between prominent industry players and those seeking opportunities within that industry." *Id.* at 52. Against this backdrop, the Court finds that sexual impropriety and power dynamics in the music industry, as in others, were indisputably an issue of public interest at the time Grand sent her email.

Grand's email and letter marked her foray into these conversations. She quite clearly frames them as her contribution to the larger discussions occurring at the time of the #MeToo movement. Her email begins by saying she is joining the "talk[ ] about sexism in the music industry" by sharing her own experiences. Grand Email at 2; *see Huggins*, 94 N.Y.2d at 304 (finding articles on parties' divorce addressed matter of public concern by "show[ing] the greater significance of [defendant's] personal story"). Her letter starts by saying she wants to "speak up" in part "for the sake of other young women." Grand Letter at 2. Coleman acknowledges this context, saying Grand wrote "as part of the broader #MeToo movement." Pl.'s Reply, Dkt. 92, at 8. Further adding to the public interest in Grand's statements, while Coleman does not have the household-name status that qualifies him as a general purpose public figure, he remains a prominent musician of interest to the jazz community. *Cf. McKee v. Cosby*, 874 F.3d 54, 62 (1st Cir. 2017) (finding sexual assault allegations against actor Bill Cosby were public controversy).

**\*9** These findings set the litigation battlefield. Because Grand's statements were "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest," Coleman must show she spoke with actual malice. N.Y. Civ. Rights Law § 76-a(1)–(2). This requires him to "establish[ ] by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." *Id.* § 76-a(2). Importantly, "[d]espite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." *Behar*, 238 F.3d at 174; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447 (1991) (actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will").

In assessing the defendant's subjective doubts as to the publication's truth, a "court typically will infer actual malice from objective facts." *Celle*, 209 F.3d at 183. These facts may include "the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story." *Id.* (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)). Significant on this motion, courts may make this determination on summary judgment, which should be granted if no reasonable factfinder could find, by clear and convincing evidence,

that the defendant acted with actual malice. *See, e.g., id.*; *Anderson*, 477 U.S. at 257.

Coleman argues that his claim satisfies the actual malice standard, making two proffers of evidentiary support. Pl.'s Mem. at 8–10. First, he points to a line in Grand's email saying "it's not public at the moment because it's legally dangerous for me to publish this (even though I've removed any mention of names)." *Id.* at 10 (quoting Grand Email at 2). Relatedly, he notes that Grand wrote in an email to a friend and colleague that she was not going to name Coleman because "I spoke with an attorney and apparently it's very dangerous for me legally to post this, because then he can sue me for damages incurred if he loses any work, or for defamation," and made similar statements to another friend. *Id.* (quoting Dkt. 82-13 at 52). Coleman claims that because it is known that speaking the truth is legal, Grand's statements show that she knew her words were false. *Id.* Second, he argues that by authorizing a different friend and colleague to circulate the letter within the industry and to journalists, and to name Coleman in doing so, Grand showed "her true motive was revenge." *Id.*; Dkt. 82-13 at 14, 20, 24–25, 31.

Neither of these proffers shows Grand acted with actual malice. While Grand could theoretically have feared a defamation suit because she knew her words were false, she could also have feared suit because she, and the attorney she consulted, believed Coleman might sue regardless of whether she spoke truthfully. Grand says just that—rooting her fears in her awareness that meritless defamation suits can be brought as "punishment," and saying she never had or voiced any concerns with her letter's truthfulness. *See* Def.'s Opp'n Mem., Dkt. 93, at 27; Grand Opp'n Decl., Dkt. 95, ¶ 24. Indeed, New York amended its anti-SLAPP law to counter the same phenomenon Grand cites: suits aimed at chilling speakers' public participation. *See* S52A Sponsor Mem. Both theories are plausible but what is crucial is that Coleman offers no facts proving, by clear and convincing evidence, that Grand knowingly or recklessly made false statements. *See Anderson*, 477 U.S. at 254 ("[T]here is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.").

**\*10** As to Coleman's argument that Grand was motivated by revenge when she authorized the letter's circulation, this also does not show actual malice. Evidence of ill will can occasionally support a finding of actual malice in combination with other clear and convincing evidence, but

"standing alone ... [it] is not sufficient to establish actual malice." *Celle*, 209 F.3d at 183. The actual malice standard focuses not "on the defendant's attitude toward the plaintiff," but rather "on the defendant's attitude toward the truth," so Grand's feelings toward Coleman do not speak to actual malice. *Konikoff*, 234 F.3d at 99. At any rate, authorizing a friend to share her letter does not show she knowingly or recklessly disregarded the truth of that letter, just that she wanted others to read it.

Grand further refutes a finding of actual malice by stating that she wrote her email and letter only from first-hand knowledge, carefully edited it with friends before sending and, albeit naively, hoped to contain its distribution. Def.'s Opp'n Mem at 27; Pl.'s 56.1 ¶ 17; Dkt. 82-13 at 50–69. At bottom, Coleman fails to meet his burden to show, by clear and convincing evidence, that Grand acted with actual malice and, as a result, he cannot prevail on his defamation claim against her.[4] But, importantly, it is not the only reason.

### *B. Statements of Opinion*

Because falsity is an element of a libel claim, a statement must consist of falsifiable facts in order to be actionable. Opinions, by contrast, are constitutionally protected. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993). Coleman argues Grand's statement consists of falsifiable, and false, facts about him, while Grand maintains she was sharing her subjective opinions on their relationship. *See* Def.'s Mem. at 17–25; Pl.'s Reply at 2–6. To determine which is correct, it must be asked "whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." *Immuno AG.*, 77 N.Y.2d at 254. Although this question can prove difficult to answer, it is one of law, properly—and preferably—decided by the Court on summary judgment. *Id.* at 256. In this decisional framework, Coleman bears the burden to show the challenged statement is fact, not protected opinion. *Celle*, 209 F.3d at 179.

To determine whether Grand's statements are protected opinion, the Court examines:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers

or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross,* 82 N.Y.2d at 153 (internal citations and quotations omitted).

To begin, some of Grand's language has a precise meaning and some does not. Taking, for example, her statements about meeting Coleman, "I met him at 17 at a workshop" clearly has a precise meaning, while "I also felt this really strong sexual vibe coming from him in the way he looked at me" does not. Grand Letter at 2. Second, some of Grand's statements are capable of being proven true or false, and others are not. For example, Coleman takes issue with her line, "About 6 months after I moved to New York in 2011, he convinced me to be intimate with him." *Id.* at 4. Yet whether Coleman persuaded Grand to sleep with him, as she says, or whether Grand pursued him to advance her career, as he says, is not determinable by this Court. These are "inherently subjective evaluations of intent and state of mind, which are matters not readily verifiable and intrinsically unsuitable as a foundation for defamation." *Cummings v. City of New York,* 2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020). Additionally, other statements are both verifiable and undisputed, such as the basic timeline of their relationship.

**\*11** Third, the full context of Grand's email and letter supports a finding that readers are likely to consider them as opinion. In undertaking this critical, and dispositive, prong of the analysis, the Court is mindful that the "hypertechnical parsing of a possible 'fact' from its plain context of 'opinion' " imperils "the cherished constitutional guarantee of free speech." *Immuno AG.,* 77 N.Y.2d at 256. Importantly, an opinion does not become actionable because its author includes supporting facts. An opinion that offers "a full recitation of the facts on which it is based is readily understood by the audience as conjecture" and allows readers to make up their own minds, so is nonactionable. *Gross,* 82 N.Y.2d at 154. Conversely, an opinion that implies the existence of undisclosed facts is actionable, as readers are likely to assume those facts are unfavorable to the statement's subject. *Id.* at 153–54.

In evaluating the competing contentions, the summary judgment court first looks to "the full context of the communication in which the statement appears." *Id.* at 153. Grand frames her statements as personal opinions on her turbulent relationship with Coleman, and adds supporting facts. Her email begins, "There's been lots of talk[ ] about sexism in the music industry. I wrote a long letter about my

experience with it." Grand Email at 2. She writes that she hopes to "be the start of a larger conversation about what's acceptable and what's not." *Id.* She starts her letter similarly, writing "[t]here's been a lot of talk about sexism lately, and I feel that I should speak up about the way sexism has affected me." Grand Letter at 2. These statements create a context in which Grand's letter is read as describing her subjective experience, allowing readers to decide for themselves "what's acceptable."

Coleman counters that the letter cannot be read as opinion because it falsely alleges criminal sexual misconduct, pointing to Grand's mentions of "sexual harassment," an "abusive dynamic" and being a "victim," among similar statements. Pl.'s Reply at 3–4. Yet the letter's full context remains one of opinion supported by disclosed facts, and its language is more nuanced than Coleman claims. For example, Grand says, "I don't intend to cast myself as only a victim of the situation" but "I do want to shed light on the strange process that happens when you enter this type of abusive dynamic and how this dynamic is embedded in the sexism that goes through our society." Grand Letter at 2. This line is consistent with a letter sharing personal opinions on a difficult relationship and related societal issues.

Furthermore, Grand does not allege criminal, non-consensual sex, as Coleman claims. She describes experiencing "sexual harassment," but recounts only instances in which Coleman tried to convince her to have sex but gave up after she refused —not instances in which he persisted despite her refusal. And, Grand supports her assertion that she was harassed by disclosing relevant facts.[5] Even if she had alleged criminal conduct, and even though allegations of sexual harassment can be actionable, Grand's letter remains protected opinion. Just as "assertions that a person is guilty of 'blackmail,' 'fraud,' 'bribery' and 'corruption' could, in certain contexts, be understood as mere, nonactionable 'rhetorical hyperbole' or 'vigorous epithet[s]' " or, "even when uttered or published in a more serious tone," nonactionable if based on disclosed facts and framed as "personal surmise built upon those facts," indeed a claim of harassment supported by facts can be protected opinion. *Gross,* 82 N.Y.2d at 155; *see also Melius v. Glacken,* 94 A.D.3d 959, 961, 943 N.Y.S.2d 134 (2d Dep't 2012) (finding statement that plaintiff was "extortionist" nonactionable where supported by factual statement that "plaintiff's lawsuit was seeking an amount 'far in excess of the appraised value' of the property.' "). Reading the language Coleman quotes in the context of the full letter— which begins and ends by saying it is a personal narrative and

adds supporting facts in the middle—supports a finding that the letter is protected opinion.

**\*12** Last, the Court pans out to review "the broader social context and surrounding circumstances." *Gross*, 82 N.Y.2d at 153. Coleman contends that readers aware of the #MeToo movement would see Grand's statements as factual, since the movement's "greatest weapon" is making factual accusations "to out and ostracize sexual abusers." Pl.'s Reply at 8. Yet while the movement inspired some to make factual, verifiable assault claims, it led others to opine on complex topics like the role of sex in professional relationships. From their first lines, Grand's email and letter tell readers she is doing the latter, adding her narrative to industry-wide talks. Additionally, "the surrounding circumstances make clear both that plaintiff and defendant[ ] have had a turbulent relationship and that the recipients of the e-mail were aware of the ongoing disputes between them," cutting against the notion that readers would see the email as conveying objective facts. *Kidd v. Epstein*, 79 A.D.3d 650, 651, 915 N.Y.S.2d 38 (1st Dep't Dec. 28, 2010). Considering Grand's statements in all their context, the Court finds they are protected opinion as a matter of law. For this reason too, summary judgment must be awarded to Grand on Coleman's libel claim.[6]

## II. Grand's Defamation Counterclaim

Now, for the flip side, subject to the same legal standards used to evaluate his libel claim against her, Coleman moves for summary judgment on Grand's defamation counterclaim. Pl.'s Mem. at 16. Grand defends by arguing that two of Coleman's communications were defamatory. Def.'s Opp'n Mem. at 28–31; *cf.* Ans. to Am. Compl. ¶¶ 75–92. First in the spotlight is Coleman's May 5, 2018 email to over 80 recipients, addressed to the We Have Voice Collective, which asserted that Grand made "false accusations," "was consciously trying to manipulate emotions of sympathy from the recipients of her letter" and "deliberately left [ ] out" the "sexual aggression on her part." Def.'s Opp'n Mem. at 28 (quoting Coleman Email at 2–3). Coleman's communication explanation explained that he wrote to "stop the bullying, intimidation, black-balling and lying from continuing." *Id.* (quoting Coleman Email at 3). Second on Grand's target list is Coleman's October 24, 2018 Facebook post claiming Grand "covertly spread misinformation," "deliberately lied" about their relationship and "co-opt[ed] the very necessary, warranted and powerful #MeToo movement." *Id.* at 28–29 (quoting Dkt. 87-24 at 1). Coleman responds only that Grand

did lie, so he did not defame her by saying so. Pl.'s Mem. at 16.

Here, too, the fact versus opinion distinction is dispositive.[7] Grand claims that, unlike her own letter, Coleman's is factual because it says she "ma[de] false accusations" of sexual harassment. Courts considering similar statements have found some actionable and others protected opinion, depending on their context. *See Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 151 (S.D.N.Y. 2016); *Schmitt v. Artforum Int'l Magazine, Inc.*, 178 A.D.3d 578, 588, 115 N.Y.S.3d 291 (1st Dep't 2019).

Like Grand's letter, Coleman's uses both language that is capable of precise meaning and falsifiable, and language that is not. Some of the lines Grand challenges as libelous are unverifiable speculation on her motives, such as Coleman's statement that she "was consciously trying to manipulate emotions of sympathy from the recipients of her letter" by omitting her "sexual aggression." Def.'s Opp'n Mem. at 28 (quoting Coleman Email at 3); *see also Cummings*, 2020 WL 882335, at \*22.

**\*13** Also like Grand's letter, the letter's immediate and broader social context signal to readers that the letter contains opinion, not fact. *Gross*, 82 N.Y.2d at 153. Coleman introduces his letter by saying that while he had "hesitated in publicly telling my side of the story," he believed he "must speak up now or forever allow hers to be the only on-the-record narrative," giving readers "both sides of the story." Coleman Email at 2. He ends by inviting readers' responses, saying he "cannot control what each of you will think about this" but is "open to dialogue." *Id.* at 3. As in Grand's letter, this framing indicates to readers that Coleman is offering his version of the story and expects readers to have their own views.

The social context bolsters this conclusion. Coleman wrote to recipients of Grand's letter and others he thought had read it, so readers were likely aware of their rocky relationship and sharply divergent perspectives. *See Kidd*, 79 A.D.3d at 651. For any who were not, the letter provides this context, saying their relationship was "unusual, intense, argumentative and passionate" and "did not end well." Coleman Letter at 2. His references to the #MeToo movement, such as "the rights of individuals being accused," further signal that he is voicing his opinion on controversial topics. *Id.* at 3.

Further, Coleman disclosed the facts supporting his assertion that Grand's claims were false. The body of the letter describes

consensual sexual encounters, and the "addendum" contains text messages with Grand about those encounters. *Cf. McKee,* 874 F.3d at 63 (finding letter nonactionable because it "adequately disclosed the non-defamatory facts underlying [defendant's] assertions," including "citations to articles and other sources" and "extensive underlying facts"). Coleman does not imply the existence of undisclosed facts. He says he has not included all of their texts, but readers would not expect him to, nor draw adverse inferences against Grand because he did not. *See id.; Gross,* 82 N.Y.2d at 153.

In much the same way, Coleman's October 24 Facebook post is also protected opinion. It is a mix of precise, falsifiable statements and vague, unverifiable allegations as to Grand's motives in "covertly spread[ing] misinformation" to "ruin my reputation." Dkt. 87-24. Coleman frames the post as one sharing his side of the story, saying he and Grand were "presenting our evidence" and respective "positions." *Id.* He shares his opinion on the #MeToo movement, calling it "very necessary" but accusing Grand of "co-opting" it. *Id.* He calls Grand's claims false, but discloses the supporting facts—this time by excerpting the complaint in this action. He includes almost all of the complaint, and correctly notes that it is a matter of public record, so does not imply the existence of undisclosed facts. With each of Coleman's challenged statements falling, like Grand's, into the category of nonactionable protected opinion, Coleman is entitled to summary judgment on Grand's defamation counterclaim.

Grand's counterclaim also fails as to the Facebook post under the same amended New York anti-SLAPP statute she invoked in her defense. Her claim is an "action involving public petition and participation," as it is based on a "communication in a place open to the public or a public forum in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a); *see also id.* § 76-a(1)(b) (including counterclaims); *Palin,* 2020 WL 7711593, at *2. Facebook is a public forum within the meaning of New York's anti-SLAPP law, just as it is under other states', and Coleman posted on his public Facebook page, generating dozens of comments. *See* Dkt. 87-24; *Stark v. Lackey,* 136 Nev. 38, 42, 458 P.3d 342, 346 (2020) (finding Facebook public forum under Nevada's anti-SLAPP law); *Cross v. Facebook, Inc.,* 14 Cal. App. 5th 190, 222 Cal. Rptr. 3d 250, 258 (2017) (same, under California's, since Facebook and the pages at issue were "accessible to anyone who consents to Facebook's Terms"); *Cevetillo v. Lang,* No. 19-CV-6031687 (TRT), 2019 WL 7597451, at *5 (Conn. Super. Ct. Dec. 13, 2019) (same, under Connecticut's); *see also Packingham v. North Carolina,* 137 S. Ct. 1730,

1737, 198 L. Ed. 2d 273 (2017) (calling Facebook and other social networking sites the "modern public square"); *Knight First Amendment Inst. at Columbia Univ. v. Trump,* 928 F.3d 226 (2d Cir. 2019) (finding President Trump's use of his Twitter account created public forum). Coleman's post addresses the #MeToo movement which, as discussed above, is an issue of public interest. *See* Dkt. 87-24 at 1; *Elliott,* 469 F. Supp. 3d at 51. Grand therefore must prove by clear and convincing evidence that Coleman acted with actual malice —that he knowingly or recklessly made false statements in his Facebook post. N.Y. Civ. Rights Law § 76-a(2). She fails to argue Coleman is liable under any fault standard, so cannot meet her burden to show actual malice. *Cf. Celle,* 209 F.3d at 183. For this additional reason, Grand's defamation counterclaim fails as a matter of law.

### III. Grand's IIED Claim

**\*14** Last, Coleman moves for summary judgment on Grand's IIED claim, in which Grand alleges he "repeatedly and continually attempted to intimidate and distress [her] because she refused to engage in sexual acts with [him] and because she wrote the Letter." Ans. to Am. Compl. ¶ 95; Pl.'s Mem. at 17–19. Under New York law, an IIED claim has four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir. 1996).

Clearly, IIED "is a highly disfavored cause of action under New York law, one that is almost never successful." *Collins v. Giving Back Fund,* No. 18-CV-8812 (CM), 2019 WL 3564578, at *14 (S.D.N.Y. Aug. 6, 2019). Claims typically fail as a matter of law on the first element. *See Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). " ' Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir. 1999) (quoting *id.* at 122). Even showing a defendant acted with tortious, criminal or malicious intent is insufficient. *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Grand does not clear this high bar. She claims Coleman used his age and prominence to "manipulate" her into a sexual relationship; that he threatened her career, "withheld performance opportunities" and "yelled at her" when she declined sex; and attended her shows "knowing that his

presence would distress" her and refused to leave when asked. Ans. to Am. Compl. ¶¶ 96–98. She alleges that, after she wrote the letter, Coleman directed others to "repeatedly bully and threaten [her] with public legal action" in emails, texts and on social media, and engaged in "continued harassment." *Id.* ¶¶ 99, 103; Def.'s Opp'n Mem. at 31–32.

Grand correctly notes that sexual harassment can form the basis for an IIED claim, provided "the continuous nature of the conduct [ ] make[s] it so outrageous and extreme as to be actionable." *Bonner v. Guccione*, 916 F. Supp. 271, 276–77 (S.D.N.Y. 1996); Def.'s Opp'n Mem. at 31. However, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities" are insufficiently "outrageous" to constitute IIED. *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) (quoting *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009)).

While the record shows Coleman and Grand had a difficult relationship that left lasting marks on each, it does not, as a matter of law, reflect acts meeting the exceedingly high

bar required to constitute IIED. Further, to the extent Grand's IIED claim is based on alleged libel by Coleman or others responding to her letter, "defamatory statements generally cannot [be pleaded as] the extreme and outrageous behavior required" by New York law to assert an IIED claim. *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014). The Court therefore grants summary judgment for Coleman on Grand's IIED claim.

## Conclusion

For the foregoing reasons, both parties' defamation claims and Grand's IIED counterclaim fail as a matter of law, and the respective cross-motions of the parties are resolved correspondingly. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**\*15** So Ordered.

## All Citations

--- F.Supp.3d ----, 2021 WL 768167

## Footnotes

1   Grand also brought and dropped a claim for "loss of employment and/or other income." *See* Ans. to Am. Compl., Dkt. 25, ¶ 93–94; Def.'s Opp'n Mem., Dkt. 93, at 28 n.149.

2   The relevant facts are drawn from the amended complaint, the parties' Local Rule 56.1 statements and their submissions on the motions for summary judgment, and are reviewed in the light most favorable to the nonmoving parties. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007). Any factual disputes are noted.

3   The parties do not dispute that Grand's letter was of and concerning Coleman and that she published it to third parties.

4   Nor could Coleman show Grand acted grossly irresponsibly in sending her letter—the longstanding fault standard applied to matters of public concern under New York law. *Konikoff*, 234 F.3d at 101. That standard is objective, requiring a plaintiff to show by a preponderance of the evidence that the defendant spoke without "due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Id.* (quoting *Chapadeau*, 38 N.Y.2d at 199). Neither of Coleman's evidentiary proffers shows gross irresponsibility, especially given that Grand's motives are irrelevant under this objective standard.

5   Coleman argues that Grand implied the existence of undisclosed facts by offering to show text messages to interested readers as "proof." Pl.'s Reply at 3–4. Yet by saying the texts are "proof for most of what [she] is talking about here," Grand implies that they support exactly the facts described in the letter, not some other set of undisclosed allegations. The law does not require that Grand include all primary source material, just that she recite the facts supporting her opinions, which she does. *Gross*, 82 N.Y.2d at 153.

6   Because the Court finds Coleman fails on the fault and falsity elements, it declines to reach the question of injury.

7   Unlike in the briefing on Coleman's claim, in the briefing on Grand's defamation counterclaim, the parties do not address the applicable fault standard. While Grand is not famous enough to be a general purpose public figure, her participation in the public controversy of the music industry's #MeToo movement could render her a limited purpose public figure on that topic. The burden to establish public figure status rests on the defendant, however, and Coleman has made no such showing here. *See Krauss*, 251 A.D.2d at 192.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.